JUDGE TIFFANY M CARTWRIGHT

1

2

3

4

5

6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

7

LAURIE PYNE,

8                              Plaintiff,

9    v.

10   CENTRALIA COLLEGE, a state community
     college; ROBERT MOHRBACHER,
11   individually and in his official capacity as the
     Chief Executive Officer of Centralia College;
12   JANE DOE MOHRBACHER, husband and
     wife and the marital community composed
13   thereof; WASHINGTON STATE
     DEPARTMENT OF CORRECTIONS, a
14   Washington Agency; DAN WHITE,
     individually and in his official former capacity
15   as the Superintendent of Washington
     Corrections Center; CHERYL STRANGE,
16   individually and in her official capacity as the
     Secretary of the Department of Corrections;
17   and JANE AND JOHN DOES,

18                              Defendants.

No. 3:24-cv-05954-TMC

DECLARATION OF A.
KHANDELWAL IN SUPPORT OF
DEFENDANTS' MOTION FOR
JUDGMENT ON THE PLEADINGS

NOTE ON MOTION CALENDAR:
MARCH 14, 2025

WITHOUT ORAL ARGUMENT

19          I, Anita Khandelwal, declare as follows:

20          1.       I am an attorney at Pacifica Law Group LLP and counsel of record for Defendant

21   in this matter.  I am over the age of eighteen, competent to testify, and make this declaration

22   based on my personal knowledge.

23   DECLARATION OF ANITA KHANDELWAL IN
     SUPPORT OF DEFENDANTS'S MOTION FOR
24   JUDGEMNT ON THE PLEADINGS - 1
     No. 3:24-cv-05954-TMC

25

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

2.      Attached as **Exhibit A** is a true and correct copy of Plaintiff's Professional Personnel Contract.

3.      Attached as **Exhibit B** is a true and correct copy of the Collective Bargaining Agreement between the Board of Trustees of Centralia College and the Centralia College Federation of Teachers, Local Number 4469, AFT/AFL-CIO.

4.      Attached as **Exhibit C** is a true and correct copy of the Administrative Law Judge's Recommended Decision in *In re Laurie Pyne*.

5.      Attached as **Exhibit D** is a true and correct copy of Plaintiff's Notice of Petition for Judicial Review of the Board of Trustees' order dismissing her in Lewis County Superior Court, 23-2-00473-21.

6.      Attached as **Exhibit E** is a true and correct copy of the Administrative Law Judge's Order on Motion to Strike, Extend Deadlines, and for Declaratory Relief.

7.      Attached as **Exhibit F** is a true and correct copy of the Order Denying Plaintiffs' Motion for Injunction or Writ of Prohibition (PI Motion) in *Cleary v. Inslee*, No. 21-2-01674-34 (Thurston Cnty. Super. Ct. Oct. 19, 2021). Pacifica Law Group represented the defendants in that case.

8.      Attached as **Exhibit G** is a true and correct copy of the Verbatim Report of Proceedings from the October 18, 2021, hearing on the plaintiffs' PI Motion in *Cleary*, *supra* ¶ 7.

9.      Attached as **Exhibit H** is a true and correct copy of the Order Granting in Part and Denying in Part Defendants' Motion for Judgment on the Pleadings entered on December 10, 2021, in *Cleary*, *supra* ¶ 7.

DECLARATION OF ANITA KHANDELWAL IN
SUPPORT OF DEFENDANTS'S MOTION FOR
JUDGEMNT ON THE PLEADINGS - 2
No. 3:24-cv-05954-TMC

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

1    10.    Attached as **Exhibit I** is a true and correct copy of the Order Denying Plaintiffs'

2    Motion for Preliminary Injunction (PI Motion) in *Mattila v. City of Seattle*, No. 22-2-14316-9

3    (King Cnty. Super. Ct. Oct. 12, 2022). Pacifica Law Group represented the defendants in that

4    case.

5    11.    Attached as **Exhibit J** is a true and correct copy of the Verbatim Report of

6    Proceedings from the October 12, 2022, hearing on the plaintiffs' PI Motion in *Mattila*, *supra* ¶

7    10.

8    I declare under penalty of perjury that the foregoing is true and correct.

9    EXECUTED this 14th day of February, 2025 at Seattle, Washington.

10    _s/ Anita Khandelwal_____
      Anita Khandelwal

11

12

13

14

15

16

17

18

19

20

21

22

23    DECLARATION OF ANITA KHANDELWAL IN
      SUPPORT OF DEFENDANTS'S MOTION FOR
24    JUDGEMNT ON THE PLEADINGS - 3
      No. 3:24-cv-05954-TMC

PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WASHINGTON  98101-3404
TELEPHONE: (206) 245-1700
FACSIMILE: (206) 245-1750

25

# EXHIBIT A



# CENTRALIA
## C O L L E G E

## PROFESSIONAL PERSONNEL CONTRACT

This contract is entered into by and between the Board of Trustees of Community College District Twelve, State of Washington, hereafter referred to as the board, and **Laurie  Pyne**, hereafter referred to as the employee, for employment at **Garrett Heyns Education Center**. The parties hereby agree to the following terms and conditions:

1.  Employment for the basic position is for the college year 2021-2022, consisting of 177 days; employee's service to begin on **July 1, 2021**, and to terminate on **June 30, 2022**, exclusive of authorized holidays and leave.

2.  a.  Employee's status and remuneration:  **Tenured Faculty Appointment**
    b.  Basic Position:  **Associate Professor, Salary Grade G**                       $54,672.00
        Extended Term:      **5 Extra Days**                                           1,544.40
                                                                                           .00

        Additional Assignments:

    c.  Total Compensation:                                                         $56,216.40

3.  This offer of employment is made subject to all terms, conditions, and policies of the Board of Trustees, the State Board for Community College Education, the applicable portions of any negotiated agreement in existence during the period of time covered by this contract, and all federal and state laws; and such rules, regulations, policies, agreement, and laws as are now or hereafter adopted and/or amended which relate to the employee's performance of this professional contract, so long as any policies adopted by the Board of Trustees do not conflict with any provision in any negotiated agreement in existence during the period of time covered by this contract.

4.  Nothing herein shall be construed to preclude granting a salary increase in addition to the salary set forth in this contract, contingent upon legislative appropriation and constrictive constraints therefore and provided such action is consistent with the adopted board policies and any negotiated agreement in existence during the period of time covered by this contract between the board and the duly recognized representative of the academic employees.  In addition, nothing herein shall be construed to preclude salary reductions or other changes in conditions of employment if required by the laws of Washington State Legislature or the rules of the State Board for Community College Education provided that all statutes, rules, policies and contract provisions pertaining to reductions are followed.

5.  This contract will recognize fully all applicable provisions of any negotiated agreement between the board and the duly recognized representative of the academic employees in existence during the period of time covered by this contract.

6.  This offer of employment shall remain open and effective only until **5:00 p.m.** on the **2nd** day of **July, 2021.** It may be accepted only by signing the same and delivering it to the office of the College President/Designee on or before the above date and time, accompanied with any certificates required by the laws of the State of Washington or rules of its agencies as a condition(s) to employment in the designated capacity.

_____
Employee

6-1-2021
_____
Date

_____
College President/Designee

7/15/21
_____
Date

# EXHIBIT B



# 2020-2023
# AGREEMENT

## By and Between the

# Board of Trustees of Centralia College District XII

## and the

# Centralia College Federation of Teachers
## Local Number 4469
## AFT/AFL-CIO

# TABLE OF CONTENTS

ARTICLE I:  DEFINITIONS...................................................................................................................1

ARTICLE II:  RECOGNITION OF RIGHTS AND FUNCTIONS OF THE FEDERATION OF TEACHERS ...................................2

SECTION 1. PAYROLL DEDUCTIONS. ...................................................................................................2
SECTION 2. RIGHTS OF FACULTY IN FEDERATION. ................................................................................2
SECTION 3. RELEASE TIME FOR FEDERATION ACTIVITIES.......................................................................2
SECTION 4. RELEASE TIME FOR FEDERATION PRESIDENT. .....................................................................2
SECTION 5. PREPARATION FOR NEGOTIATIONS. ..................................................................................3
SECTION 6. MEETING ROOMS FOR FEDERATION BUSINESS. ..................................................................3
SECTION 7. REPRESENTATION AT BOARD MEETINGS. ...........................................................................3
SECTION 8. DISTRIBUTION OF COMMUNICATIONS. ..............................................................................3
SECTION 9. FEDERATION NOTICES. ...................................................................................................3
SECTION 10. NOTIFICATION OF CHANGES. .........................................................................................4
SECTION 11. FEDERATION BUSINESS. ................................................................................................4
SECTION 12. USE OF FACILITIES. ......................................................................................................4
SECTION 13. INFORMATION. ............................................................................................................4

ARTICLE III:  RECOGNITION OF RIGHTS AND FUNCTIONS OF EMPLOYER .................................................4

ARTICLE IV:  NONDISCRIMINATION ..................................................................................................5

ARTICLE V:  ACADEMIC FREEDOM AND PARTICIPATION BY FACULTY IN COLLEGE GOVERNANCE ..........................5

SECTION 1. ACADEMIC FREEDOM.....................................................................................................5
SECTION 2. PARTICIPATION IN COLLEGE GOVERNANCE. .......................................................................5

ARTICLE VI:  FACULTY RIGHTS AND BENEFITS......................................................................................5

SECTION 1. PERSONNEL FILES.........................................................................................................5
SECTION 2. INSURANCE. .................................................................................................................5
SECTION 3. APPLICATION OF TENURE. ..............................................................................................6
SECTION 4. TERMINATION OF EMPLOYMENT. .....................................................................................6
SECTION 5. ON-CAMPUS CLASS ATTENDANCE. ..................................................................................6
SECTION 6. SUBSTITUTING. ............................................................................................................6
SECTION 8. EVENING ASSIGNMENTS. ...............................................................................................7
SECTION 9. ADJUNCT INTERVIEW RIGHTS. ........................................................................................7
SECTION 10. ADJUNCT "FAQ" DOCUMENT. ......................................................................................7
SECTION 11. TECHNOLOGY SUPPORT. ..............................................................................................7

ARTICLE VII:  COMPENSATION .........................................................................................................8

SECTION 1. SALARY SCHEDULE FOR FULL-TIME FACULTY. ....................................................................8
SECTION 2. PLACEMENT OF NEW FACULTY........................................................................................8
SECTION 3. CONTRACT YEAR. .......................................................................................................10
SECTION 4. ADVANCEMENT ON THE SALARY SCHEDULE FOR FULL-TIME AND PRO RATA FACULTY. .............10
SECTION 5. ACADEMIC RANK. ......................................................................................................11
SECTION 6. ADJUNCT/MOONLIGHT SALARY SCHEDULE. ....................................................................13
SECTION 7. COMPENSATION POOLS................................................................................................16
SECTION 8. METHOD OF CALCULATING EXTENDED CONTRACT COMPENSATION FOR ALL FACULTY. .............16
SECTION 9. STIPENDS. .................................................................................................................17
SECTION 10. BACHELOR OF APPLIED SCIENCE COMPENSATION. ..........................................................17
SECTION 11. NON-TRANSCRIPTED COURSE COMPENSATION. ..............................................................18
SECTION 12. FACULTY CHAIR. .......................................................................................................18
SECTION 13. OTHER. ...................................................................................................................19

**ARTICLE VIII: FACULTY PROFESSIONAL DEVELOPMENT OPPORTUNITIES**............................................................20

SECTION 1. FACULTY PROFESSIONAL DEVELOPMENT COMMITTEE.........................................................................20
SECTION 2. FACULTY PROFESSIONAL DEVELOPMENT PLAN. ...............................................................................20
SECTION 3. EXTENDED STUDIES. .................................................................................................................20
SECTION 4. PROFESSIONAL IMPROVEMENT CREDITS.........................................................................................22
SECTION 5. CURRICULUM DEVELOPMENT OPPORTUNITY. ..................................................................................23
SECTION 6. SABBATICALS. ...........................................................................................................................23
SECTION 7. REIMBURSED LEAVE....................................................................................................................26
SECTION 8. EXCEPTIONAL FACULTY AWARD PROGRAM......................................................................................27
SECTION 9. HANKE FACULTY ACHIEVEMENT AWARD..........................................................................................29

**ARTICLE IX: PROBATIONARY EMPLOYMENT AND TENURE** ...........................................................................30

SECTION 1. PURPOSE. .................................................................................................................................30
SECTION 2. DEFINITIONS. ............................................................................................................................30
SECTION 3. DUTIES AND RESPONSIBILITIES OF PROBATIONARY REVIEW COMMITTEES. ...........................................32

**ARTICLE X: PROFESSIONAL DUTIES AND WORKLOAD FACTORS** .................................................................34

**FOR FULL-TIME FACULTY**....................................................................................................................34

SECTION 1. PROFESSIONAL DUTIES. ..............................................................................................................34
SECTION 2. INSTRUCTIONAL WORKLOAD FACTORS. ..........................................................................................34
SECTION 3. GUIDELINES FOR FACULTY WORKLOAD ..........................................................................................35
SECTION 4. OTHER PROVISIONS. ...................................................................................................................37
SECTION 5. SPRING REVIEW. ........................................................................................................................38

**ARTICLE XI: DISTANCE EDUCATION** ......................................................................................................38

SECTION 1. DEFINITION................................................................................................................................38
SECTION 2. PARTICIPATION. .........................................................................................................................38
SECTION 3. TRAINING. .................................................................................................................................39
SECTION 4. FACULTY QUALIFICATIONS. ..........................................................................................................39
SECTION 5. WORKLOAD. ..............................................................................................................................39
SECTION 6. SUPPORT. .................................................................................................................................39
SECTION 7. COURSE DEVELOPMENT AND INTELLECTUAL PROPERTY RIGHTS. .......................................................40
SECTION 8. ONLINE ASSESSMENT. ................................................................................................................40
SECTION 9. NON-SUPPLANTING. ...................................................................................................................41

**ARTICLE XII: LEAVE OF ABSENCE** .........................................................................................................41

SECTION 1. LEAVES WITH PAY......................................................................................................................41
SECTION 2. LEAVES WITHOUT PAY.................................................................................................................44
SECTION 3. RIGHTS WHILE ON APPROVED LEAVE. ...........................................................................................44
SECTION 4. ADJUNCT FACULTY LEAVE. ..........................................................................................................44
SECTION 5. MOONLIGHT FACULTY LEAVE. ......................................................................................................45
SECTION 6. AUTHORIZED ABSENCES. .............................................................................................................46
SECTION 7. UNAUTHORIZED ABSENCES. .........................................................................................................46
SECTION 8. FAMILY AND MEDICAL LEAVE. ......................................................................................................46

**ARTICLE XIII: EVALUATION** ..................................................................................................................49

SECTION 1. TENURED FACULTY. ....................................................................................................................50
SECTION 2: FULL-TIME NON-TENURE TRACK AND PRO RATA FACULTY. ...............................................................54
SECTION 3: ADJUNCT FACULTY. ....................................................................................................................57

**ARTICLE XIV: RESOLUTION OF CONCERNS** .............................................................................................58

SECTION 1. TENURED, PROBATIONARY, FULL-TIME NON-TENURE TRACK AND PRO RATA.........................................58

SECTION 2: STUDENT CONCERNS. ...................................................................................................59

**ARTICLE XV: UNRESOLVED CONCERNS** .........................................................................................**60**

**ARTICLE XVI: DISMISSAL AND REDUCTION IN FORCE** ..................................................................**61**

SECTION 1. POLICY RELATING TO THE DISMISSAL OF TENURED AND PROBATIONARY FACULTY MEMBERS. ...................61
SECTION 2. INFORMAL HEARING. .....................................................................................................62
SECTION 3. NOTICE REQUIREMENTS .................................................................................................63
SECTION 4. PROCEDURAL RIGHTS OF AFFECTED FACULTY MEMBERS. .......................................................63
SECTION 5. HEARING OFFICE APPOINTMENT AND DUTIES. ....................................................................64
SECTION 6. DUTIES AND RESPONSIBILITIES OF THE DISMISSAL REVIEW COMMITTEES. ................................65
SECTION 7. FINAL DECISION BY THE BOARD OF TRUSTEES. ...................................................................66
SECTION 8. SPECIAL PROCEDURES RELATING TO DISMISSAL RESULTING FROM REDUCTION-IN-FORCE....................67
SECTION 9. DESIGNATION OF ADMINISTRATIVE APPOINTMENTS.................................................................71
SECTION 10. CONFIDENTIALITY OF REPORTS........................................................................................72

**ARTICLE XVII: GRIEVANCE** ..........................................................................................................**72**

SECTION 1. DEFINITION...................................................................................................................72
SECTION 2. TIME LIMITS.................................................................................................................73
SECTION 3. ARBITRATION. ..............................................................................................................73

**ARTICLE XVIII: UNINTERRUPTED INSTRUCTIONAL ACTIVITIES** .....................................................**74**

**ARTICLE XIX: ACADEMIC CALENDAR**............................................................................................**75**

**ARTICLE XX: ANNUAL MEETING** ..................................................................................................**75**

**ARTICLE XXI: SAVINGS CLAUSE** ...................................................................................................**75**

**ARTICLE XXII: SCOPE OF AGREEMENT** ..........................................................................................**75**

**ARTICLE XXIII: DURATION** ...........................................................................................................**76**

**APPENDIX "A" SPECIAL PROVISIONS FOR FACULTY MEMBERS ASSIGNED TO CORRECTIONS SITES** .....................**77**

**APPENDIX "B" EARLY RETIREMENT** ..............................................................................................**79**

# AGREEMENT

## By and Between the

## BOARD OF TRUSTEES OF CENTRALIA COLLEGE

## and the

## CENTRALIA COLLEGE FEDERATION OF TEACHERS
## Local Number 4469, AFT/AFL-CIO

This agreement is by and between the Board of Trustees of Centralia College, hereinafter called the "Employer," and the Centralia College Federation of Teachers, hereinafter called the "Federation."

The Employer hereby recognizes the Federation as the exclusive negotiation representative for all Centralia College faculty members as defined in RCW 28B.52 and/or listed in the compensation article of this Agreement. Excluded from the general provisions of this agreement are all community services employees.

## ARTICLE I:  DEFINITIONS

"Employer" shall mean the Board of Trustees or its lawfully delegated representative(s).

"College" shall mean Centralia College.

"President" shall mean the president of Centralia College or, in the president's absence, the acting president.

"Day" shall mean calendar day, unless otherwise stated.

"Full-time Faculty Member" shall mean a person expressly employed on a full-time contract based on one hundred seventy-seven (177) days; who is paid from the full-time salary schedule; who performs professional duties of a full-time faculty member; and who is generally available on campus thirty-five (35) hours a week for assigned activities for the number of contracted days during the applicable contract period. A full-time faculty member and the President may mutually agree in writing to an exception to this definition with no resulting penalty to the faculty member provided the equivalent to the above definition is worked.

"Corrections Site" shall mean any educational facility at a corrections site administered by Centralia College.

## ARTICLE II:  RECOGNITION OF RIGHTS AND FUNCTIONS OF THE FEDERATION OF TEACHERS

### Section 1.  Payroll Deductions.

The Employer shall, upon written authorization of the faculty member involved, provide payroll deduction of Federation membership dues for full-time faculty and adjunct faculty members. Such deductions shall be remitted to the authorized Federation representative.  Upon written authorization to the employer the faculty member may revoke dues deductions at any time.

The Federation agrees to indemnify the Employer and hold it harmless against any and all suits, claims, demands and liability for damages or penalties that arise out of or by reason of any action that shall be taken by the Employer for the purpose of complying with the foregoing provisions of this section provided such action has been authorized by the faculty member and such authorization has not been rescinded.

### Section 2.  Rights of Faculty in Federation.

The Employer will not interfere with the legal right of faculty members to organize, join, and support the Federation for whatever purpose in which it may legally engage.  The Employer agrees it will not discriminate against any faculty member because of membership in the Federation, because of participation in any lawful activity on behalf of the Federation, or because of any action taken within the duly established grievance procedure.

The Federation shall not discriminate against any faculty member for non-membership in the Federation.  The Federation further recognizes its responsibility as bargaining agent and agrees to represent all faculty members in the bargaining unit without discrimination, interference, restraint, or coercion.

### Section 3.  Release Time for Federation Activities.

Meetings between Employer representatives and Federation representatives shall be scheduled at a time mutually agreeable to the parties involved.  Both parties agree that to the extent feasible and practical such meetings shall not be scheduled so as to interfere with or interrupt the educational process of the College.  In instances where such scheduling is not possible, Federation representatives shall be allowed to attend such meetings provided that adequate coverage of their teaching responsibilities has been arranged.  The costs of such coverage, if any, shall be borne by the Federation.

### Section 4.  Release Time for Federation President.

A.  In recognition of the responsibilities of the Federation regarding faculty representation and matters related to this Agreement, the Employer agrees to provide the Federation President, or designee, a one-third (1/3) reduction in teaching load during fall, winter, and spring quarters.

B.  In recognition of the responsibilities associated with preparing for and participation in contract negotiations, the Employer agrees to provide the Federation President a one-half (1/2) reduction in teaching load for two quarters during such negotiations.

Section 5.  Preparation for Negotiations.

In recognition of the responsibilities associated with participating in contract negotiations, the Employer agrees that the annual schedule for a faculty member on the Federation negotiating team may be adjusted in the year of contract negotiations.  This schedule adjustment would only be at the faculty member's request.  As a courtesy, it is desirable that the request be made during the annual spring workload meeting the academic year before negotiations begin.

Section 6.  Meeting Rooms for Federation Business.

The Federation shall be permitted to use the College's facilities to hold meetings to transact official Federation business other than partisan political activities.  Room use shall be reserved through appropriate scheduling agents and shall be on the same priority and costs as other campus organizations.  There shall be no costs for meetings held on campus prior to 7:00 p.m. on class days.

Section 7.  Representation at Board Meetings.

An officially designated Federation representative or agent shall have the right to attend all regular or special meetings of the Board.  When recognized by the Chair, the representative may speak to any issue under discussion.  The Federation shall have the right to submit appropriate matters on the Board agenda through the Board Secretary.  Items to be included in the agenda shall be supplied in a reasonable length of time prior to the meeting and not later than two weeks before a scheduled Board meeting.  The Board Secretary shall transmit to the Federation President a copy of the official agenda, background information (excluding executive session and personnel matters), and minutes relating to all such meetings at the same time this material is transmitted to the Board.  Nothing in this section shall be construed to diminish the right of the Board to hold closed executive sessions excluding the Federation representative or agent within the guidelines established by law or at any meeting to transact business that is lawfully within its jurisdiction.

Section 8.  Distribution of Communications.

Copies of all communications distributed to all faculty members through a general mailing list by the Employer shall be supplied to the Federation at the same time.

Section 9.  Federation Notices.

The Federation shall have the right to use the College's communication services and faculty distribution boxes for communications to faculty members, including mass distributions, provided that the material clearly indicates that the Federation is the distributor of the material and that the material is related to the administration of this contract.  Representatives of the

Federation shall have the right to distribute material to faculty members within the College. This right shall include, but not be limited to, access to faculty distribution boxes.

Section 10. Notification of Changes.

In the event of changes affecting faculty members in policies and practices not covered by this Agreement or new policies not covered by this Agreement, the Federation, if it requests, shall have the opportunity to communicate the considered judgment of the faculty to the Board before the change is adopted. Upon request from the Federation, the Board Secretary shall provide the Federation with the requested information, and a reasonable estimate regarding the cost of implementation, provided, however, that this section shall not be construed to diminish or alter the rights of the Board to implement any changes not inconsistent with the terms of this Agreement.

Section 11. Federation Business.

Duly authorized representatives of the Federation shall be permitted to transact official Federation business on institution property at all reasonable times provided there is no disruption to the normal operation of the College.

Section 12. Use of Facilities.

College owned or rented equipment/software may be used by the Federation for its own purposes in accordance with the equipment rental schedule of the Employer. The Federation shall have the right to use other College equipment/software at reasonable times without cost when such equipment/software is not in use. The Federation shall use a physical bulletin board in each college mailroom as well as have access to electronic media, if available.

The Federation shall pay the actual costs of photocopies and long-distance telephone calls, and clerical help employed by the College may not be utilized by the Federation during working hours.

Section 13. Information.

Upon request, the Employer shall make available to the Federation, information to assist the Federation in performing its representative responsibilities. Such information shall be in the same form as is available to the general public or for internal college use.

## ARTICLE III: RECOGNITION OF RIGHTS AND FUNCTIONS OF EMPLOYER

The management of the College and the direction of the work force is vested exclusively with the Employer subject to the terms of this Agreement. All matters not specifically and expressly covered by the language of this Agreement may be administered for its duration by the Employer in accordance with such policies and procedures as it from time to time may determine.

## ARTICLE IV:  NONDISCRIMINATION

The parties agree that there shall be no discrimination against any faculty member because of race, sex, age, religion, color, ancestry, sexual orientation, physical or mental disability, marital status, nor in violation of current state and/or federal law unless on a bona fide occupation qualification, in the administration or application of the terms of this Agreement.

## ARTICLE V:  ACADEMIC FREEDOM AND PARTICIPATION BY FACULTY IN COLLEGE GOVERNANCE

Section 1.  Academic Freedom.

Each faculty member is entitled to freedom in the classroom in the discussion of the subject he/she teaches.  Each faculty member is a citizen and, as such, has the same rights as other citizens.

Section 2.  Participation in College Governance.

The Employer recognizes the requisite expertise and ability of the faculty to provide valuable input regarding many of the decisions that the Employers must make from time to time.  It is agreed that a procedure shall be maintained that allows input of the considered judgment of the faculty when appropriate.

## ARTICLE VI:  FACULTY RIGHTS AND BENEFITS

Section 1.  Personnel Files.

Copies of materials in official personnel files shall be confidential and shall be restricted for use to formal institutional meetings, normal administrative requirements or when otherwise required by law.  Excluding credential and confidential recommendations from previous employers, faculty members, or their designee, shall have access to all material in their personnel files during normal business hours.  A faculty member shall be notified of any oral or written request for access to his/her personnel files, except as excluded above.  Official personnel files shall be maintained in the college personnel office.  Upon forty-eight (48) hours' notice and payment of actual costs, copies of material in personnel files may be made.  Material that might adversely affect employment may be placed in a personnel file only after allowing the faculty member to read the material and append to it answers to any charges, complaints, or statements involved.  The faculty member shall then sign the material, but such signature shall not imply agreement with the statements contained therein.  A faculty member may petition the appropriate administrator to have any such material removed from the personnel file.  The material shall be removed after six (6) years.

Section 2.  Insurance.

The Employer shall contribute up to the maximum amount authorized by law and the Public Employees Benefits Board (PEBB) for allowable group insurance plans for each eligible faculty

member.  Faculty members shall have the opportunity to self-pay such contributions during leaves without pay.  All premiums in excess of the amount allowed by law shall be borne by the faculty member.  Such premiums shall be paid during summer months for such eligible faculty who are returning to work for the subsequent academic year.

Consistent with applicable Public Employees Benefits Board regulations, an adjunct faculty member shall be eligible for PEBB approved plans beginning the second consecutive quarter in which the assignment is one-half (.5) of an FTEF or more, in the case of counselors and librarians where the assignment is 17.5 hours per week or more at the College or when the combination of assignments at the College and other post-secondary institutions exceeds half-time.  Half-time will be determined based on each college's definition of "full-time".

At the beginning of each quarter, the College shall notify, in writing, all current and newly hired adjunct faculty of their potential right to PEBB approved benefits.

The adjunct faculty member is responsible each quarter to notify the college in writing of multiple employment status and to request a determination of their eligibility status.  (WAC 182-12-115(5)(a))

As provided for by law, unemployment insurance shall be maintained for faculty members.

Section 3.  Application of Tenure.

The Federation agrees that the ultimate authority to grant or deny tenure is vested with the Board.  The Board agrees that any decision to grant or deny tenure which is contrary to the Probationary Review Committee recommendations shall be immediately disclosed to both the probationer and applicable Probationary Review Committee.  It is further agreed that any and all decisions relating to the awarding or withholding of tenure as well as the non-renewal or renewal of individual contracts including all decisions relating to the dismissal or discharge of a faculty member shall not be subject to the grievance procedure of this Agreement.

Section 4.  Termination of Employment.

Terminations of employment of full-time faculty members during the term of their employment shall be handled in a manner consistent with Article XVI.  It is agreed that such provides a means for resolving disputes regarding terminations and that such disputes shall not be subject to the grievance procedure of this Agreement.

Section 5.  On-Campus Class Attendance.

A faculty member may request, of the Employer, permission to be allowed to attend classes on campus without loss of pay.  This shall not be construed to reduce the amount of time normally expected of a faculty member.

Section 6.  Substituting.

Full-time faculty members shall not be required to substitute as part of their regular assignment. Payment for substitute activities shall be in accordance with Article VII, provided such activities are assigned and authorized in advance by the appropriate Dean/Director.

Section 7.  Off-Campus Transfers.

Assignments of full-time faculty members to an off-campus assignment shall be made only if such assignment is necessary in order for the instructor to maintain a normal load or to maintain a program.  The College shall pay mileage or provide a College vehicle in accordance with appropriate statutory requirements of OFM regulations when a faculty member is assigned to an off-campus location.

Section 8.  Evening Assignments.

Assignments after 4:00 p.m. shall be assigned as part of a full-time faculty member's assignment only when such assignment is essential to make up the total normal load of the individual or program.  Such assignments shall rotate by quarter and by faculty member in that program provided no individual faculty member has volunteered.

Section 9.  Adjunct Interview Rights.

An adjunct faculty member who applies for an open full-time position and who fully completes the application process will be granted an interview.

Section 10.  Adjunct "FAQ" Document.

At the beginning of each quarter, the College shall provide all adjunct faculty members with a "frequently asked questions" document.  The Vice president of Instruction and the Federation President, or their designees, will develop and annually update this document.

Section 11.  Technology Support.

Faculty members will not be required to teach a course for which they do not have the requisite technology.  Faculty members will be given access to an office or work area computer station that has appropriate, functioning software, and adjunct faculty members will have technical resources made available that are comparable to full-time faculty members.  Faculty members are responsible for notifying their appropriate supervisor of technical resource needs.

## ARTICLE VII:  COMPENSATION

Section 1.  Salary Schedule for Full-time Faculty.

| Salary Step | Salary |
|-------------|--------|
| G | 53,758 |
| H | 55,844 |
| I | 57,933 |
| J | 60,023 |
| K | 62,118 |
| L | 64,210 |
| M | 66,298 |
| N | 68,040 |
| O | 69,785 |
| P | 71,457 |
| Q | 73,578 |
| R | 74,911 |
| S | 76,241 |
| T | 77,569 |
| U | 78,897 |
| V | 80,226 |
| W | 81,554 |
| X | 82,886 |
| Y | 84,215 |
| Z | 85,544 |

Section 2.  Placement of New Faculty.

Faculty members hired by the College on or after the effective date of this Agreement shall be placed on the Salary Schedule in accordance with the following provisions:

A.  Initial Placement.  Initial placement on the faculty salary schedule will be determined by the President in conjunction with the Vice president of Human Resources.

Full-time faculty will be placed at step G on the salary schedule for meeting the first of the following criteria for which they qualify:

1.  Master's degree.

2.  Bachelor's degree plus sixty (60) college credits or two (2) years' relevant experience, or combination thereof.

3.  Associate degree plus four (4) years of recent and relevant work experience.

4. A combination of a journey-level certificate and recent experience in the trade or occupation totaling six (6) years.

5. Six (6) years of current practical experience in the trade or occupation in which the person will teach.

6. Education, experience, and full-time teaching which equates to any combination of (1) through (6) above.

Initial placement beyond step G will be based on additional salary credits as defined below. Fifteen (15) salary credits are required for each step advancement. Salary credits will be allowed only in excess of those required for placement at step G.

7. One (1) salary credit for each academic quarter credit hour up to a maximum of ninety (90) academic credits.

8. One (1) salary credit for each ten (10) hours of appropriate and relevant industry training related to a professional assignment.

9. Five (5) salary credits for each full-time equivalent year of college-level teaching experience up to a maximum of six (6) years, thereafter, three (3) salary credits for each year of relevant experience. K-12 teaching experience shall count at the same rate as college-level teaching experience when the faculty member is hired to teach non-college-level classes (e.g. HSC, Basic Math, etc.). Otherwise, high-school-level teaching experience will be credited at half the rate of college-level teaching.

10. Five (5) salary credits for each full-time equivalent year of work experience directly related to the professional assignment beyond the minimum qualifications required in A above up to a maximum of six (6) years. Thereafter, three (3) salary credits for each additional year of work experience. High school teaching experience shall count as relevant work experience for faculty members hired to teach education classes. Elementary teaching experience shall count as relevant work experience for faculty members hired to teach education or early childhood education classes.

11. Full-time equivalence is defined as: teaching experience calculated as one hundred fifty (150) classroom hours equals one (1) quarter, and three (3) quarters equal one (1) year. As a counselor or librarian, three hundred fifty (350) hours of employment equals one (1) quarter. Three (3) quarters equals one (1) year.

12. New faculty members will not be placed higher than step O on the salary schedule.

New faculty members have forty-five (45) days from the date of notification of initial placement to provide documentation and/or request an amendment to that placement. Notification of initial placement shall be by certified mail return receipt requested. A fifteen (15) day extension may be requested but in no case shall the timeline by extended more than sixty (60) days past the first contracted day.

Any employment offer made by the College to prospective faculty members who begin their faculty assignment after the expiration of the current contract, not considering extensions, will be contingent on the outcome of negotiations which are in progress.

The Federation will be promptly notified of the salary placement of all new hires.

<u>Section 3.  Contract year.</u>

Individual faculty contracts, consistent with the President-approved calendar, shall be one hundred seventy-seven (177) days.  Contract days beyond one hundred seventy-seven (177) shall be compensated at 1/177 of the annual salary.  The Federation shall be notified in writing prior to any adoption or modification to the President-approved calendar.

Each full-time faculty member, and pro rata on a prorated basis, is entitled to five (5) days of faculty designated time.  These days may only be scheduled during non-instructional or non-advising days.  Requests for faculty designated days shall be approved by the appropriate supervisor.

Corrections faculty are not entitled to faculty designated time.  Instead, they are entitled to three (3) professional development days as detailed in Appendix "A" J.

<u>Section 4.  Advancement on the Salary Schedule for Full-time and Pro Rata Faculty.</u>

A.  Availability of Funds.  Any increase in compensation provided in this Agreement shall be contingent upon the legislature appropriating funds specifically for the compensation increase or specifically appropriating funds for such purposes in the operating budget.  Any provision in this Agreement pertaining to compensation shall be subject to subsequent modification by the legislature.

B.  Advancement.  Full-time faculty members shall advance one (1) level on the salary schedule for the completion of a specified number of salary credits provided there is a salary grade to which to move.  See Section 4, C for the number of salary credits needed to advance to each step.  Advancement on the salary schedule will be based on salary credits earned while employed as a faculty member at the College.

C.  Experience Credits.  The completion of each year of full-time teaching experience with the College is worth five (5) salary credits.  Faculty members who teach in an instructional program which is continuous through a period greater than three (3) academic quarters and requires the same level of effort by students and faculty during the period of the extended contract as during the regular year will earn additional salary credits.  These salary credits will be prorated over 177 days.

D.  Professional Improvement Credits.  The Federation shall establish whatever procedures it deems necessary to define professional improvement credits and to set the criteria that will be used in granting such credits, in accordance with the provisions in the contract, Article VIII, Section 4.

E.  Salary Advancement.  Faculty members shall advance one (1) level on the salary schedule for the completion of fifteen (15) salary credits.

F.  Pro Rata Faculty.  Faculty (instructional, counselor, and librarians) who are not full-time and whose work includes instruction, student advising, curriculum development, and committee work may be designed as pro rata faculty.  These faculty members shall receive an annual contract, be paid from the full-time salary schedule, receive prorated benefits, and be eligible for advancement on the full-time salary schedule on a pro rata basis.  Duties above those identified are to be recognized and compensated at the appropriate rate.

Pro rata faculty may accept moonlight and stipend contracts beyond their annual pro rata contract.  Such contracts shall not be the basis for a claim of full-time status or tenure at any time in the future.

The creation of pro rata positions will not be in lieu of full-time faculty positions in the same discipline unless circumstances warrant and will not result in the loss of full-time faculty positions.  Changes in, or establishment of, a pro rata position will be communicated to the Federation by the College.

G.  Future Salary Allocations.  Future legislatively authorized funds that become available to the College for salary increased and/or increments shall be negotiated.

If the above distribution system is legally prohibited, then this section shall be reopened.

Section 5:  Academic Rank.

A.  Instructor.  Adjunct faculty members will hold the rank of Instructor.

B.  Assistant Professor.  Probationary, pro rata, and full-time non-tenure track faculty members will hold the rank of Assistant Professor.

C.  Associate Professor.  After the Board of Trustees has awarded tenure, the faculty member will hold the rank of Associate Professor.

D.  Full Professor.  An Associate Professor will be promoted to Full Professor after the completion of eight (8) years of service as a full-time faculty member in a tenure track position at the College and the completion of forty-five (45) professional improvement credits in educational activities.

    1.  These activities may include seminars, workshops, classes, conferences, factory schools, field experience, research and development, artistic performance, and publication.

    2.  Full Professors are eligible to be mentors as outlined in Article VII, Section 5, E.

E.  Mentoring Program.

    1.  Purpose.

        a.  The purpose of this mentoring program is to facilitate the transition of newly hired and other interested faculty to the College experience.  It provides a process whereby mentors have the opportunity to give back to their colleagues the benefit of the mentor's knowledge, skills, experience, and support.

    2.  Eligibility.

        a.  Eligible faculty will have the opportunity to participate in a mentoring program for newly hired and other interested faculty.

            (1) Eligible faculty are defined as Full Professors according to Article VII, Section 5, D, 1 of the Negotiated Agreement.

            (2) Each spring quarter, the Human Resources Office will notify all faculty members who are completing eight (8) or more years at the College of their eligibility status.  Eligible faculty will then inform the Human Resources Office of their intent to participate.

            (3) All faculty members who have met the eligibility requirement by September 30 will be eligible to participate in that academic year and their contracts modified if necessary.

        b.  Mentors will receive an additional $1,000 stipend.

    3.  Activities

        a.  Faculty members may mentor one-on-one or in groups and will record these activities for their spring workload meeting.  Mentor faculty will have mentoring included in their spring workload meeting.
        b.  Mentoring activities may include assistance to colleagues in any of the duties traditionally attributed to faculty.  Mentors will be available to work with newly hired faculty and other interested faculty on an individual basis as is appropriate and reasonable.

            (1) Individual mentoring can address, but is not limited to:

                (a) Institutional procedures (course outline adoption, Professional Improvement Credits, Extended Studies, travel arrangements, field trip arrangements, etc.)

                (b) Pedagogy (syllabi development, classroom management, assessment, testing, etc.)

(c) Community culture (housing, schools, politics, history, rain)

(2) Other mentoring activities may include substantial projects e.g. yearlong grants, grant preparation and administration, etc. as agreed upon by the faculty member and appropriate dean.

c.  Payment of the faculty stipend occurs at the end of the academic year based on the spring workload meeting results.  The dean is responsible for verifying that the mentor faculty has completed activities so that the mentor stipend can then be awarded.

d.  If faculty from Centralia College, Garrett Heyns, Cedar Creek, Centralia College East, or other college sites are asked or choose to travel to another college site for a mentoring opportunity, the College will pay the cost of the travel in accordance with state policies.

<u>Section 6.  Adjunct/Moonlight Salary Schedule.</u>

**Rate**

|        |         |
|--------|---------|
| Hourly | $31.25  |

**Lecture Instruction Rates – per credit**

| Step 1 | $703.18 | Step 4 | $764.12 |
|--------|---------|--------|---------|
| Step 2 | $723.43 | Step 5 | $784.42 |
| Step 3 | $743.76 | Step 6 | $804.74 |

**Lab Instruction Rates – per credit**

| Step 1 | $1,021.22 | Step 4 | $1,110.97 |
|--------|-----------|--------|-----------|
| Step 2 | $1,051.16 | Step 5 | $1,140.87 |
| Step 3 | $1.081.07 | Step 6 | $1,170.84 |

If it is deemed appropriate by the Vice President of Instruction and the instructor that a final exam be given during the designated time, the basic contract will be increased by an amount equal to two (2) hours.

A.  Initial Placement.

1.  Adjunct or moonlight faculty members (with the exception of tenured and tenure-track faculty who moonlight) will be placed at Step 1 on the Adjunct/Moonlight Salary Schedule for initial placement.

2.  Full-time tenured and tenure-track faculty who moonlight will be placed at Step 4 on the Adjunct/Moonlight Salary Schedule for initial placement.

3.  When adjunct, pro-rata, or full-time temporary faculty are hired to a tenure track position, their placement will be evaluated on both the full-time salary schedule and adjunct/moonlight schedule.

    a.  They will be placed at Step 4 on the Adjunct/Moonlight Salary Schedule.

    b.  Those faculty members who were already higher than Step 4 on the Adjunct/Moonlight Salary Schedule will retain that placement above Step 4.

B.  Advancement.

1.  To advance on the Adjunct/Moonlight Salary Schedule:

    a.  Step advancement from Step 1 through Step 4:  Advancement of one (1) step will occur at the beginning of the first quarter following completion of thirty (30) credit hours of adjunct or moonlight faculty employment at the College.  The credits must have been accumulated within the previous five (5) year period.

    b.  Step advancement from Step 4 through Step 6:  Advancement of one (1) step will occur at the beginning of the first quarter following completion of forty-five (45) credit hours of adjunct or moonlight faculty employment at the College.  The credit hours must have been accumulated within the previous five (5) year period.  Only those credits earned since initial placement will be counted towards step advancement.

2.  Any increase in the compensation in this Agreement shall be contingent on the legislature appropriating funds specifically for the compensation increase or specifically appropriating funds for such purposes in the operating budget or the availability of local funds to be bargained by the College and the Federation.  Any provision in this Agreement pertaining to compensation shall be subject to subsequent modifications by the legislature.

3.  Employees with no break in service from the College will retain their step placement on the Adjunct/Moonlight Salary Schedule.

4.  Employees with a break in service from the College will retain their step placement for seven (7) years.

5.  Tenured and tenure-track faculty already on the Adjunct/Moonlight Salary Schedule below Step 4 will continue to utilize their FT credits in addition to their moonlight credits for advancement until they reach Step 4.  Thirty (30) credits will be needed for step advancement.

C.  Under-Enrolled Classes.  Courses that are taught under an adjunct/moonlight contract that do not reach the enrollment standard set by the Instruction Office are considered to be under-

enrolled.  Faculty members who agree to teach under-enrolled classes the college elects to run shall be paid no less than the rates specified in the following schedule:

1.  Classes that have enrollments between fifty percent (50%) of the enrollment standard and the enrollment standard, payment will be prorated based upon the actual enrollment.

2.  Classes that have enrollments between five (5) students and fifty percent (50) of the enrollment standard will be paid 50% of full contract for that class.

3.  Classes with four (4) or fewer students will be paid at a rate mutually agreeable to the faculty member and the appropriate dean.  Alternate method/modality of teaching may be considered with the approval of the appropriate dean.

4.  If the enrollment standard is an odd number, fifty percent (50%) of the standard will be calculated by rounding down.

D.  Adjunct Counselors and Librarians.  Adjunct counselors and librarians shall be paid prorated from the full-time salary schedule on the basis of thirty-five (35) hours per week as the reciprocal and shall be eligible for advancement on the full-time salary schedule on a prorated basis.

E.  Non-Traditional Instruction.  Compensation for independent study, correspondence, video, and similar non-traditional methods of instruction shall be at the non-traditional rate per student credit hour per quarter.  Such compensation will increase at the same rate as the adjunct faculty salary schedule rates.

1.  Independent study is instruction of entire courses for individual students.  Time conflicts that require additional contact time outside of the regular class schedule will be considered independent study.

2.  Time conflicts, which allow students to schedule short overlaps of courses and do not require additional contact time outside of the regular class schedule, are not considered independent study.

3.  All independent studies will be paid.

F.  Meeting/Training Attendance.

1.  Adjunct faculty members may be compensated at the non-instructional rate for attendance at college or department meetings as agreed to by the appropriate supervisor.

2.  Appropriate documentation will be signed by the supervisor and submitted to the Instruction Office by the last day of each quarter.

3.  Compensation for meeting attendance will be processed quarterly.

4. The College will provide a budget to support two hundred fifty (250) hours of adjunct meeting/training compensation for the College campus. These funds may be accessed until depleted. No limit is established for the Corrections Sites.

5. The College and the Federation will evaluate this process, its use, and funding level at the end of each academic year.

6. In order to be compensated, adjunct faculty members are responsible for getting approval from their dean or associate dean prior to completing or attending non eLearning meetings and training. The adjunct faculty members are then responsible for notifying their dean or associate dean when trainings or meetings have been completed.

G. Annual Contract. The College may offer instructional adjunct faculty an annual contract, rather than quarterly contracts, based on the adjunct faculty salary schedule. This in no way alters the "at will" status of adjunct faculty.

<u>Section 7. Compensation Pools.</u>

A. Full-time. Full-time compensation pool shall mean all compensation budgeted for full-time faculty, excluding corrections sites and other grant and contract activity, for the period indicated. Such compensation pool shall include full-time salaries, stipends, extended days, and individual contracts providing for compensation based upon the faculty salary schedule and will also include O.A.S.I. and retirement contributions paid by the College related to such compensation. Such compensation pool shall exclude sick leave buy out.

B. Adjunct and Moonlight. Adjunct compensation pool shall mean all compensation budgeted for adjunct and moonlight faculty, excluding corrections sites and other grant and contract activity, for the period indicated. Such compensation pool shall include all budgeted adjunct salaries based upon the Adjunct/Moonlight Salary Schedule and will also include O.A.S.I. and applicable retirement contributions paid by the College related to such compensation.

<u>Section 8. Method of Calculating Extended Contract Compensation for All Faculty.</u>

A. Non-Instructional Faculty. Non-instructional faculty (such as counselors, librarians, and instructional faculty who are advising) are calculated pro rata from full-time salary schedule [using thirty-five (35) hours per week as the basis for full-time] for the time covered by the extended contract.

B. Instructional Faculty. Instructional faculty are calculated pro rata from the full-time salary schedule [using thirty-five (35)] hours per week as the basis for full-time if:

1. Part of an instructional program which is continuous through a period greater than three (3) academic quarters and the same level of effort by students and faculty is required during the period of the extended contract as during the regular year.

2. Instructional faculty not covered by item 1 above, will be paid as adjunct faculty.

<u>Section 9.  Stipends.</u>

A.  Definition.  A stipend is an amount paid for an activity or project that takes place over a period of time above and beyond the employee's contractual duties.  The remuneration paid to the employee is a flat dollar amount that is not based upon an hourly calculation.

B.  Stipend Schedule.  Effective 7/1/2020

**Extracurricular Reimbursement**

| *Group I* | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|---|
| Drama Director, | FACTOR: | 0.054557177 | 0.057729 | 0.06090 | 0.064063 | 0.0673085 |
| Music (voice), | AMOUNT: | $2,933 | $3,103 | $3,274 | $3,444 | $3,618 |
| Journalism, | | | | | | |
| Radio/TV | | | | | | |

| *Group II* | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|---|
| Music | FACTOR: | 0.067308515 | 0.07133 | 0.07535 | 0.07945 | 0.08346 |
| (instrumental) | AMOUNT: | $3,618 | $3,835 | $4,051 | $4,271 | $4,487 |

**NOTE:**  It is agreed that the above extra duty activities are separate from a faculty member's normal duties and therefore exempt from tenure application.  It is further agreed that nothing in this schedule shall be construed to require the employer to maintain such programs or assignments.

C.  Policy.  Stipended positions/projects will be advertised internally to appropriate campus constituencies when open and greater than $750.

Faculty may petition the appropriate dean for a stipend of any amount when circumstances warrant.

Efforts will be made to ensure that stipends for similar work are compensated equitably.

At the end of each quarter, including summer, a report listing stipends paid to faculty members will be provided to the Federation.

Faculty members have the right to refuse stipended assignments.

<u>Section 10.  Bachelor of Applied Science Compensation.</u>

College faculty who are contracted to teach in the Bachelor of Applied Science (BAS) programs will be compensated according to the following pay scale:

1.  Full-time faculty members may have BAS courses included in their standard teaching load as defined in the negotiated agreement (Article X).  In addition, they will receive an

additional ten percent (10%) of the adjunct rate based on the Adjunct/Moonlight Salary Schedule (Article VII, Section 6) for each BAS course taught per quarter.

2.  Full-time faculty members may be contracted to teach BAS courses as an "adjunct" or "moonlight" contract.  In that case, they will receive an additional ten percent (10%) of the adjunct rate based on the Adjunct/Moonlight Salary Schedule (Article VII, Section 6) for each BAS course taught per quarter.

3.  Adjunct faculty members may be contracted to teach BAS courses.  They will be paid according to the Adjunct/Moonlight Salary Schedule plus an additional ten percent (10%) of the adjunct rate based on the Adjunct/Moonlight Salary Schedule (Article VII, Section 6) for each BAS course taught per quarter.

Section 11.  Non-Transcripted Course Compensation.

A.  Faculty members who are contracted to teach courses that are not intended for use in high school equivalency programs or pre-requisites for college level degrees or certificates will be compensated:

Theory Class Rate:            $300 per quarter credit
Guided Practice Class Rate:   $500 per quarter credit

1.  A one-credit theory class generally meets 10 hours and a one-credit guided practice class generally meets 20 hours.

2.  When courses that are not intended for use in high school equivalency programs or pre-requisites for degrees or certificates are combined with a credit bearing, graded section of a class, the instructor will be paid according to enrollment type and from the corresponding salary scale.  Total pay cannot exceed the rate of pay for a full contract under the adjunct/moonlight scale. (Article VII, Section 6).

B.  Courses that do not reach the enrollment standard set by the Instruction Office are considered to be under enrolled.  Faculty members who agree to teach under-enrolled classes the college elects to run shall be paid no less than the rates specified according to the under-enrolled schedule. (Article VII. Section 6, C. 1-4).

Section 12.  Faculty Chair.

A.  Definition.  Faculty chairs report to the dean or associate dean.  They are selected by the members of their faculty department for terms not to exceed two (2) years.  (Departments may choose to hold elections or to design a chair rotation based upon some criteria such as seniority.)  Chairs provide leadership within the department and advocate on its behalf to the rest of the College community.  The Chairs have knowledge of campus policies and practices.  This position is intended to provide representation, assistance, advisement, and information for the department.  None of these duties should be construed as being supervisory in nature.

B. Faculty Chair Responsibilities.  The faculty chair reviews department issues and concerns with the dean or associate dean and fulfills the following responsibilities:

1. Presides at department meetings.  (Minutes of meetings should be kept and shared with all department members, the immediate supervisor, and the Instruction Office.)

2. Provides leadership and opportunities for faculty input within department regarding:

   a. Program and curriculum development, review, and modification;

   b. Schedule development;

   c. Department advising activities;

   d. Purchase of department supplies and equipment;

   e. Initial budget and staffing requests;

   f. Selection of representatives for the Instructional Council, the Assessment Committee, and a department representative for the Advising Steering Committee.

3. Represents department interests to the administration and campus community.

4. Meets regularly with the dean or associate dean.

5. Attends monthly meetings with the Vice president of Instruction.

6. Assists the dean or associate dean with the selection of adjunct and temporary faculty. Full-time faculty within the discipline should be consulted regarding credentials of potential adjuncts.  They may, if they choose, interview potential adjuncts.

7. Assists the dean or associate dean in evaluating adjunct faculty according to the processes agreed to in this Agreement.  The actual evaluations may include other faculty from the department.

8. Compensation shall be a $1,000 stipend per quarter.

## Section 13.  Other.

A. Contracts.  Individual contracts with faculty members will not cover a time period of more than one (1) fiscal year.

B. Calculation.  The College reserves the right to exceed the basis of calculation described herein when in its discretion such exception serves the best interest of the colleges.

Section 14.  Reopener.

This Article may be reopened in the event that funds for such purposes are increased or reduced by the legislature and/or Governor of the State of Washington.

## ARTICLE VIII:  FACULTY PROFESSIONAL DEVELOPMENT OPPORTUNITIES

Section 1.  Faculty Professional Development Committee.

The Faculty Professional Development Committee shall be composed of a minimum of five (5) faculty members [three (3) at corrections sites].  At least one (1) academic and one (1) workforce faculty member will serve on each committee.

The Faculty Professional Development Committee shall establish policies for the implementation of the Extended Studies Support Program in consultation with the faculty and select the recipients for Extended Studies funds in accordance with provisions established in Section 3 of this Article.

The Faculty Professional Development Committee shall implements procedures established in Section 4 of this Article with respect to Professional Improvement Credits.

The Faculty Professional Development Committee shall oversee the implementation of post-tenure evaluation procedures as provided for in this Agreement.

Section 2.  Faculty Professional Development Plan.

All faculty members must complete a faculty Professional Development Plan in order to be eligible for Professional Improvement Credits and/or Extended Studies Support.

All post-tenured faculty members must have a Professional Development Plan as part of the post-tenure evaluation process.

Complete Professional Development Plans are to be filed in the Instruction Office.

Section 3.  Extended Studies.

A.  Purpose.  The purpose of this program is to provide resources for materials, activities, and equipment to assist and encourage faculty members to realize professional potential.

B.  Funding.  Funding for the College faculty shall be Step G and increase at a rate equal to the faculty salary COLA applied to the salary schedule each subsequent year.

    1.  Funding at the corrections sites will be at a percent equal to the relationship between the corrections sites full-time faculty and the College full-time faculty the previous fall quarter.

    *2.* Funds not expended or earmarked by April 1 shall be available for reimbursement that exceeds the guidelines.

C. Allocations.  All full-time, probationary, and pro rata faculty members (pro rata faculty on a prorated basis) will be allocated $450 per academic year for the acquisition of professional development materials, membership dues to professional organizations, and or professional development activities.  These include but are not limited to books, journals, software, hardware related to professional development software, and certification testing.

    1. If a faculty member chooses to use the allocation for professional development activities, the activities must be approved through the Faculty Professional Development Committee.

    2. Faculty members may arrange for either purchase of materials through the Instruction Office or for reimbursement upon presentation of receipts.  Faculty at the corrections site will make their arrangements through the dean's office.

D. Activities.  Qualified faculty members shall be reimbursed up to $375 for each credit earned under the provisions of this section.  Courses taken from the College shall be subject to the provisions of the tuition waiver program or reimbursed for tuition only in instances where the tuition waiver program cannot be used (excludes Community Service).  Support shall be granted up to a total of $375 per credit for tuition/registration, expenses including tuition, books, housing and expenses in cases where applicant must pay for alternative housing away from his/her home, and travel when the amount of travel is over twenty (20) miles one way from the faculty member's home or point of origin to the place of study or approved destination.  (Proof of such expenditures may be required.)

    1. Qualified faculty will be eligible for up to $3,750 or ten (10) quarter credit hours per fiscal year.

    2. This program shall be open to all members of the faculty who fulfill the qualifications noted below and applications shall be made in writing, setting forth the details of the proposed course of study for which the grant is requested.

    3. Credit shall be given only for courses of study related to the faculty member's field of competence; or for courses necessary to increase his/her competency in a subject area to which he/she is to be assigned; or for courses which improve competency in assigned duties which may include courses which improve competency in new teaching techniques; or for courses required for vocational certification; or activities related to the faculty member's Professional Development Plan.  Exceptions may be allowed in cases of courses being applied to a degree program.  Reimbursement shall also be provided for Factory and Industrial Training.  Seminars and conferences which meet the above criteria on the basis of fifteen (15) hours equals one (1) credit.  Courses taken as a part of the Extended Studies program shall be taken outside the faculty member's normal contract duties.

4. An applicant's eligibility for Extended Studies supported activities will be determined each year by the Faculty Professional Development Committee, in the following order:

   a. Tenured faculty;

   b. Probationary faculty;

   c. Pro rata/full-time non-tenured/adjunct faculty on the basis of seniority.

      (1) A minimum of one (1) year full-time equivalent experience as defined in Article VII, Section 2, is necessary to be eligible.

      (2) Seniority is based on equivalent years of full-time teaching experience at the College.

      (3) Tenured faculty who retire from the College may apply their years of teaching experience at the College to their adjunct status for purposes of determining Extended Studies awards.

      (4) Breaks in service do not affect eligibility for extended studies awards.

5. At corrections sites no more than seventy-five percent (75%) of the balance of the extended studies fund after initial allocation may be applied to professional leaves. These funds are in addition to the provisions in Article VIII, Section 7, A, B, and C.

6. Funds from this program shall be paid to the selected faculty members upon presentation of transcripts of grades received or receipts and appropriate documentation from conferences and seminars. If participation is in conjunction with a leave of absence, the participant must return to College employment prior to reimbursement.

E. Orientation of New Faculty. The Federation will provide an orientation to new faculty members regarding this program.

<u>Section 4. Professional Improvement Credits.</u>

The Federation shall establish whatever procedures it deems necessary to define professional improvement credits, and to set the criteria that will be used in granting such credits. Any changes in procedures or criteria from those presently on file shall immediately be filed with the Vice president of Instruction, Vice president of Students, and the President's office. Such criteria shall be district-wide and shall be consistent with the following:

A. Activities must be related to the actual or potential assignments of the faculty member or part of a degree program related to the above actual or potential assignments or part of a faculty members' Professional Development Plan.

B. Activities must be beyond the normal contractual duties of the faculty member.

C.  Activities related directly or indirectly to Federation business shall not qualify.

D.  All activities must be submitted to the Federation within ten (10) weeks of the completion of the activity and processed by the Federation consistent with F below.

E.  Professional Improvement Credits shall be available to all full-time and pro rata faculty members and be evaluated in a fair, equitable, and consistent manner, regardless of their membership in or out of the Federation or College assignment.

F.  All professional improvement credits screened, processed, and recommended by the Federation are to be submitted to the Human Resources Office on forms available from the Faculty Professional Development Committee and such forms shall be provided by the College to the committee.  All documentation verifying the completion of the approved Professional Improvement Credits are to be submitted to the Human Resources Office by September 30 following the completion of the activity to be counted for salary placement for that year.  Transcripts verifying completion of college courses must be submitted within one (1) year of completion of the courses.  Verification for all other professional improvement activities must be submitted within one (1) year of the completion of the activity.  If transcripts and/or verification for professional improvement credit activity are not received in the Human Resources Office within one (1) year of the activity taking place, another request form must be submitted by the Federation.  Requests shall be denied only to the extent that they are inconsistent with the above.

## Section 5.  Curriculum Development Opportunity.

A.  Faculty members may apply for curriculum development awards to work on curriculum projects during non-instructional periods.  The College shall budget $7,500 per academic year for such awards at the College and $3,000 per academic year for corrections sites.

B.  A curriculum development committee shall be established on each campus.  The committee shall consist of two (2) faculty and two (2) administrators on each campus.  The Federation President shall appoint one (1) academic faculty member and one (1) workforce faculty member to each committee and the President shall appoint the administrative committee members.

C.  Applications shall be made to the Curriculum Development Committee and shall specify a request for a Curriculum Development Opportunity.  Applicants shall provide the committee with the course(s) in need of development and revision and the justification for such work.

D.  The Curriculum Development Committee shall recommend recipients of the Curriculum Development Opportunity award to the President.

## Section 6.  Sabbaticals.

A.  Purpose.  The purpose of sabbatical leave is to benefit the College and its students by providing full-time faculty members with the opportunity to engage in activities leading to

professional growth and revitalization. Such leave would allow eligible faculty members an extended period of time free from normal contractual obligations to pursue legitimate professional goals. This purpose is consistent with the provisions of RCW 28B.10.650 entitled "Remunerated professional leaves for faculty members of institutions of higher education" as now exists or is hereafter amended, and with this College's commitment to faculty professional development. Appropriate uses of sabbatical leave would include formal study, travel, work experience in one's teaching field, or any other activity which would contribute substantially to the improvement of teaching abilities.

B. Eligibility. Sabbatical leave may be granted for one (1), two (2), or three (3) consecutive quarters after completion of five (5) years of full-time contractual service as a professional faculty member of the College. Faculty members awarded three (3) quarters of sabbatical leave will be eligible for an additional award after completion of a new five (5) year period of full-time employment as a faculty member. Faculty members who are awarded leaves of fewer than three (3) quarters retain their remaining entitlement and will qualify for additional entitlement at the rate of one (1) quarter for each two-year period of full-time employment as a faculty member, not to exceed three (3) quarters of entitlement.

C. Approval. All sabbatical leaves require the approval of the President. The number of sabbatical leaves approved shall not exceed two (2) for the College and one (1) for corrections sites in any quarter of any academic year. The number of leaves granted shall be subject to budget restraints. Sabbatical leaves at the corrections sites will be subject to the approval of the Department of Corrections and specifically the approval of use of Department of Corrections funds for professional paid leaves.

D. Compensation. Calculation for compensation shall be based on actual contract days in the specific quarter(s) the sabbatical is taken.

   1. For one (1) quarter sabbaticals, the rate of compensation shall be at ninety percent (90%) of the sabbatical recipient's salary.

   2. For the second one-quarter sabbatical during a five (5) consecutive college year period, the rate of compensation shall be at eighty percent (80%) of the sabbatical recipient's salary.

   3. For the third one-quarter sabbatical during a five (5) consecutive college year period, the rate of compensation shall be at seventy percent (70%) of the sabbatical recipient's salary.

E. Procedure. Separate committees for the College and the corrections sites will be established to accept and review sabbatical leave requests. The College committee will be comprised of the Vice president of Instruction, the Vice president of Student Services, and one (1) workforce and one (1) academic faculty member appointed by the President after receiving recommendations from the faculty. The committee at the corrections sites will be comprised of the dean, his/her designee, one (1) workforce and one (1) academic faculty member appointed by the President after receiving recommendations from the faculty.

1. An application for sabbatical leave, which will include reasons for requesting the leave and a detailed sabbatical leave plan, must be submitted to the committee by January 15 of the academic year prior to taking leave.  The President will, after giving reasonable consideration to the recommendations of the committee, award or deny sabbatical leave.  The President will notify the candidates for sabbatical by April 15.  The award or denial of sabbatical leave grants are not grievable under any grievance procedures.

2. Sabbatical leave shall be awarded according to the following criteria:

   a. The value of the proposed activity to the enhancement of the instructional program of the College.

   b. The value of the proposed activity to the professional growth and development of the applicant.

   c. The past contribution of the applicant (years of service, range of service, quality of service) to the College.

3. Any sabbatical award is subject to:

   a. The ability of the College to employ a qualified replacement for the faculty member requesting the sabbatical, and

   b. The availability of funds.

4. Guidelines and procedures for sabbatical leave, including application forms, rating procedures, and reporting requirements will be established by the committee prior to the institution of the sabbatical leave program.

F. Leave Contract.  When granted a sabbatical leave, the recipient shall sign a contract with the College specifying:

1. The length of sabbatical leave.

2. The amount of sabbatical payment.

3. A commitment to perform according to the approved sabbatical leave plan.

4. That the recipient will return to employment with the college following his/her completion of such leave and serve in a professional status for a period commensurate with the amount of leave so granted.  Failure to comply with the provisions of the signed agreement (contract) will constitute an obligation of the recipient to repay to the institution any remuneration received from the institution during the leave.  Application of a reduction-in-force will take precedence over any sabbatical leave agreement and/or procedures.

5. That the recipient, upon return, will submit a written report to the President or dean summarizing the work completed during the sabbatical leave and describing how the new knowledge will be utilized in professional assignments.  A report of completed professional development activity must also be submitted to the committee.

6. Non-compliance with terms of the leave contract will be dealt with according to RCW 28B.10.650.

G. Employee Rights.  The time spent on sabbatical leave shall be recognized as equivalent to time spent as a full-time faculty member of the College, exception sabbatical leave entitlement.

1. Access to the College's resources will not be diminished while on sabbatical leave.

2. Appropriate office space will be available through mutual agreement of the faculty member and the College.

Section 7.  Reimbursed Leave.

A. Purpose.  The purpose of reimbursed leave is to provide eligible faculty members with opportunities to participate in leadership, professional development, and professional growth opportunities.  Such leave would allow eligible faculty members an extended period of time free from normal contractual obligations to pursue these goals.

1. Faculty members on reimbursed leave shall not incur a break in service.

B. Eligibility.  Reimbursed leave may be granted to tenured and pro rata faculty members. Faculty members whose positions are full-time or pro rata but funded from non-general fund monies are also eligible.

1. Reimbursed leave may be granted for up to one (1) year.  The Sabbatical Committee may grant exceptions as circumstances warrant.  Leave composed of reimbursed, sabbatical, or a combination of the two (2), may not exceed two (2) years in a five (5) year period. No more than 10 percent (10%) of eligible faculty members may be on reimbursed or sabbatical leave during any one (1) quarter.

C. Approval.  An application for reimbursed leave which will include the reasons for requesting the leave will be submitted to the Sabbatical Committee at least one quarter in advance of the leave requested.  Exceptions can be made by the committee when circumstances warrant.

The Sabbatical Committee will evaluate the application for reimbursed leave based on the following considerations:

1. Is it cost neutral to the College?

2. Is there a qualified replacement?

3. Is the quality of the program maintained?

4. Is it allowed by the specific funding source of the faculty position?

The identification of a qualified replacement will involve the faculty member requesting the leave, his/her supervisor, and the appropriate vice president.

Notification of the committee's decision will be communicated to the faculty member within four (4) weeks of receipt of application.

During the summer quarter, temporary faculty appointments to the Sabbatical Committee, pursuant to Article VIII, Section 6, E will be made in order to consider summer applications.

D. Corrections Sites Professional Leave. Funds available to eligible faculty members at the corrections sites through the Curriculum Development and Extended Studies programs are available for professional leave. No more than seventy-five percent (75%) of the balance of the extended studies fund after initial allocation may be applied to professional leaves. These funds are in addition to the provisions in Article VIII, Section 7, A, B, and C.

Full-time faculty members who have served a minimum of five (5) years are eligible for this leave.

This leave may only be taken during fall, winter, and spring quarters.

Eligible faculty members may apply for this leave no later than the end of the first week of the quarter of the preceding session.

Application shall be made to the Professional Leave Committee according to the guidelines established in Article VIII, Section 6, E. The Professional Leave Committee shall be composed of the dean, his/her designee, and two (2) full-time faculty members.

<u>Section 8. Exceptional Faculty Award Program.</u>

Pursuant to RCW 28B.50.843, the Federation and the College agree to the following process for nomination and selection of faculty for the Exceptional Faculty Award.

A. Eligibility. To be eligible for the award, the individual must have completed the equivalent of three (3) years of full-time experience as a faculty member at the College.

Faculty at all sites can nominate another faculty member.

Faculty at all sites can be an award recipient.

B. Nomination. During each winter quarter the Centralia College Foundation will distribute an announcement about the program, including application/nomination forms.

Any member of the faculty or college community may nominate a faculty member.

Faculty members may not nominate themselves.

A faculty member who has been a recipient of the Exceptional Faculty Award shall not be eligible to receive another award for a period of five (5) years.

Nominated faculty will be asked to complete a supplementary information form, and all material must be submitted to the Foundation.

C.  Committee.  The exceptional Faculty Award Committee shall be composed of three (3) community members of the Centralia College Foundation Board of Directors, the faculty who received the prior year's Exceptional Faculty Award, and one (1) management representative.

If the faculty recipients from the previous year are not available to serve on the committee, the Federation will appoint a replacement.

The Exceptional Faculty Award Committee will review nomination forms and make their recommendations to the President for the award(s) by April 15.

D.  Criteria:  The following criteria and guidelines shall be considered for the selection of the recipient.

1.  Excellence in primary assignment:

   a.  Innovation and currency in pedagogy and content of the field.

   b.  Creation of the environment that motivates students in learning, critical thinking, and creative discourse.

2.  Service to students:

   a.  Exemplary mentoring and special assistance to students.

   b.  Outstanding service to students through advising, assistance to clubs, etc.

3.  Service to profession:

   a.  Praiseworthy, scholarly, academic, or technical contributions to one's field.

   b.  Leadership in, and extensive service to, professional organizations in one's field.

   c.  Recognition by professional peers.

4.   Professional contributions to the College community:

   a.   Outstanding service to the College community beyond his/her contractual duties.

   b.   Innovative College leadership and participation in programs, groups, and activities.

The President will present recommendations to the Board of Trustees for action at the May meeting.

E.   The Board of Trustees will select the recipients of the awards by the end of the first full week of May each year.

<u>Section 9.  Hanke Faculty Achievement Award.</u>

A.   The following terms, conditions, and understanding of the Hanke Faculty Achievement Award are separate from the Exceptional Faculty Award process.

B.   Hanke Faculty Achievement Awards are for noteworthy activities/projects/equipment leading to individual professional development or program enhancement under the terms of RCW 28B.50.841.  These awards can be used for training, travel, and dissemination of exemplary projects; to supplement the salary of the holder or holders of a faculty award; or to pay expenses associated with the holder's program area.  Direct payment to the award recipient will be subject to IRS rules and regulations.

C.   All faculty who are scheduled to teach at the time of the grant activity or are on approved leave are eligible.  Recipients of one (1) Hanke Faculty Achievement Award are not eligible to receive consecutive or concurrent Hanke Faculty Achievement Awards.

D.   Application shall be by submission of a clear and persuasively written proposal to a review committee.

   1.   This committee shall be comprised of:

      a.   Three (3) faculty, at least two (2) of whom must be full-time, selected by the Federation;

      b.   A Centralia College Foundation representative; and

      c.   Two (2) appointees of the President.

   2.   Applications shall include:

      a.   Statement of goals for the award;

      b.   Timeline;

     c.  Estimated budget;

     d.  Benefit to the faculty member and/or program; and

     e.  How the benefits of the award to the recipient will be shared with the campus community.

3. This committee will review the proposals and make their recommendations to the President, who will make his/her recommendation to the Board of Trustees.

4. Applications will be due by the end of the first week of spring quarter and award recipients will be notified by the end of May.

E. In the initial award cycle, there will be a minimum of two (2) awards from a maximum pool of $4,000 with an individual award maximum of $2,000. Afterwards, this amount may be adjusted as conditions warrant.

## ARTICLE IX:  PROBATIONARY EMPLOYMENT AND TENURE

### Section 1.  Purpose.

Consistent with RCW 28B.50.850-870, the Board of Trustees of Centralia College hereby establishes the following rules and procedures on faculty tenure and probationary employment, the purpose of which is threefold:

A. To protect faculty appointment rights and faculty involvement in the establishment and protection of those rights at the College and all subsequent community college campuses hereafter established within the College district; and

B. To define a reasonable and orderly process for appointment of faculty members to tenure status and the dismissal of the tenured faculty member; and

C. To assure that tenure is granted to faculty members of such character and instructional ability that the College, so far as its resources permit, can justifiably undertake to employ them for the rest of their academic careers.

### Section 2.  Definitions.

As used in this chapter, the following terms and definitions shall mean:

A. "Appointing authority" shall mean the Board of Trustees of Centralia College or its designee(s).

B. "Tenure" shall mean a faculty appointment for an indefinite period of time, which may be revoked only for sufficient cause and by due process.

C. "Faculty appointment" shall mean full-time employment as a teacher, counselor, librarian, or other position for which the training, experience, and responsibilities are comparable as determined by the appointing authority, except administrative appointments. Faculty appointment shall also mean department heads and administrators to the extent that such department heads and administrators have had or do have status as a teacher, counselor, or librarian. The term faculty appointment shall not apply to special funds positions governed by RCW 28B.50.851 or WAC 131.16.400 as now enacted or hereinafter amended.

D. "Probationary faculty appointment" shall mean a full-time faculty appointment for a designed period of time, which may be terminated without cause upon expiration of the probationer's terms of employment.

E. "Probationer" shall mean any individual holding a probationary faculty appointment.

F. "Administrative appointment" shall mean employment in a specific administrative as determined by the appointment authority.

G. "Regular college year" shall mean a faculty appointment inclusive of consecutive fall, winter, and spring.

H. "Probationary period" shall be in accordance with applicable statue.

I. "Mid-point" means the 15th day of the month representing the middle of the 2nd, 5th, or 8th probationary quarters, which shall be as follows: November 15, February 15, May 15, or July 15 (when applicable).

J. "Probationary Review Committee" shall mean a committee composed of the probationer's faculty peers, one (1) student representative, who shall be a full-time student chosen by the student association of the College, and one (1) administrator. The majority of the committee shall consist of the probationer's faculty peers.

A separate probationary review committee shall be established for each full-time probationer and shall serve as a standing committee until such time as the probationer is either granted tenure or his/her employment in a probationary faculty appointment is terminated. Each probationary review committee shall be composed of five (5) persons. Three (3) tenured faculty members selected by a majority of the tenured and probationary faculty members acting in a body within thirty (30) days of the probationer's first regular college year. The President shall appoint a college administrator as the fourth member of the committee who shall serve as Chairperson. The fifth member shall be a full-time student chosen by the student association of the College. If a vacancy occurs on the committee, the same process for selecting a replacement should be followed as applied in the selection of the original member.

Section 3.  Duties and Responsibilities of Probationary Review Committees.

A.  The general duty and responsibility of the probationary review committee shall be to assess and advise the probationer of his/her professional strengths and weaknesses and to make reasonable efforts to encourage and aid him/her to overcome his/her weaknesses.

B.  The probationary review committee shall meet at the call of the chair, when in his/her discretion the need for such a meeting arises, provided that the committee shall meet with the probationer at least twice during each of the first two (2) quarters of employment and once during all other quarters and, additionally within ten (10) days of the receipt of a written request setting forth good cause to meet as directed to the chair by the probationer.

C.  The first order of business for each probationary review committee shall be to draw up an annual plan that it will follow in evaluating the performance and professional competence of the full-time probationer assigned thereto.  The plan shall include a schedule of meetings, the names of review committee members who will make classroom observations, the frequency of these observations, and the times of these observations (i.e. 6th week of quarter, 8th week of quarter, etc.).  The plan shall also include a schedule for completion of other parts of the review process.

If, at any time during the probationary period, the committee determines that the probationer has any weaknesses in the performance of those duties for which the probationer was hired, the committee shall set forth a detailed plan for the probationer to overcome these weaknesses.  Such a plan may include additional courses to be taken by the probationer, experts to be consulted who would be in a position to assist the probationer in overcoming weaknesses, and any other steps that the committee believes will aid the probationer in overcoming weaknesses.

The probationary review committee shall prepare, for inclusion in the tenure file, its annual plan for evaluating the performance and professional competence of the full-time probationer within thirty (30) days of the formation of the probationary review committee.

Performance of duties as a probationary review committee member is an important part of the duties of both the probationary faculty member and the full-time tenured faculty members who have been elected to such committees.  It is the responsibility of the review committee chairperson to keep the probationer informed of the procedures.  The committee's evaluation of the probationer shall be directed toward and result in the determination of whether or not the probationer possesses the necessary personal characteristics and professional competence to perform effectively in his/her appointment.  A probationary review committee's evaluation procedures shall include the following:

1.  Classroom or workplace environment observations by members of the probationary review committee which may include the review of course outlines and classroom test instruments;

2.  Student evaluation administered by the committee chairperson or his/her designee;

3. Assessment of the probationer's participation in professional activities both on and off campus;

4. Self-evaluation.

The probationer or the committee shall have the right to determine additional methods or procedures of evaluation in addition to and after completion of all of the above procedures.

D. Each probationary review committee shall be required to conduct an on-going evaluation of the full-time probationer assigned thereto and render the following written reports to the probationer, the President, and the appointing authority on or before the designated times during each regular college year such appointee is on probationary status; or, as is also required, within fifteen (15) days of the President's written request therefore:

1. A written report after the first probationary quarter outlining the probationer's strengths and weaknesses. This report should also include a list of steps that can be taken by the probationer to improve his/her weaknesses.

2. A written evaluation of each full-time probationer's performance including the degree to which the probationer has overcome stated weaknesses shall be submitted to the Board of Trustees on or before the mid-point of the second, fifth, and eighth probationary quarters. The review committee shall obtain the probationer's written acknowledgment of receipt of the written evaluation. The probationer shall have the right to answer the evaluation report in writing and attach his/her answer to the report.

3. A written recommendation regarding the renewal or non-renewal of the probationer's contract for the ensuring regular year, on or before March 1; or a written recommendation for granting or denying tenure with accompanying supporting material or continued probationary status, on or before the mid-point of the eighth probationary quarter.

4. Failure of any review committee to make such written recommendation by the mid-point of the eighth probationary quarter shall not be deemed a recommendation either for or against the awarding of tenure.

E. The final decision to award or withhold tenure shall rest with the appointing authority after it has given reasonable consideration to the recommendations of the probationary review committee.

F. All written evaluations and recommendations prepared and submitted by a probationary review committee pursuant to these rules shall include the committee's findings and supportive data and analysis.

G. The appointing authority shall provide for the award or denial of faculty tenure following a probationary period not to exceed nine (9) consecutive quarters, excluding summer quarters and approved leaves of absence. Provided the appointing authority may award or withhold tenure at any time, after it has given reasonable consideration to the recommendations of the

appropriate review committee.  The probationary period may be extended in accordance with the applicable statue (RCW 28B.50.852).

H.  This appointment to tenure is effective until the faculty member resigns or retires from the College or is dismissed for "sufficient cause" (as defined in Article XVI. Section 1. A.)

## ARTICLE X:  PROFESSIONAL DUTIES AND WORKLOAD FACTORS FOR FULL-TIME FACULTY

Section 1.  Professional Duties.

The professional duties defined in this section identify the broad categories of duties performed by full-time faculty.

A.  The primary duty of full-time instructional faculty is to deliver direct student instruction.

B.  The primary duty of full-time counseling faculty is to provide support, guidance, and counseling to students in accordance with the American Counseling Association guidelines and applicable Washington state laws and regulations.

C.  The primary duty of full-time library faculty is to provide library services to patrons.

D.  All full-time faculty are to provide support and guidance to students; develop program outcomes and curricula; complete required assessment activities; maintain critical relationships; perform program management functions; and keep current in their respective fields.

Section 2.  Instructional Workload Factors.

A.  The instructional loads defined describe existing workload standards at the College.  These are not intended to provide either a general workload increase or decrease.

B.  The assignment of instructional load for faculty is the responsibility and authority of the appropriate dean/administrator.

C.  Instructional Load Standards.

1.  Faculty shall normally be assigned with a range of forty-one (41) to forty-eight (48) instructional units per academic year.

2.  Faculty who teach four (4) to eight (8) lab credits per academic year shall normally be assigned within the range of forty-one (41) to forty-seven (47) instructional units.

3.  Faculty who teach nine (9) to fourteen (14) lab credits per academic year shall normally be assigned within the range of forty-one (41) to forty-six (46) instructional units.

4. Faculty who teach fifteen (15) or more lab credits per academic year shall normally be assigned within the range of forty-one (41) to forty-five (45) instructional units.

5. Faculty members with a student/faculty ratio at or above the state average for the discipline who teach eight (8) or more sections of science labs per year will not have a unit load above 44 without additional compensation at the moonlight lab rate for the units above 44.

D. Instructional units shall be computed for the modes of instruction as follows:

1. Lecture (1.0 – 2.0) instructional units at the College

   a. One (1) contact hour per week shall equal 1.0 instructional unit for classes where the credit hours equal or exceed the weekly contact hours and class enrollment is less than fifty-five (55).

   b. One (1) contact hour per week shall equal 1.5 instructional units for classes where the credit hours equal or exceed the weekly contact hours and class enrollment is between fifty-five (55) and seventy-two (72). The class cap is set at the top of the range.

   c. One (1) contact hour per week shall equal 2.0 instructional units for classes where the credit hours equal or exceed the weekly contact hours and class enrollment is between seventy-three (73) and ninety-six (96). The class cap is set at the top of the range.

   d. Class enrollment means enrollment on the 10th day.

2. Laboratory (.60) instructional unit at the College

   a. One (1) contact hour per week shall equal .60 instructional unit as above for classes that require more than one (1) but not more than two (2) weekly contact hours for each credit hour.

3. Clinical (.40 instructional unit)

   a. One (1) contact hour per week shall equal .40 instructional unit for classes requiring more than two (2) weekly contact hours for each credit hour.

Section 3. Guidelines for Faculty Workload

The following are provided to help define reasonable expectations of faculty workload and to facilitate equity of workload among faculty members.

A. Factors included in full-time faculty workload:

Full-time faculty workload is understood to include instructional or non-instructional assignment, student advising, committee participation, and other duties as defined in faculty contracts.

Work expectations for faculty who have release time should be proportional to their percentage of instructional assignment.

B.  Multiple course preparations:

Those faculty who as part of their regular workload are required to have more than five (5) preparations ready for one (1) quarter, or those faculty members who as part of their regular workload are required to have more than ten (1) total preparations in the regular school year, shall not be expected to be at the higher end of the 41-48 range of instructional units.

C.  High student/faculty ratios:

Full-time faculty whose student/faculty ratio exceeds thirty-five (35) during the academic year may be excused from one committee assignment.

D.  Advising load:

So far as is possible, student advising shall be matched with faculty advisors by program, major, and degree intent at the time of initial registration.

Each quarter, faculty who advise thirty (30) or more students may provide their dean with a list of advisees served.  Advising workload for faculty who do not provide a list of advisees served will be calculated via the system in use by the College.

All advisees count equally, regardless of a student's status as full- or part-time.

Faculty members will be available to provide information about their program to questions initiated by potential students.  The activity will take place on campus during regularly scheduled hours unless otherwise mutually agreed upon by the College and the faculty member.

Every effort shall be made to equalize advisee loads at 15-30 advisees.  Any advisor who averages thirty (30) advisees during an academic year shall exceed that number only with written permission of the said advisor and will be paid on the independent study rate, one (1) student credit hour for each advisee over thirty (30).

Faculty advisors with less than fifteen (15) advisees may be placed at the higher end of the 41-48 range of instructional units.

In each quarter when advising day is also a teaching day, advisors who have 15 or more assigned advisees that same quarter (or a proportional number for pro rata faculty) will be provided one additional personal day.  These additional personal days must be used by the end of the academic year in which they are earned.

E.  Committee assignment and participation:

The College shall continue efforts to equalize committee assignments for all full-time faculty.  A range of 2-4 committee assignments is considered reasonable and fair, with the understanding that committee work should not be expected to exceed four (4) hours per week on an average during the school year.
Committee assignment refers to all committees on which a faculty member may serve due to their employment at the College.

A faculty member who serves as an advisor to a student club or organization that is recognized by the ASCC may count that as one of their committee assignments.

A maximum of one club may count as one of the committee assignments.

Those faculty who choose not to participate in committee work may be placed at the higher end of the 41-48 range of instructional units.

F.  Other workload factors:

In addition to the measurable workload factors listed, the following workload factors will be considered as part of the faculty member's professional commitment to the College.  These factors include, but are not limited to, program specific duties; external requirements; course specific duties; outreach/promotions; and non-instructional student contact.

<u>Section 4.  Other Provisions.</u>

A.  Counselors and librarians holding full-time faculty appointments who from time-to-time are assigned to instruct classes in the College shall do so during their weekly hours.

B.  Faculty may be assigned additional instructional units above the norm in order to meet the state formula funded student/faculty ratio for the instructional assignment.  In no case shall the total assignment exceed thirty-five (35) hours per week, including office hours.

C.  All full-time faculty will schedule at least five (5) office hours per week at a time convenient to students and approved by the appropriate dean/administrator.  Faculty may elect to hold two (2) out of the five (5) office hours online.

D.  Instructional unit credit for situations that are not covered by one of the modes of instruction (e.g., individualized instruction, field supervision, cooperative education, small business, farm management, team teaching) shall be determined on an individual basis by the appropriate dean/administrator.

E.  Faculty may be responsible for minor clerical duties associated with his or her primary assignment.

F.  One (1) day per quarter will be set aside for faculty to engage in assessment activities.  This "Assessment Day", to be scheduled by the Calendar Committee, shall be during the week before final exams.  If needed, deans may call one meeting, of one hour duration, during the winter quarter assessment day.  No meetings called by the deans will be held during the spring quarter assessment day.

G.  On the second and third day of final exams, initial advising for students never previously enrolled will be completed by the Advising and Counseling Center.

H.  Summer advising by faculty members is optional.  A schedule identifying dates and times for summer advising must be available by April 1.  Multiple training opportunities for summer advising must be held in spring quarter for faculty who have signed up for summer advising sessions.

I.  Nothing in this Article shall be construed to alter the full-time work assignment otherwise established in Article I.

Section 5.  Spring Review.

Before the end of spring quarter, each full-time and pro rata faculty member will meet with her or his supervisor to discuss workload.  During this meeting the current workload will be reviewed and workload for the upcoming year will be discussed.  It is the responsibility of the supervisor to schedule the spring review meeting.

## ARTICLE XI:  DISTANCE EDUCATION

Section 1.  Definition.

A.  For purposes of this Article, distance education will include courses offered online, hybrid, and interactive 2-way audiovisual.  This includes courses developed at the College or by external groups such as Washington On-Line.

Section 2.  Participation.

A.  Participation in the development of and teaching of distance education courses shall be voluntary.  A decision not to participate shall not be reviewed in a negative manner.

B.  Participation is not voluntary for faculty members specifically hired to teach hybrid or online courses.

Section 3.  Training.

A.  The eLearning department shall provide or facilitate technology training and instructional support.

    1.  E-learning training information will be provided to newly hired faculty by the respective dean.

B.  Faculty who are teaching online and hybrid courses are required to be trained in the learning management system that the course will utilize.

C.  When learning management software is changed, faculty members will be trained in the new software.

D.  Whenever possible, faculty members will have one quarter notice before teaching a class in a new modality.

E.  A Learning Management System Training Committee will consist of two (2) faculty members selected by the Federation and two (2) administrators.  This committee will be responsible for establishing a payment scheduled to be used by eLearning to compensate adjunct faculty for learning management systems training.

    1.  $5,000 will be made available annually to compensate adjunct faculty for learning management systems training.

Section 4.  Faculty Qualifications.

The qualifications of faculty teaching distance education classes must be consistent with those of the College faculty.

Section 5.  Workload.

A.  Class size for online classes will be capped at twenty-eight (28), or the class cap for other modalities listed on the course outline, whichever is lower.

B.  Distance education classes may be part of a full-time faculty member's load or as an adjunct contract at the adjunct credit rate.

C.  Grading procedures, textbook selection, class scheduling and faculty evaluations will follow the same policies and procedures established for traditional courses.

D.  Faculty who teach three (3) or more online classes per year will be assigned within a range of forty-one (41) to forty-five (45) instructional units per academic year.

Section 6.  Support.

A.  Technical support necessary for class delivery will be provided by the College.

B.  The College will make every effort to provide access to equipment necessary for effective delivery of distance education.

C.  If a distance education instructor travels to a site, the College will compensate for travel in accordance with state policies.

D.  To help assure student identification, the College will provide faculty members with instructional design support so that all online classes will include practices such as multiple assessment points, proctored exams, varied assessments, and other strategies.

E.  The College will make arrangements for proctoring, as required by the faculty member.

F.  Support assessment for online teaching:

1.  First time online faculty will develop, in collaboration with the eLearning department, a first quarter assessment plan.  This plan will be used by and shared with only the faculty member and the eLearning department.  This process will not be punitive.

2.  Any faculty member teaching online may request this process.

Section 7.  Course Development and Intellectual Property Rights.

A.  Faculty members will be given contracts for online course development that clearly state ownership.  If the College pays for the development, the faculty member gives up intellectual property rights.  Courses and course materials developed with any college resources are, by law, property of the college.

B.  After a course outline has been approved by Instructional Council, excluding web-enhanced courses:

1.  The appropriate program dean and faculty chair discuss upcoming modalities;

2.  Then, the eLearning course development process will commence only by approval of the appropriate program dean.

C.  When a faculty member converts a course that they teach to an online modality, that faculty member will be paid $150 per credit.  If the faculty member teaches multiple sections of the same course, they may be paid only once for converting that course.  Payment will occur upon completion of the online development process.

Section 8.  Online Assessment.

A.  Evaluation forms designed specifically for online classes are to be used for online classes.

B.  When formal student evaluations are required, they will be conducted after 60% of the course has been taught.

C.  When online faculty members are being observed for purposes of assessment, an appointment must be made in advance and the observer's presence will be made known.

Section 9.  Non-supplanting.

The inclusion of distance education classes into the College curriculum shall not result in the reduction of full-time faculty.

## ARTICLE XII:  LEAVE OF ABSENCE

Section 1.  Leaves with Pay.

Full-time faculty members shall be granted twelve (12) days upon the first day on which their initial assignment begins.  After three (3) quarters of employment, full-time faculty members shall accumulate such leave at a rate of one (1) day for each calendar month during which they are employed for either a contractual day or on a part-time basis for summer school provided the total does not include more than twelve (12) days during any given twelve (12) month period.  Three (3) personal leave days per academic year are granted to eligible faculty in addition to the above.

A.  Bereavement, Emergency, Family, Medical, Disability, and Personal Leaves.  The Employer reserves the right to request reasonable documentation in the event of leaves for illness or injury.

   1.  Bereavement leave, up to a maximum of five (5) days per bereavement, shall be granted in the event of a death in the faculty member's immediate family, of any person living in the immediate household, or of another person with a substantially similar relationship to the faculty member.  For the purposes of this section, immediate family member is defined as mother, father, sister, brother, stepmother, stepfather, spouse, parents in law (mother and father), grandparents, grandchildren, children, stepchildren, other children residing in the home of the employee, domestic partner, and those individuals with a relationship to the domestic partner as enumerated in this paragraph for the employee's spouse.  Bereavement leave is deducted from accrued leave or personal days.  Leave time to pay last respects to very close deceased friends may be granted for a partial day without loss of pay.

   2.  Emergency leave, not to exceed two (2) days per year, shall be granted in the event a faculty member must meet legal, personal, or business obligations which unexpectedly arise and cannot be fulfilled outside of the normally posted schedule.

3. Personal Leave.

    a. Full-time and pro rata faculty will be granted three (3) personal leave days per academic year.  Unused personal leave days at the end of an academic year will be forfeited.  There is no limit to the number of personal leave days that may be used in any one quarter.

    b. Faculty whose program necessitates an extended contract may use one (1) personal leave day during the extended period.  Summer quarter is the first quarter of the academic year.

    c. Prior approval by the immediate supervisor is required for scheduling personal leave days.

Leaves for emergencies not covered above or exceeding the limits established above, may be granted upon recommendation by the appropriate vice president or corrections dean and approved by the President.

B.  Procedures for Obtaining Leaves with Pay.

The faculty member shall notify the President or designee at the earliest possible time prior to the departure of the necessity for the leave.  Such notification shall include the following:

1. The nature of the leave.

2. The most appropriate coverage of the faculty member's assigned duties.

3. The estimated leave time.

4. When feasible, where the faculty member may be reached during such leave time.

Except for emergencies of a catastrophic nature, the requests should be submitted for emergency and other leaves well in advance of desired leave [preferably at least seven (7) days].  The faculty member shall produce a written leave request stating the purpose for which leave is sought and the most appropriate coverage of assigned duties.

The President or designee shall review all such requests and grant approval or denial prior to taking the requested leave.  Reasons for denial shall be provided in writing.

For emergencies of a catastrophic nature, the most expeditious means available for notifying the President should be utilized.  Upon return to campus, the faculty member shall provide the necessary information to the President to justify its inclusion in this category for payroll purposes.

**Exception:**  Deviations from posted schedules may be approved by the dean (or immediate supervisor) and consists of performing the faculty member's regular contractual duties but in a

location different than that which is posted and for which the dean (or immediate supervisor) has ample time to arrange for any needed coverage during the absence. Deviation from schedule does not include an absence from any scheduled classes.

C. Accrual. Pursuant to applicable statue, each full-time faculty member's portion of sick leave allowance shall accumulate from year to year without limit. Faculty members may cash in unused sick days above an accumulation of sixty (60) compensable days at a ratio of one (1) full day's pay for each four (4) full accumulated compensable sick days consistent with the following rules:

1. Days cashed in during January of each year shall be limited to any compensable days earned the previous year less sick leave days actually utilized during such period.

2. Days cashed in upon death or retirement shall include all compensable days as herein defined which have not previously been cashed in. Retirement shall be determined pursuant to the applicable retirement system. For the purposes of TIAA/CREF, retirement due to age shall not be considered to have occurred prior to attainment of age fifty-five (55).

3. All days earned after July 1, 1981 shall be deemed compensable. Days accumulated or transferred into the College prior to July 1, 1981 shall be deemed compensable on the basis of one (1) day for each calendar month during which a contractual day was worked. Additional accumulated days shall be retained as non-compensable days. No combination of circumstances shall result in more than one (1) compensable day being earned per month during any twelve (12) month period.

4. Days of sick leave used during the previous calendar year shall be drawn from the days accumulated in the compensation account during that same year. Days taken in excess of the annual accumulation shall be deducted from the auxiliary account, until such time that this account is depleted, following which any further absence shall be taken from the compensation account.

D. Medical Expense Plan. Pursuant to RCW 28B.50.553, faculty who accrue sick leave are eligible to participate in a Voluntary Employee Benefits Association (VEBA) upon retirement instead of receiving cash payment for eligible accrued sick leave.

1. Administration of the Plan. The plan will be administered by a third party, VEBA CTC ("Plan Administrator"). When an eligible employee retires, an amount equal to (and in lieu of) his/her sick leave buyout will be deposited by the College directly with the Plan Administrator. The Plan Administrator will thereafter be responsible for payment of the retiree's medical insurance premiums and medical, dental, and vision care expenses not covered by insurance (including co-payments and deductibles). Such payments will be made from a retiree's account until such account is exhausted. The Plan Administrator will also be responsible for accounting for each retiree's account, providing reports of account activity to the retiree, paying investment returns on each account, and applying administrative fees to each account.

2.  Required Employee Agreements.  Before funds are deposited in a retiring employee's account, the employee is required to sign an agreement to participate in the plan.

Section 2.  Leaves without Pay.

A.  Attendance at Institutions of Higher Learning.  Upon approval of the President, leaves of absence without pay up to one (1) year may be granted to any full-time faculty member for the purpose of attending an institution of higher learning.  A written application for leave without pay shall be presented to the appropriate vice president.  The written application shall contain a statement of the plan of study and the institution the faculty member plans to attend.  Such application must be filed by April 1 for leave requested to start the next academic year.  Such leaves shall not count as service for purposes of salary advancement or the accrual of benefits.

B.  Other Leaves without Pay.  Leave for other reasons may be granted to full-time faculty members upon mutual consent for up to one (1) year.  Terms and conditions of such leaves shall be reduced to writing.

Section 3.  Rights While on Approved Leave.

While on approved leave, faculty members retain their position in the assigned RIF unit(s) and continue to be subject to all of the provisions of this negotiated agreement.

Section 4.  Adjunct Faculty Leave.

A.  Method of Calculation.  Faculty members employed on adjunct and/or quarterly contracts shall earn sick leave based on their contracted FTEF multiplied by seven (7) for each month they are in active teaching status.  At no time shall the total hours of sick leave earned per month exceed seven (7) hours.  Adjunct faculty shall be granted three (3) days (prorated) sick leave upon the first day on which their initial assignment begins.  After the initial quarter of employment, adjunct faculty shall accumulate such leave at the rate of one (1) day (prorated) for each calendar month during which they are employed for a contractual day provided the total does not include more than twelve (12) days during any given twelve (12) month period.

B.  Usage.  Adjunct faculty are entitled to use their accrued sick leave for bereavement, emergency, family, medical, and disability purposes consistent with that of full-time faculty as defined in Article XII, Section 1, A.  Sick leave will only be taken during the duration of a current adjunct contract.  For purposes of establishing eligibility under the Family Medical and Leave Act, adjunct faculty are required to work three (3) consecutive quarters with the College.

C.  Accrual.

1.  Adjunct faculty accrue sick leave from quarter to quarter.

2. The College will maintain an individual's sick leave balance for three years following active employment.

3. Active employment for purposes of sick leave accrual for adjunct faculty is teaching at least one class every two (2) fiscal years.

4. Adjunct faculty must petition for reinstatement of their accrued sick leave balance within three (3) years following active employment with the College. Failure to petition for reinstatement of sick leave will result in the loss of any accrued sick leave balances.

D. Attendance Incentive. Adjunct faculty may cash in unused sick days above an accumulation of sixty (60) compensable days at a ratio of one (1) full day's pay for each four (4) full accumulated compensable sick leave days consistent with the rules identified in Section 1, C of this article.

E. Shared Leave. Adjunct faculty may participate in the College's shared leave program.

F. Transferability. Adjunct faculty may transfer sick leave balances from another Washington State public community and/or technical college when the College becomes the sole employer. Adjunct faculty must petition to transfer their sick leave balance during the third quarter following the initial first two (2) quarters in which the College has been their sole employer.

If simultaneously employed at another Washington State public community college and/or technical college, the respective campus' Negotiated Agreement will apply.

G. Sick Leave Cash-out at Retirement or Death. Adjunct faculty may cash-out unused portions of their sick leave balances at the time of their retirement or death. In the case of death, adjunct faculty designated beneficiaries would be entitled to receive the cash-out. For purposes of sick leave cash-out, adjunct faculty must provide the College with the appropriate verification from their retirement plan (TRS1, 2, or 3, PERS 1, 2, 3, TIAA/CREF, and/or Social Security) which shows they are receiving distribution payments and are in retirement status. Adjunct faculty who retire under one (1) or more retirement plans listed above, may be eligible for subsequent cash-out of unused portions of their sick leave if they reestablish employment status under another retirement program.

Adjunct faculty who retire (as noted above) may participate in the medical expense plan (VEBA) as defined in Section 1, D, 1 of this Article.

Section 5. Moonlight Faculty Leave.

A. Method of Calculation. Faculty members employed on a moonlight contract during fall, winter, or spring quarters may take one (1) leave day per quarter. A "day" shall mean one (1) class meeting. This leave does not accrue.

B. Full-time faculty employed on a moonlight contract during the summer quarter may use the regular sick leave procedures for full-time faculty.

Section 6. Authorized Absences.

A. Jury Duty. Faculty members shall receive time off for required appearances in court or hearings resulting from a call to jury duty or subpoena to appear to testify where the faculty member is not personally involved in the action as the plaintiff, the defendant, or the object of the investigation.

B. Professional Meetings and Conferences. Faculty members may be granted approval for attendance at official institutes, conferences, and/or professional meetings. The purposes of such attendance must be to add to the professional capabilities in the field in which the faculty member is hired and working. Neither students nor the faculty member's regular duties shall suffer unduly or disproportionately to the benefits anticipated from the activity.

C. The prior approval for professional development will be granted equitably, and when prior approve has been granted, it will not be arbitrarily revoked.

D. Public Testimony. Faculty members shall be granted approval to give public testimony connected to their official duties as a College employee when requested to do so by a governmental agency, to include the legislature, administrative and/or judicial bodies. Faculty members must provide the appropriate supporting documentation to the College's Human Resources Office. Appropriate documentation could include letterhead, email, faxes, or other confirming documentation of the agency's request.

Section 7. Unauthorized Absences.

Unauthorized absence, approved leave without pay, or leave taken without following the procedures described herein shall result in a salary reduction on one of the following bases: (For these purposes "absence" or "leave" shall be defined as absence from the campus during scheduled hours of instruction or related services to students, or absence from regularly scheduled meetings of organizations or groups which the individual is expected to attend.)

A. 1/177 of the instructor's basic nine-month contract for each full day of absence, or

B. 1/7 of a day's pay for each hour when leave is taken for a fraction of a day.

C. Extenuating circumstances will be considered as a basis for modifying above items A and B by joint action of the President and appropriate vice president.

Section 8. Family and Medical Leave.

A. Consistent with the federal Family and Medical Leave Act of 1993 (FMLA) and any amendments thereto and the Washington State Family Leave Act of 2006 (WFLA), a faculty member is eligible if he or she has worked for the College as a full-time faculty member for

one (1) academic year during the year preceding the start of the leave. Pro rata faculty members qualify on a pro-rated basis. Faculty members not eligible are those who are in their first year of employment, substitute workers, and other adjunct faculty members who have not worked three consecutive quarters with the College. An eligible faculty member is entitled to up to twelve (12) workweeks of family medical leave in a twelve (12) month period for one or more of the following reasons:

1. Parental leave for the birth and to care for a newborn child, or placement for adoption or foster care of a child and to care for that child.

2. Personal medical leave due to the faculty member's own serious health condition that requires the faculty member's absence from work.

3. Family medical leave to care for a spouse, son, daughter, parent, or state registered domestic partner as defined by RCWs 26.60.020 and 26.60.030 who suffers from a serious health condition that requires on-site care or supervision by the faculty member. Because the FMLA does not recognize state registered domestic partners, an absence to care for an employee's state registered domestic partner in accordance with the WFLA will not be counted towards the twelve (12) workweeks of FMLA.

4. Family medical leave for a qualifying exigency when the faculty member's spouse, child of any age, or parent is on active duty or on call to active duty status of the Armed Forces, Reserves or National Guard for deployment to a foreign country.

   Qualifying exigencies include attending certain military events, arranging for alternate childcare, addressing certain financial and legal arrangements, attending certain counseling sessions, rest and recuperation, and attending post-deployment reintegration briefings. In addition, the College and the faculty member may agree that the other events which arise out of the covered military member's active duty or call to active duty status qualify as an exigency, provided both agree to the timing and duration of the leave.

B. Military Caregiver Leave will be provided to an eligible faculty member who is the spouse, child of any age, parent or next of kin of a covered service member to take up to twenty-six (26) workweeks of leave in a single twelve (12) month period to care for the covered service member or veteran who is suffering from a serious illness or injury incurred in the line of duty.

   1. During the single twelve (12) month period during which Military Caregiver Leave is taken, the employee may only take a combined twenty-six (26) workweeks of leave for Military Caregiver Leave and leave taken for other FMLA qualifying reasons.

   2. The single twelve (12) month period to care for a covered service member or veteran begins on the first day the faculty member takes leave for this reason and ends twelve (12) months later, regardless of the twelve (12) month period established for other types of FMLA leave.

C. Entitlement to family medical leave for the care of a newborn child or newly adopted or foster care child ends twelve (12) months from the date of birth or the placement of the foster or adopted child.

D. The family medical leave entitlement period will be a twelve (12) month period measured forward from the date an employee begins family medical leave. Each time a faculty member takes family medical leave during the twelve (12) month period, the leave will be subtracted from the twelve (12) workweeks of available leave. In addition to the twelve (12) weeks allowed by FMLA, the College will allow eligible faculty members to have an additional month of paid benefits for parental or disability leave if the eligible faculty member has placed themselves in pay status for at least one (1) day that month.

E. The College will continue the faculty member's existing employer-paid health insurance, life insurance, and disability insurance benefits during the period of leave covered by family medical leave. The faculty member will be required to pay his or her share of health insurance, life insurance, and disability insurance premiums. The College may require a faculty member to exhaust all paid leave prior to using any leave without pay, except that the employee will be allowed to use the necessary amount of accrued leave during each month to provide for the continuation of benefits as provided for by the Public Employees Benefit Board.

F. The College has the authority to designate absences that meet the criteria of the family medical leave.

   1. The use of any paid or unpaid leave (excluding leave for compensable work=related illness or injury and compensatory time) for a family medical leave qualifying event will run concurrently, with, not in addition to,the use of the family medical leave for that event. A faculty member, who meets the eligibility requirements, may request that family medical leave run concurrently with absences due to work-related illness or injury covered by workers' compensation at any time during the absence. Faculty members will not be required to exhaust all paid leave prior to using any leave without pay for a compensable work-related injury or illness.

   2. A faculty member using paid leave during a family medical leave qualifying event must follow the notice and certification requirements related to the family medical leave usage in addition to any notice requirements relating to the paid leave.

G. Parental and Pregnancy Disability Leave.

   1. Parental leave will be granted to the faculty member for the purpose of bonding with his or her natural newborn adoptive or foster child. Parental leave may extend up to six (6) months, including time covered by the family medical leave, during the first year after the child's birth or placement. Leave beyond the period covered by family medical leave and pregnancy disability may only be denied by the College due to operational necessity.

2. Pregnancy disability leave will be granted for the period of time a faculty member is sick or temporarily disabled because of pregnancy and/or childbirth and will be in addition to any leave granted under family medical leave or Washington state family leave laws.

H. The College may require certification from the faculty member's, family member's, or covered service member's health care provider for the purpose of qualifying for family medical leave.

I. Personal medical leave, serious health condition leave, or serious injury or illness leave covered by family medical leave may be taken intermittently or on a reduced schedule basis when certified as medically necessary. Faculty members must make reasonable efforts to schedule leave for planned medical treatment so as not to unduly disrupt the College's operations. Leave due to qualifying exigencies may also be taken on an intermittent basis.

J. Upon returning to work after the faculty member's own family medical leave qualifying illness, the faculty member may be required to provide a fitness for duty certification from a health care provider.

K. Eligible faculty members must give thirty (30) days advance notice to their supervisor and Human Resources of the need for family medical leave when it is foreseeable. When it is not possible, notice must be given "as soon as possible" ordinarily between one (1) and two (2) business days of when the eligible faculty member learns of the need for leave.

L. Faculty members may need to have alternative work assignments prior to or following a FMLA qualifying event. In order to minimize the potential disruption to the instruction of students, faculty members will work with Human Resources and their supervisor to determine the best option.

M. Faculty members returning from family medical leave will have return rights in accordance with FMLA and WFLA.

N. Both parties agree that nothing in this Agreement will prevent a faculty member from filing a complaint regarding FMLA with the Department of Labor or regarding the WFLA with the Department of Labor and Industries.

O. Definitions used in this Article will be in accordance with the FMLA and WFLA. The parties recognize that the Department of Labor is working on further defining the amendments to FMLA. The College and the faculty members will comply with the existing and any adopted federal FMLA regulations and/or interpretations.

## ARTICLE XIII:  EVALUATION

All contracted faculty members shall be evaluated. Evaluations shall be conducted in accordance with evaluation procedures mutually developed and approved by the Federation and the College.

<u>Section 1.  Tenured Faculty.</u>

A.  Purpose.  The purpose of the post-tenured faculty evaluation process shall be to foster continued excellence in the performance of academic duties.

This process will not be used in any disciplinary action by the College towards a faculty member.

B.  Evaluation Cycle.  Evaluation of all tenured faculty shall be completed on a five-year cycle.

The Federation and the College will mutually determine a process by which tenured faculty will be divided into five (5) groups to be assigned to one (1) of the five (5) years of the evaluation cycle.  Whenever possible, workforce faculty will be assigned to a group so that their post tenure evaluation cycle coincides with their five-year vocational certification cycle.
The quarter after tenure is awarded the faculty member will be placed in the current year's group and shall develop their Professional Development Plan in collaboration with their immediate supervisor.

C.  Components.  The post-tenured faculty evaluation process will be composed of the following components:

1.  A Post-Tenure Evaluation Committee;

2.  A Professional Development Plan (PDP);

3.  Self-Evaluation;

4.  Three (3) sets of student evaluations;

5.  A peer evaluation;

6.  Two (2) classroom observations completed by the chair of the Post-Tenure Committee;

7.  A supervisory evaluation;

8.  Workload reports from Annual Spring Workload meetings; and

9.  A report written by the committee.

D.  Process.  The College will develop and monitor a checklist for the evaluation process and place this in the tenured faculty member's Post-Tenure Evaluation file.

1.  Post-Tenure Evaluation Committee

a.  Composition:  Each tenured faculty member shall have a Post-Tenure Evaluation Committee composed of:

(1) one (1) faculty member chosen by the faculty member being evaluated;

(2) one (1) peer evaluator chosen in collaboration between the faculty member being evaluated and his/her immediate supervisor;

(3) the immediate superior who will serve as the committee chair;

    a)  It is the responsibility of the chair of the committee to ensure that all of the elements of the Post-Tenure Evaluation Process are completed at the appropriate times.

(4) and the faculty member being evaluated.

b. Upon request, the vice president may appoint an alternate administrator to fulfill the role of the chair in the Post-Tenure Evaluation process with the exception of the completion of the supervisory evaluation during the fifth year of the evaluation cycle.

2. Meetings:  The Post-Tenure Evaluation Committee must meet three (3) times during the fifth year of the evaluation cycle.

a. The first meeting shall take place during the fall quarter during which time the committee and the faculty member being evaluated shall clarify roles, review the Professional Develop Plan, review the Self-Evaluation, and establish dates/times for the remaining two (2) meetings.

b. During the second meeting, the committee shall review and analyze information provided by the student evaluations, peer evaluation, classroom observations, supervisory evaluation, and the self-evaluation.  The faculty member being evaluated is not present during this meeting.

c. During the third meeting, the committee shall share with the faculty member being evaluated the information provided by the student evaluations, peer evaluation, classroom observations, supervisory evaluation, and the self-evaluation.  The committee shall identify the elements and content of the report.

3. Report.

a. Each Post-Tenure Evaluation Committee shall submit a report identifying strengths and areas that may need development based on the information provided by the student evaluations, peer evaluation, classroom observations, supervisor evaluation, and the self-evaluation.  This report will help guide subsequent Professional Development Plans.

b. It is the responsibility of the chair of the committee to write the report and submit it no later than May 15 of the fifth year to the appropriate vice president.

c. All members of the committee will sign and date the document before it is submitted.

d. Copies of the report shall be sent to the faculty member being evaluated, to the chair of the committee, and to the immediate supervisor is he/she is not the chair of the committee.

4. Professional Development Plan.

   a. The Professional Development Plan (PDP) shall be developed, modified, or updated in collaboration with the immediate supervisor during the fall quarter of the fifth year of the cycle.

   b. The PDP shall be placed in the faculty member's Post-Tenure Evaluation file, in addition to the Professional Development File used by the Faculty Professional Development Committee.

   c. The PDP may be modified at any time in collaboration between the faculty member and the immediate supervisor.

5. Self-Evaluation.

   a. Each tenured faculty member will complete a self-evaluation as part of the Post-Tenure Evaluation Process.

   b. The self-evaluation shall be submitted to the chair of the committee by the second meeting in the process.

6. Student Evaluation.

   a. Three (3) sets of student evaluations shall be completed during the post-tenure evaluation cycle.

   b. Student evaluations shall be conducted during the first and third year.

   c. Two (2) of the classes to be evaluated shall be selected by the faculty member.

   d. One (1) of the classes to be evaluated shall be selected by the chair of the committee.

   e. Counselors shall select the option of either three (3) sets of twenty-five (25) post-individual session student evaluations, student evaluations from a small group, or a combination. If the combination is chosen, the number of individual evaluations to be completed will be ten (10).

   f. Librarians shall have three (3) sets of twenty-five (25) student evaluations completed after the librarian's services have been rendered.

   g. Student evaluations shall be administered after the tenth day of the quarter and before the 35th day of the quarter.

7. Peer Observation.

    a. A peer, chosen in collaboration between the faculty member being evaluated and the chair of his/her post-tenure evaluation committee shall complete a peer evaluation during the fourth year of the evaluation cycle.

    b. The peer may be a professional in the faculty member's discipline from off campus.

8. Classroom Observation.  The chair of the Post-Tenure Evaluation Committee shall complete an observation during the second year and the fourth year of the evaluation cycle.

9. Supervisory Evaluation.  The immediate supervisor shall submit a supervisory evaluation during the fifth year of the evaluation cycle.

10. Workload Document.  The immediate supervisor shall provide the committee copies of the workload documents from the annual spring workload meetings.

    a. In cases where collaboration fails, disputed issues shall be submitted to mediation. The mediator will be mutually agreed upon by the Federation and the College. Mediation costs will be equally shared by the Federation and the College.

E. Records.

1. All original materials and data used and collected as part of this process shall be placed in the Post-Tenure Evaluation file of the faculty member being evaluated.

2. All original materials and data used and collected as a part of this process shall be maintained in the office of the appropriate vice president.

3. Copies of the Post-Tenure Evaluation file shall be made available to the faculty member upon request.

4. The documents will be maintained in accordance with Washington States rules regarding records retention.

**Table 1:  Post-Tenure Evaluation Process**

|  | Component | Person(s) Responsible |
|---|---|---|
| Year #1 | Post-tenure Evaluation Committee formed | Created by VP, Committee Chair and Faculty Member |
|  | Student Evaluation(s) | Committee Chair |
|  | Spring Workload Review | Faculty Member and Supervisor |
| Year #2 | Classroom Observation #1 | Committee Chair |
|  | Spring Workload Review | Faculty Member and Supervisor |
| Year #3 | Student Evaluation(s) | Committee Chair |
|  | Spring Workload Review | Faculty Member and Supervisor |
| Year #4 | Classroom Observation #2 | Committee Chair |
|  | Peer Evaluation | Chosen in collaboration between faculty member and Committee Chair |
|  | Spring Workload Review | Faculty Member and Supervisor |
| Year #5 | Supervisor Evaluation (completed by the 2nd meeting) | Supervisor |
|  | Self-Evaluation (completed by the 2nd meeting) | Faculty Member |
|  | Final Report (completed, reviewed by the faculty member, and submitted by May 15) | Committee Chair |
|  | Spring Workload Review | Faculty Member and Supervisor |

**Note:**  This is a quick reference guide only.  For full details refer to Article XIII.

Section 2:  Full-time Non-Tenure Track and Pro Rata Faculty.

A.  Purpose.  The purpose of full-time non-tenure track and pro rata faculty evaluation is to strengthen the professional skills of the faculty.

B. Evaluation Cycle.  Evaluation of all full-time non-tenure track and pro rata faculty shall be completed annually for the first four (4) years and biannually thereafter.

   1. The Federation and the College will mutually determine a process by which full-time non-tenure track and pro rata faculty will be assigned to the evaluation rotation.

   2. Prior to the completion of the faculty member's designated year for evaluation, a conference between the faculty member and the appropriate vice president will be held to discuss the results of the evaluation.

C. Components.

   1. Professional Development Plan.

      a. Each full-time non-tenure track and pro rata faculty member shall develop a Professional Development Plan and discuss this plan with the appropriate vice president.

      b. The plan shall be placed in the faculty member's Professional Development file.

      c. The faculty member will then develop a new two-year Professional Development Plan.  This will be submitted to the appropriate vice president, who will read the document, note receipt, and place it into the faculty member's Professional Development file.  The appropriate vice president will have the opportunity to discuss questions about the Professional Development Plan with the faculty member before forwarding it to the file.

      d. During fall quarter, each faculty member will have the opportunity to submit modifications to his/her current Professional Development Plan.  Under unusual circumstances, the Professional Development Committee can approve modifications at other times.

   2. Supervisory Evaluation.  A supervisory evaluation will be performed each year for the first four (4) years a faculty member is in full-time non-tenure track or pro rata status, and every other year thereafter.  The faculty member will use the same evaluation form utilized in the probationary faculty review process.

   3. Self-Evaluation.  A self-evaluation will be performed each year for the first four (4) years a faculty member is in full-time non-tenure track or pro rata status, and every other year thereafter.  The faculty member will use the same evaluation form utilized in the probationary faculty review process.

   4. Student Evaluation.

      a. Instructional Faculty:  During the designated evaluation year, the instructional faculty member will select either written student evaluations or Student Guided Instructional Diagnosis (SGID) for a specified class and quarter.  The SGID or written student

evaluation shall take place after the 10th class day and prior to the 35th class day.  If the SGID is not completed by the 35th class day, written student evaluations will be completed by the 40th class day.  If neither the SGID nor written student evaluations are completed in the agreed upon time frame, this component will not be subject to review until the next evaluation cycle.

b.  Counselors:  During the designated evaluation year, full-time non-tenure track and pro rata counselors will select the option of either twenty-five (25) post-individual session student evaluations, or student evaluations from a small group, or a combination of both, to be completed during a quarter to be selected by the counselor. If the combination is chosen, the number of individual evaluations to be completed will be ten (10).

c.  Librarians:  During the designated evaluation year, the librarian will identify a time frame and notify the appropriate vice president when twenty-five (25) student evaluations will be completed.  These will be obtained from students after the librarian's services have been rendered.

5.  Instructional Observation (Instructional Faculty).  During the designated evaluation year, the instructional faculty member will also have a classroom observation, based on methodology, completed during a quarter to be selected by the faculty member.  The observer shall be a faculty member mutually agreed upon by the faculty member and the appropriate vice president.

6.  Peer Evaluation (Counseling and Library Faculty).

a.  Counselors:  During the designated evaluation year, the counselor will also have an observation, completed by a peer, of counseling situations to include either three (3) individual sessions or one (1) group session.  This is to be mutually agreed upon by the counselor and the appropriate vice president.  For peer observation of individual sessions, student consent is required.  The peer is defined as a faculty/counselor for the Washington State Community and Technical College system who may be either from on or off campus mutually agreed upon by the faculty member and appropriate vice president.

b.  Librarians:  During the designated evaluation year, the librarian will also have a peer observation completed during a selected half-day time frame.  The peer is defined as a full-time, tenured faculty/librarian from the Washington State Community and Technical College system from either on or off campus mutually agreed upon by the faculty member (librarian) and appropriate vice president.

7.  Spring Workload Review:  Each year each pro rata and full-time temporary faculty member will meet with his or her dean to complete a workload review.  This is not a mandatory component of the meeting with the vice president, but may be included if the faculty member chooses.

8. Evaluation Checklist:  The College will develop and monitor a checklist for the evaluation process and place this in the faculty member's Professional Development file.

9. Record Retention:  All original materials and data used and collected as a part of this process shall be destroyed in accordance with the legal minimum established by the records retention statute.  Copies of the current file shall be made available to the faculty member upon request.

<u>Section 3:  Adjunct Faculty.</u>

A.  Purpose.  The purpose of adjunct faculty evaluation is to strengthen their professional skills.

B.  Evaluation Cycle.  Adjunct faculty members who have taught less than two (2) quarters of classes at the College will be considered first-time and evaluated each of their first two (2) quarters and annually thereafter.

1. Other adjunct faculty are those who have completed two (2) full quarters of instruction at the College and will be evaluated annually.

2. Full-time and pro rata faculty who accept adjunct contracts (moonlighting) are exempt from this process.

3. The rotation of annual evaluation for adjunct faculty will be developed and managed by the Instruction Office.

C.  Components.  First-time adjunct faculty will be evaluated during the first two (2) quarters of teaching in the following manner:

1. During each of the first two (2) quarters, written student evaluations will be performed. A summarized report of the results will be provided to both the faculty member and the supervisor.

2. By the end of the second quarter, at least one (1) classroom observation and evaluation by supervisor or designee will be performed.

3. During each of the first two (2) quarters, the adjunct faculty will meet and confer with the supervisor on the results of the quarterly evaluations.

Other adjunct faculty will be evaluated annually with one (1) written student evaluation and one (1) classroom observation by the supervisor or designee for a single class.

Evaluation tools and forms will be mutually agreed upon by the Federation and the College.

## <u>ARTICLE XIV:  RESOLUTION OF CONCERNS</u>

<u>Section 1.  Tenured, Probationary, Full-time Non-Tenure Track and Pro Rata.</u>

A.  Purpose.  This is a process by which substantive concerns raised by the College can be addressed.  The goal of this sequential process is to resolve the concerns.

B.  Scope.  This process applies to tenured, probationary, full-time non-tenure track, and pro rata faculty.

This will not alter the at-will status of full-time non-tenure track or pro rata faculty.

This is a separate process from the tenure review process as identified in Article IX of this Negotiated Agreement.

C.  Written Complaints.  Written complaints must be submitted to the faculty member within ten (10) contract days of receipt by the appropriate dean or supervisor.

D.  Informal Communication.  It shall be the policy of the College to attempt to resolve the concern through direct verbal communication.

This communication can be initiated by either the faculty member or the College.

The faculty member may request representation by the Federation at any point during this step.

E.  Formal Communication.  If the concern is not resolved through informal communication, upon mutual agreement by the College, the Federation, and the faculty member, a formal process will be initiated.

In order to initiate the formal process, the complaint or concern(s) must be reduced to writing, signed, and presented to the faculty member and the Federation.

The Federation, notified in writing at the same time the faculty member is notified, will attend all meetings held pursuant to this section.

The College, the Federation, and the faculty member will mutually develop a written plan to address the concerns which will contain the following:

1.  Identification of the acceptable standard of behavior;

2.  Delineation of the faculty member's actual behavior supported by the complaint received which pertains to the specific concern.  The documentation which supports this complaint shall be included;

3.  Identification of the impact/effect of the specific behavior;

4.  A plan for resolution which will include the process for specific, measurable steps to be taken, the feedback mechanism, and a timeline for completion;

5.  The method by which the plan for improvement will be assessed;

6.  A plan which allows for investigation and information gathering by all parties.

Working documents will be held by the supervisor involved with the plan.  Upon successful resolution of the concerns, the documents will be placed in the faculty member's personnel file. One year after resolution, the file pertaining to this issue will be returned to the faculty member.

<u>Section 2:  Student Concerns.</u>

A.  Purpose.  This is a process by which concerns raised by students regarding faculty or instructional programs can be addressed.  The goal of this sequential process is to resolve the concern as close to the point of initiation as possible.  Complains regarding illegal discrimination and sexual harassment are to be handled by the appropriate procedures already in place.

B.  Informal Communication.  It shall be the policy of the College that the student and the faculty member will meet with each other in an attempt to resolve the concern through direct verbal communication.

C.  Formal Communication.  If the concern is not resolved through informal communication between the student and the faculty member, the student must reduce the concern to writing and submit it to the (associate) dean.  The written document shall include a description of the situation, relevant dates and times, examples, and copies of any and all relevant documents. This document must be signed and dated.

Upon receipt of the written complaint, the (associate) dean will submit the document to the faculty member, as per Article XII of the Negotiated Agreement and will meet with the faculty member.  Within fifteen (15) contract days of receipt of the written complaint, the (associate) dean will provide a written response to the student and a copy to the faculty member.

If the student chooses to appeal the decision, he/she must do so with the appropriate vice president within five (5) contract days of the (associate) dean's decision.  The vice president will also be required to respond in writing to the student within fifteen (15) contract days.  A copy will be sent to the faculty member.

If the student would like to appeal the decision, he/she may address the issue with the President within five (5) contract days of the vice president's decision.  The written complaint would again be submitted by the student for the President's consideration.  The President will communication his/her decision regarding the concern to the student (with a copy to the faculty member) within fifteen (15) contract days.  The President's decision is considered to be final under this process.

D.  Documentation.  Information and materials collected during this process are considered confidential and may be shared only with parties directly involved in the concern or College employees or agents of the College who, as a result of their official duties, have a need to know in order to perform the functions of their assignment.

One year after resolution, the file shall be closed.  Once the file is closed, materials and information in the closed file may not be used in any disciplinary action against the faculty member.  Materials shall be stored separately in the Instruction Office for a period of seven (7) years after the complainant has exhausted all rights to internal appeal.  After this seven (7) year period, and at the request of the faculty member involved, the College shall destroy the file and certify in writing to the faculty member that such destruction has occurred.  Materials and information from the file shall not be viewed or otherwise be made available to any person except the faculty member involved, except that the college shall have access to the file in order to comply with any lawful court order or subpoena, to defend itself or any employee from any litigation, grievance or complaint, or to otherwise comply with any legally required duty or obligation.  In such case where the file is reopened, the faculty member(s) involved shall be notified in writing within five (5) working days.

## ARTICLE XV:  UNRESOLVED CONCERNS

A.  Article XV, Resolution of Concerns, will be the first step in any prospective discipline except in cases of gross misconduct.

B.  The employer's expectations with respect to employee conduct will be clearly explained.  The employee will be informed of the consequences of his or her actions.  An investigation to determine the facts will be conducted fairly and objectively.

C.  All discipline matters will be handled in consultation with the Human Resources office.  The faculty member has the right to Federation representation throughout this process including during the college's initial interview with the employee.

D.  Options for discipline are:

1.  Oral reprimand;

2.  Written reprimand to be included in the employee's personnel file;

3.  Suspension; or

4.  Dismissal.

E.  Imposition of these measures will be progressive except in cases of gross misconduct.

F.  Prior to any prospective discipline the employee will be advised of his or her grievance rights.  Action beyond a written reprimand must be reported to the Federation regardless of the Federation's role in the process.

G. In the event a grievance is filed, all discipline will be held in abeyance until the grievance is resolved.  Leave with pay is not considered discipline with respect to this section.

H. Discipline documents and materials related to discipline will be treated in accordance with the personnel standards as in state law.

I. The College will train administrators regarding the application of discipline language in the Negotiated Agreement.

## ARTICLE XVI:  DISMISSAL AND REDUCTION IN FORCE

### Section 1.  Policy Relating to the Dismissal of Tenured and Probationary Faculty Members.

When reason arises to question the fitness of a tenured or probationary faculty member, it shall be the policy to attempt to resolve the matter without instituting the formal dismissal procedures. Furthermore, it shall be the policy that a tenured faculty member shall not be dismissed except for "sufficient cause", nor shall a faculty member who holds a probationary faculty appointment be dismissed prior to the written terms of the appointment except for "sufficient cause".

A. "Sufficient cause" shall include but is not limited to:

1. Aiding and abetting or participating in:

   a. Any unlawful act of violence;

   b. Any unlawful act resulting in destruction of College property;

   c. Any unlawful interference with the orderly conduct of the educational process.

2. Incompetence.

3. Neglect of duty.

4. Insubordination.

5. Conduct unbecoming a member of the faculty and which is detrimental to the educational objectives of the College, provided that no such charge shall be sustained that constitutes interference with academic freedom of the person charged.

6. Physical or mental inability to perform duties and responsibilities as specified in the contract.

7. Gross misconduct

8. For corrections sites, if the Superintendent has determined a faculty member is no longer permitted at a corrections site, this shall be sufficient cause under Article XVI, Sec. 1 and shall not go through Article XV:  Unresolved Concerns.

B. Reduction-in-force resulting from any of the following:

1. Lack of funds;

2. Elimination and/or reduction of programs, courses, or services;

3. Decreased enrollment;

4. Overstaffing;

5. Reduction of allotments pursuant to Chapter 43.88 RCW, as now or hereafter amended; or

6. Board-approved changes in educational policy and/or goals.

C. Reduction-in-force resulting from State Board for Community and Technical Colleges declaration of financial emergency pursuant to RCW 28B.50.873 under the following conditions:

1. Reduction of allotments by the governor pursuant to RCW 43.88.110(3), or

2. Reduction by the legislature from one biennium to the next or within a biennium of appropriated funds based on constant dollars using the implicit price deflator.

Nothing in this reduction-in-force policy shall be construed to affect the decision and right of the appointing authority not to renew a probationary faculty appointment without cause pursuant to RCW 28B.50.857.

<u>Section 2.  Informal Hearing.</u>

Before any official action is taken relating to a dismissal or reduction-in-force of a tenured or probationary faculty member, the faculty member shall receive:

A. Oral or written notice of the reasons;

B. An explanation of the evidence supporting the reasons; and

C. An opportunity either in person or in writing to present reasons why the proposed action should not be taken.  The Federation shall be notified in writing of any meetings held pursuant to this section at the same time the faculty member is notified.

Section 3.  Notice Requirements

A.  Formal Notice.  Following the informal procedures outlined in Section 5 above, the President may initiate dismissal procedures by specifying the grounds constituting sufficient cause for dismissal, serve written notice of the cause(s) to the affected faculty member and provide copies to the dismissal review committee.  The notice shall include:

    1.  A short and plain statement of the matters asserted.  In the case of a reduction-in-force for the reasons set forth in Section 1, B this shall include a statement of:

        a.  The grounds for reduction-in-force as delineated in Section 1, B, 1-6; and

        b.  The basis for selection of the affected faculty member.  In the case of a reduction-in-force for reasons set forth in Section 1, C, this shall clearly indicate the separation is not due to the job performance of the faculty member and is without prejudice, and, in addition, shall indicate the basis for reduction in force as one (1) or both of the reasons set forth in Section 1, C.  The notice must also indicate the effective date of separation from service.

B.  Request for Hearing.  The affected faculty member shall have twenty (20) days from the date of the notice of dismissal to make a written request for a hearing.  The faculty at the corrections sites have seven (7) days to make a request for a hearing when the matter involves a reduction-in-force for reasons set forth in Section 1, B.  If the faculty member fails to respond within the twenty (20) days provided herein, or seven (7) days with respect to the corrections sites faculty pursuant to Section 1, B, this failure to request a hearing shall constitute acceptance of dismissal and waiver of any right to a hearing.  The decision of a faculty member not to request a hearing shall be communicated to the dismissal review committee and the College.  Furthermore, a timely written request for a hearing within the above twenty (20) day period, or seven (7) days in the case of corrections sites faculty when the action is pursuant to Section 1, B is deemed jurisdictional.

C.  Notice of Hearing.  The notice of the hearing (in accordance with Administrative Procedures Act RCW 34.05.434) includes a statement of the time, place, and nature of the hearing (the hearing must be held on not less than ten (10) days written notice, or in the case of corrections sites faculty not less than three (3) days when the action is pursuant to Section 1, B; a statement of the legal authority and jurisdiction under which the hearing is to be held; and a reference to the particular rules of the College that are involved.

Section 4.  Procedural Rights of Affected Faculty Members.

An affected faculty member who has requested a hearing shall be entitled to one (1) formal, contested case hearing pursuant to the Administrative Procedures Act, chapter 34.05 RCW, and shall have the following procedural rights:

A.  The right to confront and cross-examine adverse witnesses.

B.  The right to be free from compulsion to divulge information which he/she could not be compelled to divulge in a court of law.

C.  The right to be heard in his/her own defense and to present witnesses, testimony, and evidence on all issues involved.

D.  The right to the assistance of the hearing officer in securing the witnesses and evidence pursuant to Administrative Procedures Act, chapter 34.05 RCW.

E.  The right to counsel of his/her choosing who may appear and act on his/her behalf at the hearings.

F.  The right to have witnesses sworn and testify under oath.

Section 5.  Hearing Office Appointment and Duties.

Upon receipt of a request for a hearing from an affected faculty member, the President shall notify the College and request that the College appoint an impartial hearing officer.  The hearing officer shall be an attorney in good standing with the Washington State Bar Association and shall not be an employee of the State of Washington or any of its political subdivisions, with the exception of an Administrative Law Judge.  The hearing officer shall also not be a member of the Board of Trustees of any community college in the State of Washington.

1.  In the case of a reduction-in-force for reasons set forth in Section 1, C, at the time of a faculty member's request for formal hearing, the faculty member may ask to participate in choosing the hearing officer in the manner provided in RCW 28A.405.310(4):

    a.  When there is more than one (1) faculty member affected by the College's reduction-in-force, faculty members requesting hearing must act collectively in making such request;

    b.  Costs incurred for the services and expenses of the hearing officer shall be shared equally by the College and the faculty member requesting a hearing.

A.  Duties.  It shall be the role of the impartial hearing officer to conduct the hearing in accordance with the Administrative Procedures Act Chapter 34.05 RCW.

B.  In the case of a reduction-in-force for reasons set forth in Section 1, C, the formal hearing (pursuant to Administrative Procedures Act Chapter 34.05 RCW and conducted by the hearing officer appointed by the Employer):

    1.  Shall be concluded by the hearing officer within sixty (60) days after written notice of the reduction-in-force has been issued;

    2.  The only issue to be determined shall be whether under the applicable policies, rules, or negotiated agreement, the particular faculty member advised of severance are the proper ones to be terminated;

3. Any findings, conclusions of law, and recommended decisions shall not be subject to further dismissal review committee action.

<u>Section 6.  Duties and Responsibilities of the Dismissal Review Committees.</u>

The general duty of dismissal review committees shall be to submit recommendations regarding proposed presidential action.  Specific responsibilities of the committees shall be:

A.  To review the case of the proposed dismissal.

B.  To attend the hearing and, at the discretion of the hearing officer, call and/or examine any witnesses.

C.  To hear testimony from all interested parties, including but not limited to other faculty members and students and review any evidence offered by same.

D.  To arrive at its recommendations in conference on the basis of the hearing.  As soon as reasonably practicable, but in no event longer than thirty (30) days after the conclusion of the formal hearing or within seven (7) days in the case of reduction-in-force for reasons set forth in Section 1, B, as it relates to the faculty at the corrections sites, and within three (3) days in the case of a reduction-in-force for reasons set forth in Section 1, C, the written recommendations of the committee will be presented to the hearing officer, the President, the affected faculty member, and the Board of Trustees.

E.  Failure of any dismissal committee to make written recommendations regarding dismissal within the prescribed time set forth in this Article shall be deemed a recommendation neither for nor against dismissal and the appointing authority may proceed with the dismissal or continue the appointment of the faculty member based upon this type of recommendation from the committee.

F.  Dismissal Review Committee shall mean a committee composed of the faculty peers or tenured faculty member's peers, one (1) student representative, who shall be a full-time student chosen by the student association of the College, and one (1) administrator.  The majority of the committee shall consist of the probationer's faculty peers or tenured faculty member's peers.

1. A separate dismissal review committee shall be established for each tenured faculty member for whom dismissal procedures are being initiated or for each probationary faculty member whose appointment may be terminated prior to the terms of the written contract when the reasons for such action are those specified in Section 1, A, 1 through 8 of this Article.  Each dismissal review committee shall be composed of five (5) persons, three (3) of whom shall be tenured faculty members selected by a majority of the tenured and probationary faculty members and the division chairs acting in a body, one (1) administrative officer appointed by the President, and one (1) full-time student chosen by the student association of the College.  Appointment shall be made within ten (10) days of written notice of pending dismissal.

2.  The immediate administrative supervisor of the faculty member under dismissal review should not be a member of his/her dismissal review committee.  The committee should elect its own chairperson from its membership.  If a vacancy on the committee occurs, the same process for selection of a replacement should be followed as applied in the selection of the original members.

3.  A separate College dismissal review committee should be created if dismissal procedures are being initiated in accordance with Section 1, B and C of this Article.  The committee shall be established within ten (10) days of receipt of notice of pending dismissal.  The members shall include one (1) administrator chosen by the President, one (1) full-time student chosen by the student association in such manner as the members thereof shall determine, and three (3) faculty members representing the faculty who shall be selected by a majority of the faculty acting as a body.  In no case shall a member of the committee sit in judgment of his/her own case, or the case of his/her spouse.  The immediate administrative supervisor of the faculty member(s) under review should not be a member of the review committee.  In the event there is a vacancy on the committee, a replacement shall be selected within five (5) days of the vacancy in the manner outlined above.

Section 7.  Final Decision by the Board of Trustees.

A.  The case shall be reviewed by the Board of Trustees as follows:

1.  The Board review shall be based on the record of the hearing below and on any record made before the Board of Trustees.

2.  The Board may permit an opportunity for oral or written argument or both by the parties or their representatives.

3.  The Board may hold such other proceedings as it deems advisable.

4.  The final decision to dismiss or not to dismiss shall rest, with respect to both the facts and the decision, with the Board of Trustees after giving reasonable consideration to the recommendations of the dismissal review committee and the hearing officer.  The dismissal review committee's recommendations and the findings, conclusions, and recommended decision of the hearing officer shall be advisory only and in no respect binding in fact or law upon the decisions maker, the Board of Trustees.  The Board of Trustees shall within a reasonable time following the conclusion of its review, notify the charged faculty member in writing of its final decision, and the effective date of dismissal.

B.  Effective Date of Dismissals.  The effective date of a dismissal for sufficient/adequate cause shall be such date subsequent to notification of the Board's final written decision as determined in the discretion of the Board of Trustees (e.g., immediately, end of any academic quarter, expiration of the individual employment contract, etc.).  In the case of a reduction-in-force for reasons set forth in Section 1, C, failure to request a hearing shall cause separation from service on the effective date stated in the notice, regardless of the duration of any

individual employment contract.  In the case of a reduction-in-force for reasons set forth in Section 1, C, separation from service after formal hearing shall become effective upon final action by the Board of Trustees.

C.  Suspension.  Suspension by the President during the administrative proceedings (prior to the final decision of the Board of Trustees) is justified if immediate harm to the affected faculty member or others is threatened by his/her continuance.  Any such suspension shall be with pay.

D.  Publicity.  Except for such simple announcements as may be required covering the time of the hearing and similar matters, no public statements about the case shall be made by the faculty member, the dismissal review committee, administrative officers, or the Board of Trustees until all administrative proceedings and appeals have been completed.

E.  Appeal from Board of Trustees Decisions.  Pursuant to Administrative Procedures Act, RCW 34.05 as now existing or hereafter amended, the faculty member, who may be represented by legal counsel or the Federation, shall have the right to appeal the final decision of the Board of Trustees within thirty (30) days after service of the final decision.  The filing of an appeal shall not stay enforcement of the decision of the Board.

## Section 8.  Special Procedures Relating to Dismissal Resulting from Reduction-in-Force.

A.  Reduction-in-force Units and Procedure for Assignment.

1.  Reduction-in-force units shall be established on an annual basis as follows and each tenured faculty member and each faculty member holding a probationary faculty appointment shall be assigned by the appropriate vice president to not more than two (2) of the units.  Also included on the RIF unit lists are former tenured faculty members currently holding administrative appointments.  Such individuals are asterisked and identified as a footnote on the RIF Unit Lists.

**RIF UNITS LISTS**

**RIF Units (excluding corrections sites)**

| | |
|---|---|
| Accounting | Fine Art |
| ABE/GED | French |
| Anthropology | German |
| Biology | Graphic Arts |
| Botany | History/Political Science |
| Business | Library/Media |
| Business Education/Office Administration | Marketing |
| Chemistry | Mathematics (College Level) |
| Civil Engineering Technology | Mathematics (Pre-college) |
| Computer Science Technology | Music |
| Counseling | Nursing (PN) |
| Criminal Justice | Nursing (RN) |
| Diesel Equipment Technology | Nutrition |
| Drama | PE/Health/Recreation |
| Early Childhood Education | Philosophy |
| Earth Sciences | Physics |
| Economics | Psychology |
| Education | Radio/TV |
| Electronics Technology | Sociology |
| Engineering | Spanish |
| English (College Level) | Speech |
| English (Pre-college) | Welding |
| English as a Second Language | Zoology/Microbiology |
| Farm Management | |

**Corrections Sites RIF Units**

| | |
|---|---|
| ABE/GED | Horticulture |
| Building Trades/CTAP | Offender Change |
| Computer Basics | Office Data Specialist |

2. Additional RIF units may be added by the Employer to reflect program changes or by mutual agreement with the Federation. The Federation President shall be notified within fifteen (15) days of the creation of a new RIF unit.

3. Each tenured faculty member and each faculty member holding a probationary faculty appointment shall qualify for assignment in, and be assigned to the RIF unit in which the faculty member has his/her major assignment. Seniority in the RIF list begins accruing when the faculty are hired into the tenure track position.

4. Faculty members may request placement in a second RIF unit between September 1 and December 31 of each year.  A faculty member may qualify for one (1) additional RIF unit and be placed in the second unit if the faculty member meets any of the following criteria:

    a. The faculty member has taught courses in the additional unit or has performed duties in the unit to satisfactorily demonstrate qualifications, or

    b. The faculty member has a Master's Degree or equivalent in the discipline, or

    c. The faculty member has sufficient relevant work experience in the unit to qualify for vocational certification.

    d. When a faculty member is placed in a second unit, the faculty member is placed after already identified incumbents.  The date of seniority for the second unit is December 1 of the year of addition to that unit.  If further seniority differentiation is necessary, refer to Section 8. B. 3. a.

5. RIF unit lists shall be developed annually.  Each faculty member shall be ranked in the appropriate RIF unit in accordance with the seniority procedures defined herein.

    a. The initial RIF list shall be published and distributed by Human Resources by December 1.

    b. The annual RIF unit assignments shall become effective on December 1.

    c. Any disputes regarding RIF assignments must be presented to the appropriate vice president by December 31.

    d. If necessary, a revised RIF list will be published and distributed by January 15.

    e. A decision not to grant a request for placement in the second RIF unit shall be explained in writing to the affected faculty member with a copy of the denial sent to the Federation president by January 15.

B. Order of Reduction.

1. Courses, Programs, Services—First Priority.  If the number of full-time contracted faculty members subject to this policy is to be reduced, the President with such advice as he/she deems necessary shall determine what programs or services are most necessary.  This determination is within the sole discretion of the President.  The Employer reserves the right to establish the number of full-time and adjunct faculty to be employed; provided, however, the Employer will make every reasonable effort to maintain a full-time/adjunct ratio of faculty consistent with budgetary and funding requirements.  In making decisions on reductions, the President may consider factors including but not limited to:

    a.  Budget limitations, lack of funds, change in instructional or service programs or courses, or lack of students participating in particular programs, courses, or services.

    b.  The enrollment, the trends in enrollment, and their effect upon the department or program.

    c.  The present and anticipated service needs of the College and its students and prospective students, including staffing needs.

    d.  Information concerning faculty and administrative vacancies occurring through retirement, resignation, and professional and other leave.

    e.  Board-approved changes in educational policies and goals.

    f.  Other similar relevant considerations.

    g.  Responsibilities of full-time faculty members generally not performed by adjunct faculty members such as advising students, curriculum development, committee assignments, and related non-instructional duties.

2.  Selection of Individuals.  If a reduction is determined to be necessary within a reduction-in-force unit, the order of reduction will be based on seniority.  A faculty member being RIFed from one unit may bump a less senior faculty member in a second unit if the less senior faculty member is actually performing service in the second unit.

3.  Seniority.  Seniority shall be defined as continuous full-time service in a faculty position with the College (including faculty member's previous service at corrections sites.).  In computing a faculty member's seniority any and all service at any of the above including leaves of absence up to twenty-four (24) calendar months and sabbatical leaves shall be counted.

    a.  The individual with the highest number of qualifying years shall be the most senior; in case of ties, seniority shall be determined in the following descending order:

        (1) Initial placement notification date.

        (2) First date of signature of an employment contract.

        (3) Faculty members hired prior to May 21, 2009 will retain their seniority as defined in previous Faculty Negotiated Agreements.

    b.  Seniority for a faculty member who moves to an administrative position without continuing a one-half (1/2) faculty assignment as a part of his/her regular contract, shall accrue for the first three (3) years of such administrative assignment and then remain at that level for the duration of the administrative assignment.  If the same faculty member returns from administration to full-time faculty assignment or

assumes a one-half (1/2) faculty load as part of his/her regular contract, seniority shall continue from the seniority level the member had accrued under this section.

C. Recall.  Full-time faculty members who have been separated from service as a result of this reduction-in-force procedure shall have the right to be recalled consistent with the provisions specified below.

1.  Recall lists shall be created and maintained by the employer for each affected RIF unit. The names of each affected faculty member shall be placed on the appropriate RIF unit list according to seniority.

2.  Recall shall be in reverse order of reduction-in-force by RIF unit to a faculty position, either newly created or a vacant full-time position.

3.  The right of recall shall extend three (3) years from the effective date of the lay-off.

4.  Each RIFed faculty member shall keep the President's office informed of any change in address.

5.  New hire(s) shall not be employed to fill a full-time faculty vacancy unless there are no qualified faculty members on the applicable RIF unit recall list to accept the vacancy.

6.  A faculty member on lay-off shall have fifteen (15) days to respond following issuance of written notice by registered mail of an offer of recall to a full-time position.  If the individual fails to respond, his/her recall right shall be waived.

7.  Upon recall, a faculty member shall retain those benefits to which he/she is entitled such as sick leave, tenure, retirement, and seniority which existed at the time of lay-off.

8.  The Employer shall notify the Federation, in writing, of all employment offers made to faculty on recall and the final outcome of such offers.

9.  A faculty member on recall shall have first right of refusal to any adjunct assignments in his/her lay-off units at his/her college; provided, failure to accept such assignment shall not alter recall rights to full-time vacancies otherwise established.

<u>Section 9.  Designation of Administrative Appointments.</u>

A tenured faculty member, upon appointment to an administrative position, except that of the President, shall be allowed to retain his/her tenure as a faculty member.  However, persons assigned administrative responsibility and authority will occupy positions for which the privileges of tenure cannot be extended.  The recognized administrative positions which are specifically exempt from provisions of tenure as described herein include all administrative contract positions, and other directors, coaches, or supervisors for which extra pay and/or released time is given for activities other than the regular duties for which the faculty member's certification and basic contract indicate.  Faculty appointed to administrative positions after July

1, 1989 who teach less than one-third (1/3) load or perform faculty counseling or library functions less than one-third (1/3) of the time shall accumulate a maximum of three (3) years of such time as bargaining unit seniority.

<u>Section 10.  Confidentiality of Reports.</u>

All reports prepared and/or provided pursuant to this chapter by a review committee shall be held in confidence by the committee, the President, and appointing authority except where otherwise required by law.

## <u>**ARTICLE XVII:  GRIEVANCE**</u>

<u>Section 1.  Definition.</u>

A grievance is hereby defined as a complaint or claim against, or dispute, misunderstanding or controversy with, the Employer by a faculty member or members or the Federation arising out of the interpretation or application of any alleged violation by the Employer of the terms of this Agreement.  An individual faculty member or group of faculty members shall have the right to present grievances and to have such grievances adjusted without the intervention of the Federation, as long as the adjustment is not inconsistent with the terms of this Agreement and a representative of the Federation has been given the opportunity to be present at such adjustment. Such grievances shall be handled in the following manner:

**Step One**
The grievant and Federation representative, if requested by the grievant, shall orally present the alleged grievance to her/his vice president.

If the grievance is not adjusted orally, the grievance shall be reduced to writing, dated and signed by the faculty member and the Federation representative involved, if any, and shall state the specific factual basis of the grievance, the provision or provisions of the Agreement involved, if any, and the remedy sought.  Any grievance not presented in writing within thirty (30) days after the aggrieved cognizance of the facts on which the grievance is based shall be waived for all purposes.  The vice president shall be given the written grievance and he/she will not receipt of the same by countersigning and dating the original grievance and shall give a copy of the grievance to the Federation representative.  The vice president shall answer the grievance in writing within thirty (30) days and shall concurrently send a copy of the grievance and the answer to the Federation.

**Step Two**
If no settlement is reached at Step One, the written grievance may be submitted to the President or designed representative not more than fourteen (14) days after it is answered in Step One. Representative(s) of the Federation will be present at any meeting called to consider the grievance at this Step Two.  The President or his/her designated representative shall send his/her written answer to the Federation within fourteen (14) days.  Such answer shall be deemed to be the position of the Employer.

**Step Three**

If no settlement is reached at Step Two, the Federation may in its sole discretion within thirty (30) days after the date of the Step Two answer, request by written notice to the President and the American Arbitration Association that the grievance be arbitrated, provided that the grievance presents an arbitrable matter as herein defined.

Section 2.  Time Limits.

With respect to Section 1 of this Article, the following time lines are established.  Any grievance not presented in writing as provided in Step One of Section 1 above within thirty (30) days after the aggrieved cognizance of the facts on which the grievance is based shall be waived for all purposes.  In addition, if any other steps or actions provided for in Section 1 of this Article are not taken, or appeals therein provided for not taken or filed, or notice not given within the time limits therein specified, then the grievance shall be deemed finally closed and settled on the basis of the Employer's last answer.  Time limits identified in Steps One, Two, and Three begin the day after proper notice is given.  The thirty (30) day time limit begins the day after the aggrieved is cognizant of the facts on which the grievance is based.  Time limits may be extended by mutual agreement.  With respect to this Article, the term "day" shall exclude those days which fall between the end of a quarter and the beginning of the next quarter (including summer quarter).

Section 3.  Arbitration.

A.  Matters subject to arbitration shall be referred to the American Arbitration Association under its voluntary rules.

B.  Only grievances which involve an alleged violation by the Employer of a specific section or provision of this Agreement and which are presented to the Employer in writing during the term of this Agreement and which are processed in the manner and within the time limits herein provided shall be subject to arbitration.

C.  Jurisdiction of the arbitrator is limited to:

   1.  Adjudication of the issues which, under the express terms of this Agreement and any Submission Agreement are subject to arbitration; and

   2.  Interpretation of the specific terms of this Agreement which are applicable to the particular issue presented to the arbitrator, and such jurisdiction shall not give such arbitrator authority to supplement or modify this Agreement by reference to any industry practice or custom or common law of the industry; and

   3.  The rendition of a decision or award which in no way modifies, adds to, subtracts from, changes or amends any term or condition of this Agreement or which is in conflict with the provision of this Agreement; and

4.  The rendition of a decision or award which does not grant relief extending beyond the termination date of this Agreement or any renewal or extension thereof; and

5.  The rendition of a decision or award in writing which shall include a statement of the reasoning and grounds upon which such decision or award is based; and

6.  The rendition of a decision or award based solely on the evidence and matters presented to the arbitrator by the respective parties in the presence of each other, and the matters presented in the written briefs of the parties; and

7.  The rendition of a decision or award within thirty (30) days of the date of presentation of written briefs by the parties unless waived by the parties.

8.  Upon request of either party, the merits of a grievance and procedural arbitrability issues arising in connection with that grievance shall be consolidated for hearing before the arbitrator provided that an arbitrator shall resolve the arbitrability of a grievance before deciding the merits of the grievance.

9.  An arbitrator shall not have the authority to remand an issue back to the parties for negotiations as a part of any award.

D.  The fees and expenses of the arbitrator shall be borne equally by the parties.  The decision of the arbitrator within the time limits herein prescribed shall be final and binding upon the Employer, the Federation and the faculty member(s) affected, consistent with the terms of this Agreement.

E.  Upon petition by either part to a court of competent jurisdiction, any arbitration decision or award hereunder shall be vacated and/or corrected upon any of the following grounds:

1.  That the arbitrator exceeded his/her jurisdiction or authority under this Agreement and/or under the Submission Agreement;

2.  That the arbitrator's decision or award is not supported by substantial evidence; and

3.  That the arbitrator's decision or award is based upon an error of law.

## ARTICLE XVIII:  UNINTERRUPTED INSTRUCTIONAL ACTIVITIES

The Employer and the Federation agree that disputes which may arise between them shall be settled without resort to strike or lockout.  The Employer agrees that it will not lock out any or all of its faculty members during the term of this Agreement and the Federation agrees on behalf of itself and its membership that there shall be no strike or slowdowns during the term of this Agreement.

## ARTICLE XIX:  ACADEMIC CALENDAR

The Federation and the College shall participate in developing a campus-wide process for establishing the Academic Calendar.  This resulting process will include at least two (2) Federation appointed members.

## ARTICLE XX:  ANNUAL MEETING

Each winter quarter the College shall meet and confer with representative(s) from the Federation regarding:  funding FTE growth, staffing needs, vacant position, turnover savings, workloads, trends, and other issues of mutual concern to the Federation and the College.

Representatives of the College administration will meet with faculty of the corrections sites to review fiscal status and other issues of mutual interest during the first two (2) weeks of spring quarter.

## ARTICLE XXI:  SAVINGS CLAUSE

It is the belief of both parties that all provisions of this Agreement are lawful.  If any section of this Agreement should be found to be contrary to existing law by court of competent jurisdiction, the remainder of the Agreement shall not be affected thereby and the parties shall enter into immediate negotiations for the purpose of arriving at a mutually satisfactory replacement of such section.

## ARTICLE XXII:  SCOPE OF AGREEMENT

This Agreement constitutes the negotiated agreements between the Employer and the Federation and supersedes any previous agreements or understanding, whether oral or written, between the parties.  In addition, this Agreement supersedes any rules, regulations, policies, resolutions, or practices of the Employer which shall be contrary to or inconsistent with its terms.

Agreement expressed herein in writing constitutes the entire Agreement between the parties, and no oral statement shall add to or supersede any of its provisions.

The parties acknowledge that each has had the unlimited right and opportunity to make demands and proposals with respect to any matter deemed a proper subject for negotiations.  The result of the exercise of that right and opportunity are set forth in the Agreement.  Therefore, except as specifically stated in Articles XIX and XXI, the Employer and the Federation for the duration of this Agreement each voluntarily and unqualifiedly agree to waive the right to oblige the other part to negotiate with respect to any subject or matter covered or not covered in this Agreement unless mutually agreed otherwise.

Nothing contained herein shall be construed to deny or restrict to any faculty member rights and responsibilities he/she may have under the laws of the State of Washington and the United States or other applicable regulations.

No individual contract offered to faculty members by the Employer shall be inconsistent with the terms and conditions of this Agreement.

### ARTICLE XXIII:  DURATION

**PLEASE REFER TO THE SIGNED ARTICLE XXIII (PAGE 80)
AT THE END OF THIS DOCUMENT**

This Agreement shall remain in full force and effect upon its execution from July 1, 2020 to and including June 30, 2023.

Articles and Appendixes of this agreement may be reopened upon mutual consent of the Federation and Employer and as otherwise specified herein.  Such negotiations referred to in this section shall be conducted consistent with RCW 28B.52 or any subsequent legislation.

Negotiations for a successor Agreement shall commence on or after January 1, 2020.

Signed this _____ day of _____, 2020, at Centralia, Washington.

FOR THE FEDERATION                              FOR THE BOARD


_____                _____
Sharon Mitchler, President                      Robert Mohrbacher, President
Centralia College Federation of Teachers        Centralia College

# APPENDIX "A"
## SPECIAL PROVISIONS FOR FACULTY MEMBERS ASSIGNED TO CORRECTIONS SITES

Faculty members assigned to corrections sites are hereby recognized as members of the unit and subject to the terms and consideration of this Agreement as modified below:

A.  The base contract for faculty assigned to corrections sites shall not be less than 177 days or more than 220 days.  The annual contract begins July and continues up to June 30 of the following year.  All full-time faculty in the same program will be offered the same base contract.

  1.  One (1) faculty day = 7 hours.  One-half (1/2) faculty day = 3.5 hours.

  2.  If more days are needed to fulfill the Department of Corrections contract, the dean will issue extra days equitably between those faculty members who would like more days and are qualified for the program.

B.  Corrections site faculty will be available for six (6) hours student contact per contract day, or three (3) hours student contact per ½ contract day.

C.  The Adjunct/Moonlight hourly rate scale for corrections sites is based on the Adjunct/Moonlight Lab Instruction Rate (see Article VII:  Compensation, Section 6) with an equivalency of 22 contact hours per credit.

  1.  Step advancement at 800 hours per step; however, movement may only happen when authorized on main campus.

  2.  Faculty hired prior to January 1, 2014 will retain previous compensation levels if the placement on the new scale results in a reduction in compensation.

D.  The commitment of the College regarding meetings rooms (Article II, Section 8), Federation business (Article II, Section 13), and the use of facilities (Article II, Section 14) shall be applicable only to the extent that they are consistent with the rules and regulations which from time to time may be promulgated by the management of the corrections sites.

E.  The provisions of Article IX shall apply to corrections sites faculty members.  "Sufficient cause" shall also include failure to abide by the established rules of the Corrections Center.

F.  The representative of the Employer at the Step One level of grievances (Article XVII) shall be the corrections site dean.

G.  One (1) corrections site faculty member shall be allowed to leave early for the purpose of attending the monthly Federation meeting provided that suitable arrangements have been made to cover the assignment missed.  A second corrections site faculty member will be released early if that person is an officer in the Federation.

H.  The provisions of Article IX will apply in their entirely except that the composition of the Tenure Review Committee or Dismissal Review Committee shall be two (2) tenured faculty and one (1) administrator on each committee.

I.  The provisions of Professional Duties and Workload Factors for Full-Time Faculty (Article X) shall not be applicable to faculty members assigned to corrections sites. Workload activities for faculty assigned to corrections sites include: instructional assignments, committee participation, curriculum development, required Department of Corrections training and preparation time.

J.  Corrections sites faculty shall have three (3) days each academic year for professional development activities. Faculty shall request use of the professional days at least seven (7) days in advance.

    1.  Faculty designated time is not available for faculty at corrections sites.

K.  Garrett Heyns faculty shall be eligible for sabbatical leave during summer quarter effective summer, 1990.

L.  Faculty members may apply for Curriculum Development Awards to work on curriculum projects during non-instructional periods. The College shall budget $3,000 per academic year for corrections sites.

M.  Funds available to eligible faculty members through the Curriculum Development and Extended Studies are available for professional leave. See Article VIII for specific details.

N.  The College administration will forward to the Department of Corrections administration the safety concern(s) of corrections site faculty raised during group discussions.

O.  One (1) corrections sites faculty member shall be allowed to leave early for the purpose of attending the contract negotiations provided that suitable arrangements have been made to cover the assignment missed. The Federation will notify the College who the corrections sites faculty representative for negotiations will be at least one (1) quarter before the start of negotiations.

P.  Effective with the ratification of this contract, 2014-2017, eligible faculty at Cedar Creek will enter the tenure process.

    1.  Seniority will be based on the same process as main campus.

    2.  Main campus and corrections sites RIF unit lists are to remain separate.

    3.  All corrections sites will be included in a "Corrections Sites RIF Units" list.

        a.  Multiple units will be listed, and each faculty member may be included in no more than two units.

## APPENDIX "B"
## EARLY RETIREMENT

The President may grant, upon request, incentives for early retirement when it is beneficial to both the College and the faculty member.  Examples of such incentives may include the following:

A.  Phased Early Retirement.  The Phased Early Retirement Option provides for reduced load employment following a faculty member's retirement from his/her full-time appointment.  Where a faculty member's application for this option is approved by the President, he/she shall enter into an agreement with the College in which the faculty member makes an intentional, intelligent and voluntary waiver of any and all tenure rights and the College agrees to employ the faculty member on a reduced load for a time certain in the future.  All terms of such arrangements shall be specified in written agreement between the College and the faculty member.

B.  Complete Early Retirement.  The Complete Early Retirement Option provides for the purchase of valuable tenure rights of faculty members in exchange for the faculty member's separation for service at a time earlier than that required by law.  Where a faculty member's application for this option is approved by the President, he/she shall retire and waive any and all tenure rights and shall receive payment in exchange for such retirement and waiver of tenure rights.  The amount and method of such payment shall be as mutually agreed upon by the College and the faculty member.  Payment under this option shall not be reported as wages by the employer but must be reported as ordinary income by the faculty member for the year in which received.  Such payment shall be excluded in any calculation regarding retirement benefits.  The written agreement will include a schedule of payment(s).  No payment will be made after age seventy (70).  Upon the death of a faculty member participating in this option, the faculty member's estate shall be entitled to receive death benefits based upon the same schedule as the one to have been received by the deceased faculty member.

C.  Other Early Retirement Options.  Other Early Retirement Options not covered above may be implemented at any time upon written mutual agreement between the faculty member and the President.

### ARTICLE XXIII:  DURATION

This Agreement shall remain in full force and effect upon its execution from July 1, 2020 to and including June 30, 2023.

Articles and Appendixes of this agreement may be reopened upon mutual consent of the Federation and Employer and as otherwise specified herein.  Such negotiations referred to in this section shall be conducted consistent with RCW 28B.52 or any subsequent legislation.

Negotiations for a successor Agreement shall commence on or after January 1, 2020.

Signed this 29 day of June , 2020, at Centralia, Washington.

FOR THE FEDERATION

Sharon Mitchler, President
Centralia College Federation of Teachers

FOR THE BOARD

Robert Mohrbacher, President
Centralia College

Scanned with CamScanner

# EXHIBIT C

**WASHINGTON STATE
OFFICE OF ADMINISTRATIVE HEARINGS**

| | |
|---|---|
| In the matter of: | Docket No.  12-2021-CLG-00008 |
| Laurie Pyne, | **RECOMMENDED DECISION** |
| Appellant. | Agency:    Colleges<br>Program:   Centralia College |

1. ISSUE

   1.1. Did Centralia College properly seek to separate Laurie Pyne from employment pursuant to Proclamation 21-14.1, as set out in the Notice of Non-disciplinary Separation dated October 18, 2021?

2. ORDER SUMMARY

   2.1. Centralia College was bound to abide by Proclamation 21-14.1.  Therefore, it has sufficient cause to dismiss Laurie Pyne under RCW 28B.50.861 and Article XVI(1) of the CBA.

3. HEARING

   3.1. Hearing Date:                         December 14-15, 2022

   3.2. Administrative Law Judge:       Joni Derifield

   3.3. Appellant:                              Dr. Laurie Pyne ("Dr. Pyne" or "Appellant")

      3.3.1.  Representative:             Joy Lockerby

      3.3.2.  Witnesses:

         3.3.2.1.   Tammy Remund, Human Resources for Centralia College

         3.3.2.2.   Dr. Elizabeth Grant, Dean of Corrections Education for Centralia College and Appellant's supervisor

         3.3.2.3.   Mark Gorecki, President of Centralia College Federation of Teachers Local No. 4469

         3.3.2.4.   Suzanne Weil, Secretary of Centralia College Federation of Teachers Local No. 4469

         3.3.2.5.   Dr. Laurie Pyne, Appellant

         3.3.2.6.   Dr. Robert Morbacher, President of Centralia College

         3.3.2.7.   LaDonna Hebert, former employee of the Department of Corrections

   3.4. Agency:                               Centralia College ("College")

3.4.1.  Representative:                    Matthew Barber, Assistant Attorney General

3.4.2.  Witnesses:

    3.4.2.1.  Tammy Remund, College Human Resources

    3.4.2.2.  Dr. Elizabeth Grant, Dean of Corrections Education for the College and Appellant's supervisor

3.5. Dismissal Review Committee

3.5.1.  The Dismissal Review Committee ("Committee") was present for the duration of the hearing, and members of the Committee had the opportunity to ask questions of every witness who testified.

3.5.2.  The Committee is comprised of the following individuals:

    3.5.2.1.  Connie Smejkal, Dean of Instruction at the College

    3.5.2.2.  Preston Kiekel, Professor at the College

    3.5.2.3.  Brian Rauscher, Professor at the College

    3.5.2.4.  Patricia Meierdiercks, Professor at the College

    3.5.2.5.  Aleena Hurd, current student of the College

3.6. Exhibits:

3.6.1.  The College's Exhibits 1 through 17 were admitted.

3.6.2.  The Appellant's Exhibits A through M, O through W, Y, Z, BB, and CC were admitted.

3.6.3.  Counsel for the College shall ensure that the Committee receives a copy of the admitted exhibits in this case.  Those documents are a part of the electronic file, labeled as "Admitted Exhibits – Laurie Pyne."

3.6.4.  The Committee shall not consider exhibits which were excluded from evidence.

4.  FINDINGS OF FACT

I find the following facts by a preponderance of the evidence:

*Jurisdiction*

4.1. On October 18, 2021, the College issued Dr. Pyne a Notice of Non-disciplinary Separation.  Ex. 16, pg. 1-3.

4.2. On November 2, 2021, Dr. Pyne timely requested a hearing to contest the College's action.  Ex. 17, pg. 1.

*Dr. Pyne's Employment with the College*

4.3. Dr. Pyne is employed by the College as an Associate Professor at the Washington Corrections Center[1] in Shelton, Washington. Ex. 1, pg. 1; *Grant Testimony*; *Pyne Testimony*. She served as an instructor of adult basic education and horticulture at the prison. *Pyne Testimony*.

4.4. Dr. Pyne commenced employment with the College on October 19, 2018. Ex. S, pg. 40-41. The College awarded her tenure on March 11, 2021. Ex. S, pg. 32.

4.5. Dr. Pyne's contract for the 2021-2022 school year provided that she was to be employed from July 1, 2021 to June 30, 2022. Ex. 1, pg. 1; Ex. B, pg. 1. The contract contained a provision that it was subject to state laws, including those which are subsequently enacted. *Id*.

4.6. Dr. Pyne is a member of the Centralia College Federation of Teachers Local No. 4469 ("Union"). *Pyne Testimony*. A collective bargaining agreement between the College and the Union supplies additional terms of employment. Ex. 2, pg. 1-7.

*Vaccine Mandate*

4.7. On August 9, 2021, Governor Jay Inslee issued Proclamation 21-14, which generally prohibited State employees from working after October 18, 2021, unless the employee is fully vaccinated against COVID-19. On August 20, 2021, the Governor issued an additional proclamation, Proclamation 21-14.1, which clarified that the vaccine mandate applied to workers in educational settings.

4.8. On August 16, 2021, Dr. Elizabeth Grant, Dean of Corrections Education for the College, sent her staff (including Dr. Pyne) an email instructing them to provide proof of vaccination status to the Department of Corrections. Ex. 3, pg. 1. Dr. Grant noted in her email that the procedure for requesting an exemption had not yet been determined. *Id*.

4.9. On August 17, 2021, the Secretary of the Department of Corrections ("DOC"), Cheryl Strange, sent an email to all DOC staff, including Dr. Pyne. Ex. U, pg. 2; *Pyne Testimony*. Secretary Strange informed staff of the Governor's vaccine mandate, as well as that it permitted for medical and religious exemptions. *Id*.

4.10.      On August 19, 2021, Dr. Erica Holmes, Vice President for Human Resources and Equity for the College, emailed all Centralia College employees to inform them of the Governor's vaccine mandate. Ex. 4, pg. 1. Dr. Holmes' email advised employees of the dates to receive vaccines in order to comply with the Governor's October 18, 2021 deadline. *Id*.

---

[1] The Department of Corrections has a contract with the Washington State Board for Community and Technical Colleges. *Grant Testimony*.

4.11.    On August 19, 2021, Dr. Grant emailed Dr. Pyne directly to request verification of her vaccination status.  Ex. 5, pg. 1.  Dr. Grant attached exemption forms to that email.  *Id*.

4.12.    Also on August 19, 2021, Dr. Holmes again emailed all College employees regarding deadlines for becoming fully vaccinated.  Ex. 7, pg. 1.  Dr. Holmes' email stated that the Proclamation "makes vaccination a condition of employment for all college employees."  *Id*.

4.13.    Dr. Holmes sent a similar email on August 30, 2021 which elaborated on the exemption process and attached exemption forms.  Ex. 14, pg. 1-6.  That email emphasized that the College "<u>cannot</u> grant a religious-related exemption to any employee . . . if this documentation is not received and approved by October 18, 2021."  *Id*. at 2 (emphasis in original).

4.14.    Dr. Grant again emailed Dr. Pyne directly on September 1, 2021, asking whether Dr. Pyne was vaccinated.  Ex. 8, pg. 1-2.  Dr. Pyne responded to the email on September 3, 2021, indicating she was not vaccinated.  *Id*. at 1.

4.15.    Additionally, Dr. Grant and Dr. Pyne had an in-person meeting at which Dr. Grant asked Dr. Pyne for her vaccination status, because she was required by the DOC to do so.  *Grant Testimony*; *Pyne Testimony*.  Dr. Pyne informed Dr. Grant that she was disturbed by the request to disclose private medical information.  *Pyne Testimony*.  In addition, Dr. Pyne voiced her concerns that the vaccine was experimental and may cause adverse reactions.  *Id*.

4.16.    On September 3, 2021, Dr. Holmes sent another email to College employees advising them of the vaccine mandate and the dates to receive particular vaccinations to become fully vaccinated by the October 18, 2021 deadline.  Ex. S, pg. 66.

4.17.    On September 7, 2021, the DOC sent an email to its workers, including Dr. Pyne, reminding them of the October 18, 2021 deadline to become fully vaccinated.  Ex. 9, pg. 1.  The email explained the dates by which workers needed to receive vaccines in order to qualify as fully vaccinated.  *Id*.  The DOC sent a similar email reminder to all of its workers on September 9, 2021.  Ex. 10, pg. 1-2.

4.18.    On September 16, 2021, Dr. Holmes sent an email to Dr. Pyne and others informing them of the requirement to enter their vaccination status into ctcLink, the College's system for human resources, payroll, and other functions.  Ex. D, pg. 1-2; *Reymund Testimony*.  The email advised that employees who wished to claim an exemption to the vaccine requirement must complete the applicable exemption form.  Ex. D, pg. 1.

4.19.    On September 20, 2021, Dr. Holmes sent an additional reminder to all College employees of the vaccine requirement deadlines.  Ex. 11, pg. 1-3.  The email instructed employees to attest to vaccination status in ctcLink.  *Id*.

4.20.    Dr. Grant emailed Dr. Pyne once more on September 21, 2021, explaining that she received notification that Dr. Pyne's vaccination status had not been entered into ctcLink.  Ex. 12, pg. 1.  Furthermore, Dr. Grant stated: [i]f you plan to seek an exemption for medical or religious reasons, please complete the appropriate form and submit it . . . by **October 1, 2021**.  Attached are a Religious Exemption Request Form and a Medical Questionnaire Form (for exemption)."  *Id*. (emphasis in original).

4.21.    On September 30, 2021, Dr. Holmes sent all College employees an email reminding them that October 4, 2021 was the final day to receive a vaccine to be fully vaccinated by the October 18, 2021 deadline.  Ex. 14, pg. 1.  The email informed employees that requests for exemptions were due by a revised deadline of **October 10, 2021**, and attached those exemption forms.  *Id*. (emphasis added); *see also Remund Testimony*.

4.22.    On October 1, 2021, Dr. Grant issued Dr. Pyne a Notice of Intent to Separate for Non-disciplinary Reasons, which Dr. Pyne received on October 6, 2021.  Ex. 15, pg. 1-3.  The letter erroneously noted that Dr. Pyne had started the vaccination process and received one dose of a COVID-19 vaccine.  *Id*. at 1; *Pyne Testimony*.  However, once again, this letter informed Dr. Pyne that she must be fully vaccinated to work after October 18, 2021, unless she had an approved exemption due to a medical condition or sincerely held religious beliefs which preclude vaccination.  Ex. 15, pg. 1.  It stated that if Dr. Pyne provided proof of being fully vaccinated, the College would rescind the Notice.  *Id*.

4.23.    That same day, Dr. Holmes issued Dr. Pyne a similar Notice of Intent to Separate for Non-disciplinary Reasons. Ex. Z, pg. 1.  That Notice also indicated that College employees must be fully vaccinated to work after October 18, 2021, unless exempt for medical or religious reasons.  *Id*.  It accurately stated that Dr. Pyne had not provided proof that she is fully vaccinated, nor did she request a medical or religious exemption.  *Id*.

4.24.    On October 18, 2021, Dr. Bob Mohrbacher, President of the College, issued Dr. Pyne a Notice of Non-disciplinary Separation which placed Dr. Pyne on unpaid administrative leave during the separation process, effective at the end of her work shift on October 18, 2021.  Ex. 16, pg. 1-3.  The Notice indicated that Dr. Pyne did not provide proof of being fully vaccinated, nor did she request a medical or religious exemption.  *Id*. at 1.  As such, she was no longer qualified for her position and was prohibited from performing work under the Governor's proclamation.  *Id*. The letter further noted that under Article XVI of the Collective Bargaining

Agreement ("CBA"), the separation was for sufficient cause.  *Id*.  Dr. Pyne received the Notice on October 20, 2021.  *Id*. at 2.

4.25.    Prior to issuance of the October 18, 2021 Notice of Non-disciplinary Separation, Dr. Pyne received written notification by the College and the DOC on at least 16 occasions of the necessity of becoming vaccinated to maintain her employment.  Ex. 3, pg. 1; Ex. 4, pg. 1; Ex. 5, pg. 1; Ex. 7, pg. 1; Ex. 8, pg. 1; Ex. 9, pg. 1; Ex. 10, pg. 1; Ex. 11, pg. 1; Ex. 12, pg. 1; Ex. 14, pg. 1; Ex. 15, pg. 1; Ex. D, pg. 1; Ex. S, pg. 66; Ex. U, pg. 2; Ex. Z, pg. 1.  Moreover, the College informed her on at least seven occasions that there was a process for requesting a medical or religious exemption.  Ex. 5, pg. 1; Ex. 14, pg. 1-6; Ex. 12, pg. 1; Ex. 14, pg. 1; Ex. 15, pg. 1; Ex. D, pg. 1; Ex. Z, pg. 1; *see also* Ex. U, pg. 2.  The College emailed Dr. Pyne exemption forms on three occasions.  Ex. 5, pg. 1; Ex. 14, pg. 1-6; Ex. 12, pg. 1.

4.26.    On November 2, 2021, Dr. Pyne requested a hearing.  Ex. 17, pg. 1-2; Ex. F, pg. 1-2.  Enclosed with her hearing request was a Religious Exemption Request Form, dated October 26, 2021.  *Id*. at 2.  Dr. Pyne checked a box on the Religious Exemption Request Form indicating she has a sincerely held religious belief or religious conviction that prevents her from receiving a COVID-19 vaccination.  *Id*.  She refused to attest that she had never received a vaccine as an adult.  *Id*.

4.27.    Although not articulated on the Religious Exemption Request Form, Dr. Pyne's basis for a religious exemption is that she does not believe her employer has the right to question her about her religious beliefs.  *Pyne Testimony*.  Dr. Pyne was concerned about receiving a COVID-19 vaccine because she believed they were experimental and presented safety risks.  *Id*.  Ultimately, she decided that the risks of the vaccine outweighed the benefits.  *Id*.

4.28.    The College did not process Dr. Pyne's Religious Exemption Request Form.  *Reymund Testimony*; *Pyne Testimony*.

*Conflicting Evidence*

4.29.    The College presented some argument and testimony during the hearing that conflicted with the bases for separation it offered in the Notice of Non-disciplinary Separation.  Counsel for the college argued during opening statements that Dr. Pyne was physically unable to do her job, and that it was plausible to find she was insubordinate.

4.30.    Similarly, Dr. Mohrbacher suggested in his testimony that Dr. Pyne's failure to comply with the College's request for her vaccination status could be characterized as insubordination or neglect of duty under the CBA.  *Mohrbacher Testimony*.  He went on to testify, however, that the College's authority for its

action comes from the Governor's proclamation. *Id*. The Proclamation trumped Dr. Pyne's tenure agreement. *Id*.

4.31.    Furthermore, Dr. Grant testified that College employees serve at the pleasure of the DOC are obligated to meet the DOC's requirements. *Grant Testimony*. The DOC had a policy that employees must be vaccinated to be on site at the prison. *Id*. Additionally, she pointed to a CBA provision which provides sufficient cause where an employee fails to abide by rules established by the corrections center. *Id*. Dr. Grant stated she had no complaints with Dr. Pyne's performance; Dr. Pyne would have remained employed had vaccination not been an issue. *Id*.

4.32.    Tammy Remund, who is in human resources for the College, testified that other College employees who did not comply with the vaccine mandate received letters similar to Dr. Pyne's October 18, 2021 Notice of Non-disciplinary Separation. *Remund Testimony*.

4.33.    Dr. Pyne testified that the College never told her she was being separated for insubordination. *Pyne Testimony*. She was not aware that this was a potential basis for the separation until the argument and testimony discussed above was offered during the hearing. *Id*. She explained that the College did not follow a disciplinary process to address her alleged insubordination. *Id*. She further testified that she had no interactions with the College regarding physical inability to perform her job duties, nor was she told by the College that the DOT said she was no longer permitted to work at the prison. *Id*.

4.34.    Although the College offered multiple bases for Dr. Pyne's separation during the hearing, the basis offered in the Notice of Non-disciplinary Separation was that Dr. Pyne neither provided proof of being fully vaccinated, nor requested a medical or religious exemption, as required by Proclamation 21-14.1. The undersigned is persuaded that the October 28, 2021 Notice of Non-disciplinary Separation sets forth the College's primary reason for seeking to separate Dr. Pyne.

5.  CONCLUSIONS OF LAW

Based upon the facts above, I make the following conclusions:

*Jurisdiction*

5.1. I have jurisdiction over the persons and subject matter of this case under WAC 132L-108-020 and Article XVI(5) of the Collective Bargaining Agreement.[2]

*/ / /*

---

[2] The undersigned previously issued an Order on Motion to Strike, to Extend Deadlines, and for Declaratory Relief, which addressed the Appellant's jurisdictional objections.

*Governor's Proclamations*

5.2. RCW 43.06.010(12) grants the governor the authority to declare a state of emergency.  Moreover, after proclaiming a state of emergency and prior to terminating that state of emergency, the governor may issue an order prohibiting "[s]uch other activities as he or she reasonably believes should be prohibited to help preserve and maintain life, health, property or the public peace."  RCW 43.06.220(1)(h).

5.3. On February 29, 2020, Washington State Governor Jay Inslee declared a state of emergency in all counties in Washington and issued a number of proclamations intended to curb the spread of COVID-19 during the public health emergency.  *See, e.g.*, Proclamation 20-05; Proclamation 20-14.

5.4. On August 20, 2021, the Governor issued a proclamation which, in relevant part, prohibits the following:

    a. Any Worker from engaging in work for a State Agency after October 18, 2021 if the Worker has not been fully vaccinated against COVID-19;

    b. Any State Agency from permitting any Worker to engage in work for the agency after October 18, 2021 if the Worker has not been fully vaccinated against COVID-19 and provided proof thereof as required below;

    c. Any Worker[3] from engaging in work for the operator of an Educational Setting[4] after October 18, 2021 if the Worker has not been fully vaccinated against COVID-19;

    d. **Any operator of an Educational Setting from permitting a Worker to engage in work for the operator after October 18, 2021 if the Worker has not been fully vaccinated against COVID-19 and provided proof thereof as required below**;

    . . . .

Proclamation 21-14.1(1) (emphasis added).

5.5. Additionally, Proclamation 21-14.1 provides an avenue for exemption from the vaccine requirement.  It states that workers "are not required to get vaccinated against COVID-19 under this Order if they are unable to do so because of a disability or if the requirement to do so conflicts with their sincerely held religious beliefs, practice, or observance."  Proclamation 21-14.1(2).

---

[3] Students of Educational Settings are excluded from the definition of "Worker."  Proclamation 21-14.1(6)(a).
[4] "Educational Setting" includes community colleges.  Proclamation 21-14.1(6)(e).

5.6. Furthermore, Proclamation 21-14.1 requires State agencies and educational settings to provide disability-related reasonable accommodations and sincerely held religious belief accommodations to employees. *Id*.

5.7. However, prior to granting such accommodations, the Proclamation requires that the State agency or educational setting obtain supporting documentation from the individual requesting the accommodation. *Id*. In the case of a disability-related accommodation, the agency is required to obtain from the employee "documentation from an appropriate health care or rehabilitation professional stating that the individual has a disability that necessitates an accommodation and the probable duration of the need for an accommodation." *Id*. With respect to a sincerely held religious belief accommodation, the agency is required to "**document** that the request for an accommodation has been made and include a statement in the document explaining **the way in which the requirements of this order conflict with the sincerely held religious belief, practice, or observance** of the individual." *Id*. (emphasis added).

5.8. Finally, Proclamation 21-14.1 requires workers to provide proof of full vaccination against COVID-19. Proclamation 21-14.1(3). It also requires State agencies and educational settings to obtain a copy or visual proof of full vaccination for every employee. *Id*.

5.9. Governor Inslee terminated the state of emergency effective October 31, 2022. Proclamation 20-12.6.

5.10. The Ninth Circuit Court of Appeals recently held that Governor Inslee had the authority under RCW 43.06.010(12) to declare a state of emergency due to the COVID-19 pandemic. *Slidewaters LLC v. Wash. State Dep't of Labor & Indus*., 4 F.4th 747, 755 (9th Cir. 2021). Furthermore, the Court noted: "[t]he Washington Supreme Court has held that '[t]he proclamation of an emergency and the Governor's issuance of executive orders' to address that emergency 'are by statute committed to the sole discretion of the governor.'" *Id*. (quoting *Cougar Bus. Owners Ass'n v. State*, 97 Wn.2d 466 (1982)). The Governor's proclamations related to the COVID-19 public health emergency have the force of law. *In re Recall of White*, 196 Wn.2d 492, 504 (2020).

*Applicable Statutes and Collective Bargaining Agreement*

5.11. The College and the Union entered into a CBA which is effective during the period of July 1, 2020 through June 30, 2023. *2020-2023 Agreement*, https://www.sbctc.edu/resources/documents/colleges-staff/my-employment/faculty-collective-bargaining-agreements/centralia-2020-2023.pdf. The CBA establishes procedural requirements for faculty dismissals.

5.12.    RCW 28B.50.861 provides that a "tenured faculty member shall not be dismissed except for sufficient cause."

5.13.    Similarly, the CBA directs that the College may only dismiss a tenured faculty member for "sufficient cause."  CBA, Article XVI(1).  The CBA defines the term "sufficient cause."  It states:

> "Sufficient cause" shall include but **is not limited to**:
>
> 1. Aiding and abetting or participating in:
>
>     a.  Any unlawful act of violence;
>
>     b.  Any unlawful act resulting in destruction of College property;
>
>     c.  Any unlawful interference with the orderly conduct of the educational process.
>
> 2. Incompetence.
>
> 3. Neglect of duty.
>
> 4. Insubordination.
>
> 5. Conduct unbecoming a member of the faculty and which is detrimental to the educational objectives of the College, provided that no such charge shall be sustained that constitutes interference with academic freedom of the person charged.
>
> 6. Physical or mental inability to perform duties and responsibilities as specified in the contract.
>
> 7. Gross misconduct
>
> 8. For corrections sites, if the Superintendent has determined a faculty member is no longer permitted at a corrections site, this shall be sufficient cause . . .

CBA, Article XVI(1)(A) (emphasis added).

5.14.    The CBA provides an additional basis for "sufficient cause" applicable to faculty at corrections sites.  CBA, Appedix "A"(E).  It states: "'[s]ufficient cause' shall also include failure to abide by the established rules of the Corrections Center."  *Id.*

*Analysis*

5.15.    In this case, Governor Inslee's Proclamation 21-14.1 was the impetus for the College's actions.  The College was bound to abide by the Governor's directive that no employee may work for it after October 18, 2021 without being fully vaccinated against COVID-19.  Likewise, the College was required to act in

accordance with the exemption process set forth in Proclamation 21-14.1.  The College took its actions in this case during an active state of emergency.  The Governor's emergency powers under RCW 43.06.220(1)(h) supplant any conflicting provisions of Dr. Pyne's tenure agreement and employment agreement with the College.

5.16.    Here, Dr. Pyne was neither fully vaccinated against COVID-19 nor exempt from the vaccination requirement.  She failed to submit an exemption request until November 2, 2021—23 days after the deadline the college set for submitting exemption requests, and 15 days after the date on which the Governor's proclamation prohibited unvaccinated employees from working.  Therefore, the College had sufficient cause to separate Dr. Pyne from employment under RCW 28B.50.861 and Article XVI(1) of the CBA.

5.17.    This precise situation is not identified as a "sufficient cause" reason for dismissal under Article XVI(1)(A) of the CBA.  Such is not necessary.  The CBA language is clear that the eight enumerated items which constitute sufficient cause are not an exhaustive list of every possible basis for sufficient cause.

5.18.    The undersigned considered Dr. Pyne's argument that the College failed to act upon her untimely religious exemption request, and that it has an ongoing duty to engage in an interactive process with her regarding her exemption request.  However, she presented insufficient evidence that the College should have done so.  Notably, Proclamation 21-14.1 prohibited the College from granting such an accommodation without documentation "explaining the way in which the requirements of [the Proclamation] conflict with the sincerely held religious belief, practice, or observance of the individual."  *See* Proclamation 21-14.1(2).  Dr. Pyne checked a box on the Religious Exemption Request Form indicating she has a sincerely held religious belief or religious conviction that prevented her from receiving a COVID-19 vaccination, but refused to attest that she had never received a vaccine as an adult.  She provided no further information to the College in support of her religious exemption request.

5.19.    Even in testimony at the hearing, Dr. Pyne did not point to any sincerely held religious belief which prevented her from becoming vaccinated against COVID-19.  She voiced her opinions that the employer did not have a right to inquire about her religious beliefs, and that the risks of the vaccine outweighed the benefits.  However, she did not describe a sincerely held *religious belief* which formed the basis for her religious exemption request.  While Dr. Pyne may indeed have a sincerely held religious belief, there is no evidence before this tribunal as to the way in which a COVID-19 vaccination conflicts with Dr. Pyne's sincerely held religious belief, practice, or observance.  Absent such information, the College could not grant a religious exemption under Proclamation 21-14.1.

5.20.    Accordingly, the undersigned concludes the College met its burden of proof in establishing sufficient cause to dismiss Dr. Pyne under RCW 28B.50.861 and the CBA.

6.  INITIAL ORDER

IT IS HEREBY RECOMMENDED THAT:

6.1. The College was bound to abide by Proclamation 21-14.1.  Therefore, it has sufficient cause to dismiss Dr. Pyne under RCW 28B.50.861 and Article XVI(1) of the CBA.


Issued from Tacoma, Washington on the date of mailing.


_____
Joni Derifield
Administrative Law Judge
Office of Administrative Hearings


**CERTIFICATE OF SERVICE ATTACHED**

**CERTIFICATE OF SERVICE FOR OAH DOCKET NO. 12-2021-CLG-00008**

I certify that true copies of this document were served on those listed below, from Tacoma, Washington via Consolidated Mail Services by one of the following: First Class Mail, Certified Mail, Hand Delivery via Messenger, Campus Mail, Facsimile, or by email.

| | |
|---|---|
| Laurie Pyne<br>PO Box 392<br>Tenino, WA 98589<br><br>***Appellant*** | ☐ First Class Mail<br>☐ Certified Mail, Return Receipt<br>☐ Campus Mail<br>☒ E-mail:<br>    lmpcarl@gmail.com |
| Joy Lockerby<br>Lockerby Law PLLC<br>PO Box 19444<br>Seattle, WA 98109<br>***Appellant Representative*** | ☐ First Class Mail<br>☐ Certified Mail, Return Receipt<br>☐ Campus Mail<br>☒ E-mail:<br>    joy@lockerbylaw.com |
| Matthew Barber, AAG<br>Office of the Attorney<br>General Education Division<br>PO Box 40100<br>Olympia, WA 98504<br><br>***Agency Representative*** | ☐ First Class Mail<br>☐ Certified Mail, Return Receipt<br>☐ Campus Mail<br>☒ E-mail:<br>    matthew.barber@atg.wa.gov |
| Connie Smejkal, Dean of Instruction<br><br>Joy L. Anglesey, Vice President for Human Resources & Equity<br><br>***Administrative Representatives*** | ☐ First Class Mail<br>☐ Certified Mail, Return Receipt<br>☐ Campus Mail<br>☒ E-mail:<br>    Connie.smejkal@centralia.edu<br>    joy.anglesey@centralia.edu<br>    candi.fetch@centralia.edu |
| Susanne Weil & Preston Kiekel<br><br>***Faculty Committee Members*** | ☐ First Class Mail<br>☐ Certified Mail, Return Receipt<br>☐ Campus Mail<br>☒ E-mail:<br>    susanne.weil@centralia.edu<br>    preston.kiekel@centralia.edu |

Date:  Thursday, December 29, 2022

OFFICE OF ADMINISTRATIVE HEARINGS

Ashleigh Rainey
Legal Assistant 2

# EXHIBIT D

1
2
3
4
5
6
7
8

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF LEWIS

9

10

| | |
|---|---|
| LAURIE PYNE,<br><br>               Petitioner,<br><br>v.<br><br>CENTRALIA COLLEGE BOARD OF<br>TRUSTEES AND CENTRALIA COLLEGE,<br><br>               Respondent. | No.<br><br>NOTICE OF PETITION FOR<br>JUDICIAL REVIEW<br><br>*Filing Fee Required* |

11
12
13
14
15
16
17
18
19
20
21

COMES NOW, Laurie Pyne ("Petitioner" or "Dr. Pyne"), by and through her

attorney, Joy Lockerby, to petition this court for judicial review of a Final Decision of the

Centralia College Board of Trustees (the "Board" or "Respondent") which terminates Dr.

Pyne's employment and/or tenure position effective April 30, 2023. Dr. Pyne seeks to

vindicate her rights and obtain relief to the extent availability by this court. On May 2, 2023,

PETITION FOR JUDICIAL REVIEW – Page 1

Lockerby Law, PLLC
1420 Fifth Avenue, Suite 3000
Seattle, WA 98101
Phone: (206) 854-2869
Joy@LockerbyLaw.com

Dr. Pyne received a copy of the Board's "Final Decision of the Centralia College Board of Trustees Faculty Dismissal of Instructor Laurie Pyne" (the "Final Decision"). Pursuant to Title 28B.50 *et. seq.* RCW and Title 132L WAC; the Administrative Procedures Act, Title 34.05 RCW; and the Equal Access to Justice Act, RCW 4.84.350, or other laws that provide for reasonable recovery of attorney's fees and costs.

Attached as Exhibits A-G and incorporated are the following: (A) Respondent's "April 20, 2023" letter, the "April 26, 2023" certificate of service, and the April 28, 2023 postmarked envelopes, which were served on May 2, 2023; (B) January 6, 2023 letter from Joy Angelsey and attached letter from Tenure Dismissal Review Committee; (C) Respondent's January 11, 2023 to ALJ Joni Derifield; (D) February 9, 2023 request for written argument; (E)  is the Centralia College's argument to the Board of Trustees; (F) Dr. Pyne's argument to the Board of Trustees; and (G) ALJ Joni Derifield's "Recommended Decision" Docket 12-2021-CLG00008.

## I.    **PARTIES**

1.1    Petitioner Laurie Pyne is a resident of Thurston County, Washington. Mailing information for Petitioner and Petitioner's attorney is as follows:

> Lockerby Law, PLLC
> Attn: Joy Lockerby, Attorney
> 1420 Fifth Ave, Suite 3000
> PO Box 19444
> Seattle, WA 98109-1444
> Email: Joy@LockerbyLaw.com
> Phone: (206) 854-2869

PETITION FOR JUDICIAL REVIEW – Page 2

1.2     Respondent the Centralia College Board of Trustees ("the Board") is an administrative agency in Centralia, Lewis County, Washington that exists under the laws of the State of Washington Chapter 28B.50 RCW and Title 132L WAC. The Board is comprised of board chair Court Stanley, Petrina Mullins, Mark Scheibmeir, Annalee Tobey, and Doris Wood-Brumsickle. Respondent's mailing address is as follows:

> Centralia College
> Centralia College Board of Trustees
> Attn: Janet Reaume, Board Secretary
> 600 Centralia College Blvd
> Centralia, WA 98531
> janet.reaume@centralia.edu

1.3     Respondent is represented by the Washington Attorney General's Office at the following address:

> Matthew Barber, AAG
> Office of the Attorney General
> PO Box 40100
> Olympia, WA 98504-0100
> Matthew.barber@atg.wa.gov and eduolyef@atg.wa.gov

1.4     Respondent is also represented by Assistant Attorney General John Clark, who is referenced in the Final Decision as advising the Board in some capacity. Mr. Clark did not submit a notice of appearance or provide notice to Dr. Pyne or her legal counsel.

1.5     Centralia College Federation of Teachers Local Number 4469, AFT/AFL-CIO (the "Union") is the union representative for Dr. Pyne but has not entered an appearance in these proceedings. Respondent did not include the Union as an interested party to its Final Decision.

PETITION FOR JUDICIAL REVIEW – Page 3

## II.    JURISDICTION AND VENUE

2.1    This court has jurisdiction to review the Final Decision of Respondent pursuant to the Administrative Procedure Act, RCW 34.05.514(2) and chapter 34.05 RCW. Venue is in Lewis County.

## III.    STATEMENT OF FACTS

3.1    Up until April 30, 2023, Petitioner Dr. Laurie Pyne ("Dr. Pyne" or "Petitioner") was a tenured professor with Centralia College pursuant to an employment contract with Centralia College and a Collective Bargaining Agreement with the Centralia College Federation of Teachers Local Number 4469, AFT/AFL-CIO.

3.2    Dr. Pyne was hired by Centralia College on October 19, 2018 and awarded tenure on March 11, 2021.

3.3    Centralia College, a legislative branch state agency, assigned Dr. Pyne to work at the Washington Corrections Center's Department of Corrections (DOC) in Shelton, Washington, an executive branch agency.[1]

3.4    Dr. Pyne received excellent performance reviews. She received no discipline, other than when she was placed on an unpaid leave of absence, at which point she lost all pay and benefits while her tenure position continued.

---

[1] Centralia College did not make DOC a party to the proceedings at any point in this case.

PETITION FOR JUDICIAL REVIEW – Page 4

Lockerby Law, PLLC
1420 Fifth Avenue, Suite 3000
Seattle, WA 98101
Phone: (206) 854-2869
Joy@LockerbyLaw.com

3.5    In August 2021, Centralia College submitted emails via a listserv requiring all employees to receive COVID-19 mRNA vaccines per the mandate of Governor Inslee Proclamation 21-14.1

3.6    On or about September 21, 2021, Dr. Pyne voiced objections about the vaccine to her supervisor, Elizabeth Grant.

3.7    On or about October 1, 2021, Centralia College, through one or more persons, issued a notice of intent to separate for non-disciplinary reasons. There were discrepancies with regard authorship and content. There was no mention of a Loudermill hearing.

3.8    On or about October 18, 2021, Centralia College, through President Robert Mohrbacher, issued a Notice of Non-Disciplinary Separation. There is no mention of a Loudermill hearing, but the letter provided 20-day timeframe to request a hearing.

3.9    On or about October 26, 2021, Dr. Pyne submitted a request for a religious exemption. Evidence at the hearing established that that Centralia College did not process the exemption request, even though Dr. Pyne was still employed.

3.10    On or about November 3, 2021, the union President, Mark Gorecki emailed Centralia College faculty stating in part, "We are required to obtain approval from the majority of faculty of the formation of a dismissal committee. The committee's responsibilities are found in article xvi of the CBA. Our committee is Ryer Banta, Preston Kiekel and Susanne Weil. Email any objections by November 6th. If you do not respond we will take that to mean approval." (Ex. V-1, p. 157-58).

PETITION FOR JUDICIAL REVIEW – Page 5

3.11    On or about December 7, 2021, Dr. Pyne received an email from Erica Holmes stating Joni Derifield was appointed by ALJ to serve as the hearings officer and that a pre-hearing meeting will be scheduled.

3.12    On or about December 2, 2022, days before her first hearing, Dr. Pyne was informed that Centralia College had changed the composition of the Dismissal Review Committee.

3.13    On or about December 14 and 15, 2022, the hearing was held over two days.

3.14    Following the hearing, Dr. Pyne detected an anomaly with the recording. Dr. Pyne motioned for a stay to the issuance of the recommended decision; that motion was denied.

3.15    On or about December 29, 2022, ALJ Joni Derifield issued her Recommended Decision, finding that there was "sufficient cause" under RCW 28B.50.861 and Article XVI of the CBA.

3.16    On or about January 6, 2023, the Dismissal Review Committee, through Brian Rauscher, faculty counselor, provided the Tenure Dismissal Committee Recommendation to President Robert Mohrbacher and Vice President Joy Anglesey. It states the Tenure Dismissal Committee met and voted to recommend dismissal. No evidence or basis for the decision was provided by the committee. The letter was forwarded to Dr. Pyne and counsel from Joy Anglesey, who informed Dr. Pyne she would be notified of the Board of Trustees' special meeting as soon as possible. Exhibit B.

PETITION FOR JUDICIAL REVIEW – Page 6

3.17    On or about January 11, 2023, Matthew Barber, AAG for Centralia College submitted a letter to ALJ Derifield, purporting to provide a copy of the "written recommendations." Exhibit C.

3.18    On or about February 9, 2023, Board chair Court Stanley requested written argument, subject to the limitations by the Board. The letter states, "the Board of Trustees is authorized to make a final decision on whether to uphold or reverse the decision to dismiss Laurie Pyne." Exhibit D.

3.19    On or about March ,, 2023, Centralia College submitted arguments to the Board; Dr. Pyne submitted argument for consideration to the Centralia College Board of Trustees on March 3, 2023. Exhibits E and F.

3.20    On May 2, 2023, the Board of Trustees served a certified copy of "Final Decision of the Centralia College Board of Trustees Faculty Dismissal of Instructor Laurie Pyne" dated April 20, 2023. Exhibit A.

## IV.    BASIS FOR RELIEF OF AGENCY ACTION

Petitioner is entitled to judicial review and relief of agency action pursuant to RCW 34.05.514(3) and/or RCW 34.05.570(4)(b) and (c) for the agency action including the termination of deprivation of tenure without due process of law. Petitioner asks this court to review Respondent's Final Decision to terminate employment and sever tenure.

PETITION FOR JUDICIAL REVIEW – Page 7

4.1     Petitioner realleges paragraphs 1.1 through 3.19 and seeks further relief with respect to the Board's Final Decision (Exhibit A) under RCW 34.05.570(3)(a)-(i) to the extent the "evidentiary hearing" constitutes an "adjudication."

4.1.1    Respondent's Final Decision, or the order or decision on which it is based, to sever tenure and terminate employment for "sufficient cause," is in violation of constitutional provisions on it face or as applied. The lack of transparency, lack of specificity, and other deficiencies fail to protect Dr. Pyne's constitutional rights. RCW 34.05.570(3)(a).

4.1.2    Respondent's Final Decision is outside the statutory authority or jurisdiction of the agency conferred by any provision of law. Dr. Pyne maintains her challenge to the authority of the Office of Administrative Hearings in recommending dismissal of tenure and was not afforded full representation by her Union. RCW 34.05.570(3)(b).

4.1.3    Respondent engaged in unlawful adjudication procedure or decision-making process, or failed to follow a prescribed procedure. Centralia College made up the process as they went along, changing the composition of the dismissal review committee without including Dr. Pyne in that process despite her employed status. The Board is fact-finder, not a reviewing body. RCW 34.05.570(3)(c).

4.1.4    Respondent erroneously interpreted or applied the law, including laws protecting constitutional property rights for tenured employment. The Board failed

PETITION FOR JUDICIAL REVIEW – Page 8

to specify with particularity in its Final Decision which of the reasons constituted sufficient case. Centralia College made new allegations of misconduct in the hearing. RCW 34.05.570(3)(d).

4.1.5    The Final Decision is not supported by evidence that is substantial when viewed in light of the whole record, which includes all of the agency record for judicial review, motions, the OAH Prism Portal and docket, and any supplemented by any additional evidenced received by the court under this chapter. RCW 34.05.570(3)(e).

4.1.6    The Final Decision was issued without timely and proper adjudication and resolution of all issues. Centralia College President Mohrbacher and/or AAG Matthew Barber raised new allegations of misconduct during the hearing and argued the sincerity of Dr. Pyne's beliefs based on religion or creed. RCW 34.05.570(3)(f).

4.1.7    A motion was not made to disqualify the ALJ Joni Derifield; however, during the proceeding ALJ Derifield exhibited bias against Dr. Pyne, and attempt to cure AAG Barber's line of questioning. RCW 34.05.570(3)(g).

4.1.8    The Final Decision is inconsistent with a rule of the agency unless the agency explains the inconsistency by stating facts and reasons to demonstrate a rational basis for inconsistency. As of the date of the hearing, December 14-15, 2022, Centralia College had not engaged in any rulemaking and did not promulgate any employment policies. RCW 34.05.570(3)(h).

PETITION FOR JUDICIAL REVIEW – Page 9

4.1.9    The Final Decision is contrary to public policy, disregards competent evidence of record, and is arbitrary and capricious. The Board used the wrong standard of review for deciding tenure and acted as a reviewing capacity. It failed to reference any promulgated policies. RCW 34.05.570(3)(i).

4.2    To the extent that Dr. Pyne's "evidentiary hearing" is not truly and adjudicative proceeding, Dr. Pyne petitions this court for review of other agency action not reviewable under subsection (3) including but not limited to: (4)(b) and (c).  Dr. Pyne's rights were violated by Centralia College's failure to perform a duty required by law  including but not limited to conducting an internal investigation and/or offering her a "Loudermill," "Weingarten," or name-clearing following the new allegations of misconduct and as referenced in ALJ Derifield's order. This court may hear evidence, pursuant to to RCW 34.05.562 on material issues of fact raised in the petition and answer. A person aggrieved by the performance of an agency action, including the exercise of discretion, can be granted relief if this court determines the action(s) are unconstitutional, outside the statutory authority of the agency or the authority conferred by a provision of law; arbitrary or capricious, or undertaken by persons not properly constituted to take such action.

4.3    As an aggrieved party to Respondent's actions, Petitioner Dr. Pyne has standing and has timely filed this Petition for Judicial Review. Petitioner has exhausted administrative remedies or can show that further exhaustion is futile.

PETITION FOR JUDICIAL REVIEW – Page 10

4.4     In filing this Petition, Petitioner does not waive any of her rights including but not limited to her right to due process to protect tenure, a property interest, objections raised during the proceedings below, and new objections to defective service of the Final Decision which was sent at a date after that which was certified under penalty of perjury and Centralia College's failure to inform the Federation of Teachers, and failed to include a copy of the "Recommended Decision" by ALJ Derifield, contrary to the Certificate of Service under penalty of perjury.

4.5     There are several defects with regard to Respondent's service of its Final Decision, including but not limited to: (1) Erroneous date listed for the date of mailing and service (postmarked on April 28, 2023, not April 26, 2023); (2) erroneous date listed for the date of service of April 20, 2023, (3) the Union is not copied; and (4) a copy of ALJ Derifield's "Recommended Decision" was not submitted by electronic or certified mail to Dr. Pyne or her counsel of record. Exhibit G.

4.6     During the proceedings and thereafter, Centralia College raised new unsupported accusations of misconduct. Dr. Pyne has not waived her right to Union representation or her right to Loudermill, Weingarten, or name-clearing hearing rights pertaining to those new accusations or her ability to failure to pay tenure salary and benefits during the pendency of the hearing is prejudicial and punitive.

4.7     Petitioner asks this case be set for oral argument before this court and that Petitioner be permitted to submit written briefing prior to that hearing.

PETITION FOR JUDICIAL REVIEW – Page 11

Lockerby Law, PLLC
1420 Fifth Avenue, Suite 3000
Seattle, WA 98101
Phone: (206) 854-2869
Joy@LockerbyLaw.com

1

## V.    **PRAYER FOR RELIEF**

2      WHEREFORE, Petitioner prayers for relief and judgment from this court to:

3      A.      Reverse or modify ALJ Joni Derifield's Order on Motion to Strike, To Extend

4 Deadlines, and for Declaratory Relief, dated September 14, 2022.

5      B.      Reverse or modify the "Final Decision of the Centralia College Board of

6 Trustees Faculty Dismissal of Instructor Laurie Pyne." Respondent's and the

7 "Recommended Decision" from the Office of Administrative Hearings, Docket 12-2021-

8 CLG00008.

9      C.      Award Petitioner's reasonable attorney's fees and costs as provided in RCW

10 RCW 4.84.350, Equal Access to Justice Act (EAJA).

11      D.      Award any further relief that this Court deems fair and equitable.

12

13      RESPECTFULLY SUBMITTED this 30th day of May, 2023.

14                    LOCKERBY LAW, PLLC

15

16                    By:____/s/ Joy Lockerby_____
                      Joy M. Lockerby, WSBA #44343
                      1420 Fifth Avenue, Suite 3000
17                    Seattle, WA 98101
                      Phone: (206) 854-2869
18                    Email: Joy@LockerbyLaw.com
                      Attorney for Petitioner, Dr. Laurie Pyne
19

20

21

PETITION FOR JUDICIAL REVIEW – Page 12

1

CERTIFICATE OF SERVICE

2

The hereby certify that on the date set forth below I caused the foregoing *Petition for*

3

*Judicial Review,* and the attached *Exhibits A-G,* to be filed with this Court, and further caused

4

to be served a true and correct copy to the parties as indicated below:

5

6   Centralia College                              ☐     Email
    Centralia College Board of Trustees            ☐     U.S. Mail
7   Attn: Janet Reaume, Board Secretary            ☐     E-Filing
    600 Centralia College Blvd                     ☐     Hand Delivery
8   Centralia, WA 98531                            ☒     Process Service

9
    Matthew Barber, AAG                            ☐     Email
10  Office of the Attorney General                 ☐     U.S. Mail
    PO Box 40100                                   ☒     E-Filing
11  Olympia, WA 98504-0100                         ☐     Hand Delivery
    Matthew.barber@atg.wa.gov
12  eduolyef@atg.wa.gov
    serviceATG@atg.wa.gov

13

14

15

16

17      DATED this 30th day of May, 2023.

18                          Lockerby Law, PLLC

19
                            By: ___/s/ Joy Lockerby_____
20                          Joy M. Lockerby, WSBA 44343

21

PETITION FOR JUDICIAL REVIEW – Page 13

Lockerby Law, PLLC
1420 Fifth Avenue, Suite 3000
Seattle, WA 98101
Phone: (206) 854-2869
Joy@LockerbyLaw.com

# EXHIBIT E

**WASHINGTON STATE**
**OFFICE OF ADMINISTRATIVE HEARINGS**

| | |
|---|---|
| In the matter of: | Docket No.  12-2021-CLG-00008 |
| Laurie Pyne, | **ORDER ON MOTION TO STRIKE, TO EXTEND DEADLINES, AND FOR DECLARATORY RELIEF** |
| Appellant. | |
| | Agency:    Colleges |
| | Program:   Centralia College |

1. ISSUES

   1.1. Does the Office of Administrative Hearings have jurisdiction over this matter?

   1.2. Should the current issue statement be stricken and modified?

   1.3. Should the deadline for filing witness lists, exhibit lists, and exhibits be extended?

2. ORDER SUMMARY

   2.1. Yes.  The Office of Administrative Hearings, and the undersigned Administrative Law Judge, have jurisdiction over this matter.

   2.2. Yes.  The issue statement is modified as indicated below.

   2.3. Yes.  The deadline for filing witness lists, exhibit lists, and exhibits is extended.

3. MOTION HEARING

   3.1. Hearing Date:              August 15, 2022

   3.2. Administrative Law Judge:  Joni Derifield

   3.3. Appellant:                 Laurie Pyne ("Dr. Pyne")

      3.3.1.  Representative:      Joy Lockerby

   3.4. Agency:                    Centralia College ("College")

      3.4.1.  Representative:      Matthew Barber, Assistant Attorney General

   3.5. Documents Considered: I considered the following documents:

| Doc. No. | Document Name | Document Date | No. Pages |
|---|---|---|---|
| 1 | Motion to Strike, to Extend Deadlines, and for Declaratory Relief | 07/12/22 | 21 |

| 2 | Declaration of Joy Lockerby in Support of Motion to Strike, Extend, and Declaratory Relief, with associated Exhibit A | 07/12/22 | 9 |
| 3 | (Supplemented) Motion to Strike, to Extend Deadlines, and for Declaratory Relief | 07/13/22 | 22 |
| 4 | Declaration of Laurie Pyne in Support of Motion to Strike, Extend, and For Declaratory Relief, with associated Exhibits A-U | 07/13/22 | 114 |
| 5 | Respondent Centralia College's Response to Appellant's Supplemented Motion to Strike, to Extend Deadlines, and for Declaratory Relief, with referenced Exhibits 1-17 | 07/26/22 | 23 |
| 6 | Dr. Pyne's Reply in Support of (Supplemented) Motion to Strike, to Extend Deadlines, and for Declaratory Relief | 08/02/22 | 11 |

## 4.  FINDINGS OF FACT

*Procedural History*

4.1. On January 31, 2022, the undersigned Administrative Law Judge held a prehearing conference at which Dr. Pyne appeared pro se.

4.2. On February 7, 2022, the undersigned issued a Prehearing Conference Order.  In relevant part, the Prehearing Conference Order set the case schedule, and directed that the final day for filing and serving Witness Lists, Exhibit Lists, and marked Exhibits was April 29, 2022.  Dr. Pyne and the College each submitted their respective Witness Lists, Exhibit Lists, and Exhibits by the April 29, 2022 deadline.

4.3. The Prehearing Conference Order also identified the issue to be determined at the evidentiary hearing as follows:

> Did Centralia College properly separate Laurie Pyne from employment pursuant to WAC 357-46-195 and/or Proclamation 21-14.1, as set out in the Notice of Non-disciplinary Separation dated October 18, 2021?

4.4. The undersigned continued the evidentiary hearing, originally scheduled for May 13, 2022, at Dr. Pyne's request to enable her to retain counsel.

4.5. On or about June 1, 2022, Dr. Pyne retained Ms. Lockerby to represent her in this matter.

4.6. Dr. Pyne, via her counsel, filed a Motion to Strike, to Extend Deadlines, and for Declaratory Relief on July 12, 2022, and a supplemented motion on July 13, 2022. Ex. 1; Ex. 3.

4.7. The College filed a Response on July 26, 2022.  Ex. 5.

4.8. Dr. Pyne filed a reply on August 3, 2022.  Ex. 6.

*Dr. Pyne's Employment with Centralia College*

4.9. Dr. Laurie Pyne is employed by Centralia College as an instructor at the Washington Corrections Center in Shelton, Washington.  Ex. 4, pg. 2.

4.10.     Dr. Pyne is a member of the Centralia College Federation of Teachers, Local No. 4469, AFT/AFL-CIO ("Union").  *Id.* at 3.

4.11.     The College granted Dr. Pyne tenure on March 11, 2021.  *Id.* at 2.

4.12.     On August 9, 2021, Governor Jay Inslee issued Proclamation 21-14, which generally prohibited state employees from working after October 18, 2021, unless the employee is fully vaccinated against COVID-19.  Ex. 5, pg. 3.  On August 20, 2021, the governor issued an additional proclamation, Proclamation 21-14.1, which clarified that the vaccine mandate applied to workers in educational settings.  *Id.*

4.13.     On August 16, 2021, Dr. Elizabeth Grant, Dean of Corrections Education for the College, sent her staff (including Dr. Pyne) an email instructing them to provide proof of vaccination status to the Department of Corrections.  *Id.* at sub-Ex. 3, pg. 1.  Dr. Grant noted in her email that the procedure for requesting an exemption had not yet been determined.  *Id.*

4.14.     On August 19, 2021, Dr. Grant emailed Dr. Pyne directly to request verification of her vaccination status.  *Id.* at sub-Ex. 5, pg. 1.  Dr. Grant attached exemption forms to that email.  *Id.*  That same day, Dr. Erica Holmes, Vice President for Human Resources and Equity for the College, emailed all College employees regarding deadlines for becoming fully vaccinated.  *Id.* at sub-Ex. 4, pg. 1.  The College sent similar reminders by email on September 3, 7, 9, 20, and 30, 2021.  *Id.* at sub-Ex. 7, pg. 1; sub-Ex. 9, pg. 1; sub-Ex. 10, pg. 1-2; sub-Ex. 11, pg. 1-3; sub-Ex. 14, pg. 1.

4.15.     Dr. Grant again emailed Dr. Pyne directly on September 1, 2021, asking whether Dr. Pyne was vaccinated.  *Id.* at sub-Ex. 8, pg. 1.  Dr. Pyne responded to the email on September 3, 2021, indicating she was not vaccinated.  *Id.*

4.16.     Dr. Grant emailed Dr. Pyne once more on September 21, 2021, explaining that she received notification that Dr. Pyne's vaccination status had not been entered into the database.  *Id.* at sub-Ex. 12, pg. 1.  Furthermore, she stated: [i]f you plan to seek an exemption for medical or religious reasons, please complete

the appropriate form and submit it . . . by **October 1, 2021**.  Attached are a Religious Exemption Request Form and a Medical Questionnaire Form (for exemption)."  *Id*. (emphasis in original).

4.17.      On September 30, 2021, Dr. Holmes sent all College employees an email reminding them that October 4, 2021 was the final day to receive a vaccine to be fully vaccinated by the October 18, 2021 deadline.  *Id*. at sub-Ex. 14, pg. 1.  The email informed employees that requests for exemptions were due by October 10, 2021, and attached those exemption forms.  *Id*.

4.18.      On October 1, 2021, Dr. Grant issued Dr. Pyne a "Notice of Intent to Separate for Non-disciplinary Reasons," which Dr. Pyne received on October 6, 2021.  *Id*. at sub-Ex. 15, pg. 1-3.  Once again, this letter informed Dr. Pyne that she must be fully vaccinated to work after October 18, 2021, unless she had an approved exemption due to a disability/medical condition or sincerely held religious beliefs which preclude vaccination.  *Id*.  It stated that if she provided proof of being fully vaccinated, the College would rescind the Notice.  *Id*.

4.19.      On October 18, 2021, Dr. Bob Mohrbacher, President of the College, issued Dr. Pyne a Notice of Non-disciplinary Separation which placed her on "unpaid administrative leave during the separation process," effective at the end of her work shift on October 18, 2021.  *Id*. at sub-Ex. 16, pg. 1-3.  The letter indicated that Dr. Pyne did not provide proof of being fully vaccinated, nor did she request a medical or religious exemption.  *Id*.  As such, she was no longer qualified for her position and was prohibited from performing work under the Governor's proclamation.  *Id*.  The letter further noted that under Article XVI of the Collective Bargaining Agreement ("CBA"), the separation was for sufficient cause.  *Id*.  Dr. Pyne received the letter on October 20, 2021.  *Id*.

4.20.      Although Dr. Morbacher's letter accurately described the College's reasons for placing Dr. Pyne on unpaid administrative leave, Dr. Mohrbacher's letter incorrectly cited WAC 357-46-195 and WAC 357-46-200.[1]  *Id*.

4.21.      On November 2, 2021, Dr. Pyne requested a hearing.  *Id*. at sub-Ex. 17, pg. 1-2.  Enclosed with her hearing request was a Religious Exemption Request Form, dated October 26, 2021.  *Id*.

5.  CONCLUSIONS OF LAW

Based upon the facts above, I make the following conclusions:

---

[1] These citations were erroneous, as the regulations were promulgated by the State Human Resources Director, and academic personnel employed by an institution of higher education are exempt from those provisions.  *See* RCW 41.06.070(2)(a).

ORDER ON MOTION TO STRIKE, TO EXTEND DEADLINES, AND FOR DECLARATORY RELIEF      OAH:  (253) 476-6888
Docket No. 12-2021-CLG-00008      Page 4 of 11
8411-SCP

*Applicable Law and Collective Bargaining Agreement*

5.1. The College and the Union entered into a collective bargaining agreement ("CBA") which is effective during the period of July 1, 2020 through June 30, 2023. The CBA establishes procedural requirements for dismissals.

5.2. The CBA directs that a tenured faculty member may only be dismissed for "sufficient cause." CBA, Article XVI(1). Similarly, RCW 28B.50.861 provides that a "tenured faculty member shall not be dismissed except for sufficient cause."[2]

5.3. Under the terms of the CBA, prior to the College taking official action relating to a dismissal, the faculty member must receive an informal hearing process which includes:

    A. Oral or written notice of the reasons;

    B. An explanation of the evidence supporting the reasons, and

    C. An opportunity either in person or in writing to present reasons why the proposed action should not be taken.

CBA, Article XVI(2).

5.4. After the informal hearing process concludes, the CBA directs that the faculty member is entitled to one formal hearing. CBA, Article XVI(3)-(4). The CBA provides that during the formal hearing, the faculty member has the following procedural rights:

    A. The right to confront and cross-examine adverse witnesses.

    B. The right to be free from compulsion to divulge information which he/she could not be compelled to divulge in a court of law.

    C. The right to be heard in his/her own defense and to present witnesses, testimony, and evidence on all issues involved.

    D. The right to assistance of the hearing officer in securing the witnesses and evidence pursuant to Administrative Procedure[] Act, chapter 34.05 RCW.

    E. The right to counsel of his/her choosing who may appear and act on his/her behalf at the hearings.

    F. The right to have witnesses sworn and testify under oath.

CBA, Article XVI(4)(A)-(F).

---

[2] The College correctly notes that labeling Dr. Pyne as "appellant" in this matter does not change the burden of proof. The burden of proof in this matter rests with the College, pursuant to RCW 28B.50.861.

5.5. Similarly, the statutes pertaining to community and technical colleges specify that the College must fulfill particular procedural requirements to dismiss a tenured faculty member. Prior to dismissing a tenured faculty member,

> the case shall first be reviewed by a review committee. The review shall include testimony from all interested parties including, but not limited to, other faculty members and students. The faculty member whose case is being reviewed shall be afforded the right of cross-examination and the opportunity to defend himself or herself. The review committee shall prepare recommendations on the action they propose be taken and submit such recommendations to the appointing authority prior to their final action.

RCW 28B.50.863.

5.6. The term "appointing authority" is defined as "the board of trustees of a college district." RCW 28B.50.851(2).

5.7. The review committee must be composed of two tenured faculty members and one administrator. CBA, Appendix A, § H. The review committee shall review the case, attend the hearing, hear testimony, and "arrive at its recommendations in conference on the basis of the hearing." CBA, Article XVI(6)(A)-(D).

5.8. The College's regulations require the President to designate a presiding officer for an adjudicative proceeding, which may be an administrative law judge. WAC 132L-108-020; *see also* CBA, Article XVI(5). The model rules of procedure, Chapter 10-08 WAC, and the Administrative Procedure Act, Chapter 34.05 RCW, are applicable in such proceedings. WAC 132L-108-010; CBA, Article XVI(5)(A).

*Jurisdiction*

5.9. With respect to the CBA requirements, the College fulfilled its obligations under Article XVI(2) to offer an informal hearing. On October 1, 2021, Dr. Grant's letter gave Dr. Pyne notice that the College intended to separate her from employment on the grounds that she was not fully vaccinated and did not have an approved exemption. The letter cited evidence that Dr. Pyne provided information that she had started her vaccination process and received one vaccine dose, but had not provided proof of being fully vaccinated. Furthermore, Dr. Grant's letter advised Dr. Pyne that she could provide any additional information she would like Dr. Grant to consider by October 8, 2021. Dr. Grant's October 1, 2021 letter clearly satisfied the College's obligation to provide an informal hearing under CBA, Article XVI(2).

5.10. The evidentiary hearing before the undersigned administrative law judge is the next step in the process. It is the formal hearing referenced in CBA Article XVI(4), as well as the review committee hearing required by RCW 28B.50.863. Dr. Pyne will have the opportunity to testify on her own behalf, present witnesses, and

cross-examine the College's witnesses.  The review committee will be a part of the evidentiary hearing and may ask questions of witnesses who testify.  Members of the review committee previously participated in the prehearing conference, and review committee availability will be considered when scheduling the evidentiary hearing.  During the formal hearing, Dr. Pyne will be afforded all of the procedural rights required by the CBA, RCW 28B.50.863, and the Administrative Procedure Act.  This hearing is the due process to which Dr. Pyne is entitled.

5.11.     Furthermore, WAC 132L-108-020 clearly grants the College President the authority to designate a presiding officer for this proceeding.  One of the specifically enumerated options for a presiding officer is an administrative law judge such as the undersigned.  WAC 132L-108-020; CBA Article XVI(5).  The Office of Administrative Hearings, and the undersigned administrative law judge, have jurisdiction over this matter.

*Issue Statement*

5.12.     It is evident from Dr. Mohrbacher's October 18, 2021 letter that the College placed Dr. Pyne on unpaid administrative leave during the separation process, but has yet to separate her from employment due to the pendency of this proceeding.  Therefore, the issue statement will be amended to reflect that the College *seeks* to separate Dr. Pyne from employment.  Additionally, the undersigned removed the reference to WAC 357-46-195, as the College acknowledges in its briefing that the citation is inapplicable.  The issue statement is hereby amended as follows:

> **Did Centralia College properly seek to separate Laurie Pyne from employment pursuant to Proclamation 21-14.1, as set out in the Notice of Non-disciplinary Separation dated October 18, 2021?**

5.13.     Next, Dr. Pyne argues that the issue statement should include whether the process created by the CBA comports with RCW 28B.50.863.  As was discussed above, the CBA and RCW 28B.50.863 are not in conflict.  Dr. Pyne did not establish a sufficient basis to amend the issue statement in that regard.

5.14.     Furthermore, Dr. Pyne argues that the issue statement should be amended to include an issue of whether Dr. Pyne submitted a legitimate religious exemption and whether Centralia College had an obligation to review it and allow her an interactive process.  That issue falls within the issue already identified—whether the College properly sought to separate Dr. Pyne from employment.

5.15.     Dr. Pyne asserts that the statement of issues should include whether the College's process of separating Dr. Pyne from employment and its failure to pay her salary and benefits violates her employment contract.  She does not explain why this should be the case.  Therefore, the undersigned denies Dr. Pyne's request to include this issue.  In this administrative matter, Dr. Pyne is not litigating

the details of her employment contract; she filed a request for hearing on the sole issue of whether the Notice of Non-disciplinary Separation was proper. Enforcement of the employment contract is a civil matter which is not properly before the undersigned.

5.16. Finally, Dr. Pyne asserts that the process outlined in RCW 28B.50.863 should have been completed before depriving her of her property rights, and that her due process rights were violated. Dr. Pyne presented insufficient evidence and argument that her due process rights were violated. As was discussed above, the College followed the procedural requirements outlined in the CBA and RCW 28B.50.863. Dr. Pyne will receive a formal administrative hearing as required by those provisions. The issue statement does not require amendment as requested by Dr. Pyne.

*Extension of Deadlines*

5.17. Dr. Pyne was not represented by counsel at the time the witness and exhibit list deadline expired. However, as a pro se party she did submit a witness list, exhibit list, and exhibits in support of her case. Nonetheless, it is appropriate to afford Dr. Pyne's counsel the opportunity to participate in this crucial aspect of the case, so that she may submit the evidence and call the witnesses at hearing she deems necessary to present Dr. Pyne's case. To prevent Dr. Pyne's counsel from doing so would compromise her ability to effectively represent Dr. Pyne.

5.18. Likewise, counsel for the College may amend or supplement the exhibits it originally filed.

5.19. The Office of Administrative Hearings will communicate with the parties regarding scheduling a status conference, at which we will set a new witness and exhibit list deadline as well as the evidentiary hearing date.

6. ORDER

IT IS HEREBY ORDERED THAT:

6.1. Dr. Pyne's Motion to Strike, to Extend Deadlines, and for Declaratory Relief is GRANTED IN PART AND DENIED IN PART.

6.2. The Office of Administrative Hearings, and the undersigned Administrative Law Judge, have jurisdiction over this matter.

6.3. The issue statement is modified as indicated above.

/ / /

/ / /

/ / /

6.4. The deadline for filing witness lists, exhibit lists, and exhibits is extended.

SIGNED at Tacoma, Washington on the date of mailing.

_____

Joni Derifield
Administrative Law Judge
Office of Administrative Hearings

**CERTIFICATE OF SERVICE ATTACHED**

You may not separately appeal this order. You may appeal it after I enter an Initial Order that disposes of all issues as part of your appeal of the Initial Order.

**CERTIFICATE OF SERVICE FOR OAH DOCKET NO. 12-2021-CLG-00008**

I certify that true copies of this document were served from Tacoma, Washington via Consolidated Mail Services upon the following as indicated:

| | |
|---|---|
| Laurie Pyne<br>PO Box 392<br>Tenino, WA 98589<br>***Appellant*** | ☒ First Class Mail<br>☐ Certified Mail, Return Receipt<br>☐ Campus Mail<br>☐ E-mail:<br>    lmpcarl@gmail.com |
| Joy Lockerby<br>Lockerby Law PLLC<br>PO Box 19444<br>Seattle, WA 98109<br>***Appellant Representative*** | ☒ First Class Mail<br>☐ Certified Mail, Return Receipt<br>☐ Campus Mail<br>☐ E-mail:<br>    joy@lockerbylaw.com |
| Karen Osborne<br>KOsborne Law LLC<br>9721 NE Livingston Mountain Court<br>Camas, WA, 98607<br>***Appellant Representative*** | ☐ First Class Mail<br>☐ Certified Mail, Return Receipt<br>☐ Campus Mail<br>☒ E-mail:<br>    Karen.Osborne@KOsborneLaw.com |
| Matthew Barber, AAG<br>Office of the Attorney<br>General Education Division<br>PO Box 40100<br>Olympia, WA 98504<br>***Agency Representative*** | ☐ First Class Mail<br>☐ Certified Mail, Return Receipt<br>☐ Campus Mail<br>☒ E-mail:<br>    matthew.barber@atg.wa.gov |
| John Bosenberg, Interim Vice President of Human Resources<br><br>Connie Smejkal, Dean of Instruction<br><br>***Administrative Representatives*** | ☐ First Class Mail<br>☐ Certified Mail, Return Receipt<br>☐ Campus Mail<br>☒ E-mail:<br>    john.boesenberg@centralia.edu<br>    candi.fetch@centralia.edu<br>    Connie.smejkal@centralia.edu |

| | |
|---|---|
| Susanne Weil, Ryer Banta, Preston Kiekel & Mark Gorecki<br><br>***Faculty Committee Members*** | ☐ First Class Mail<br>☐ Certified Mail, Return Receipt<br>☐ Campus Mail<br>☒ E-mail:<br>     susanne.weil@centralia.edu<br>     ryer.banta@centralia.edu<br>     preston.kiekel@centralia.edu<br>     mark.gorecki@centralia.edu.edu |

Date:  Wednesday, September 14, 2022

OFFICE OF ADMINISTRATIVE HEARINGS

Ashleigh Rainey
Legal Assistant 2

ORDER ON MOTION TO STRIKE, TO EXTEND DEADLINES, AND FOR DECLARATORY RELIEF    OAH:  (253) 476-6888
Docket No. 12-2021-CLG-00008    Page 11 of 11
8411-SCP

# EXHIBIT F



21-2-01674-34
ORDYMT          96
Order Denying Motion Petition
11217727

FILED
SUPERIOR COURT
THURSTON COUNTY, WA

2021 OCT 19 AM 9: 18

Linda Myhre Enlow
Thurston County Clerk

Hearing date: October 18, 2021
Hearing time: 9:00 a.m.
Judge/Calendar: Hon. Carol Murphy

**STATE OF WASHINGTON**
**THURSTON COUNTY SUPERIOR COURT**

| | |
|---|---|
| WILLIAM CLEARY, et al., | NO. 21-2-01674-34 |
|        Plaintiffs, | ORDER DENYING PLAINTIFFS' MOTION FOR INJUNCTION OR WRIT OF PROHIBITION |
|   v. | |
| JAY INSLEE, et al., | [PROPOSED] |
|        Defendants. | |

This Court has considered Plaintiffs' Motion for Injunction or Writ of Prohibition and their supporting declarations and exhibits filed on September 17, 2021; Plaintiffs' Re-Note and Brief in Support of Plaintiff's Motion for Injunctive and Declaratory Relief and their supporting declarations and exhibits filed on September 30, 2021; Defendants' Opposition and their supporting declarations and exhibits filed on September 22, 2021; Defendants' Further Opposition and their supporting declarations and exhibits filed on October 5, 2021; Plaintiffs' reply thereto; Defendants' Reply Declaration of Nathan J. Arnold; Plaintiffs' response thereto; the argument of the parties, the applicable law, and all the papers, pleadings, and records of the Court in this matter.

ORDER DENYING PLAINTIFFS'
MOTION FOR INJUNCTION OR
WRIT OF PROHIBITION [PROPOSED]
NO. 21-2-01674-34

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1       The Court, finding itself fully informed, hereby concludes that Plaintiffs have failed to

2  establish each of the three elements required to award preliminary injunctive relief in this facial

3  challenge to Proclamation 21-14, Proclamation 21-14.1, and Proclamation 21-14.2 (together, the

4  Proclamation). To prevail in a facial challenge to a law, a plaintiff must establish that there are

5  no circumstances under which it can constitutionally be applied. In this case, Plaintiffs are

6  unlikely to ultimately prevail on the merits of their claim that the Proclamation is beyond the

7  Governor's statutory or constitutional authority. The Court found that strict scrutiny does not

8  apply, but even if it did apply, Plaintiffs would still be unlikely to prevail. For those reasons,

9  Plaintiffs have failed to establish either a clear legal or equitable right or a well-grounded fear of

10  immediate invasion of that right. The Court did not consider Plaintiffs' challenge to the

11  Proclamation to be an "as applied" challenge. The Court also concludes that Plaintiffs have failed

*because there is not a fully developed record of such.*    *cm*

12  to establish that the Proclamation is either resulting in or will result in actual, substantial, and

13  irreparable injury, as the financial harms they allege are not irreparable. For similar reasons, the

14  Plaintiffs have also not demonstrated that a writ of prohibition should issue. Therefore, Plaintiffs'

15  Motion for Injunction or Writ of Prohibition is DENIED.

16       IT IS SO ORDERED.

17       DATED this ___8th___ day of October 2021.

18

19

                         *carol murphy*

20                 THE HONORABLE CAROL MURPHY
                 Thurston County Superior Court Judge

21

22  Presented by:

23  ROBERT W. FERGUSON

ORDER DENYING PLAINTIFFS'       2       ATTORNEY GENERAL OF WASHINGTON
MOTION FOR INJUNCTION OR                 Complex Litigation Division
WRIT OF PROHIBITION [PROPOSED]            800 Fifth Avenue, Suite 2000
NO. 21-2-01674-34                         Seattle, WA 98104-3188
                                     (206) 464-7744

Attorney General

/s/ Kristin Beneski
KRISTIN BENESKI, WSBA #45478
First Assistant Attorney General
LAURYN K. FRAAS, WSBA #53238
CRISTINA SEPE, WSBA #53609
Assistant Attorneys General
KARL D. SMITH, WSBA #41988
Deputy Solicitor General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
Kristin.Beneski@atg.wa.gov
Lauryn.Fraas@atg.wa.gov
Cristina.Sepe@atg.wa.gov
Karl.Smith@atg.wa.gov

ZACHARY PEKELIS JONES, WSBA #44557
Special Assistant Attorney General
PACIFICA LAW GROUP LLP
1191 2nd Ave. Suite 2000
Seattle, WA 98101
(206) 245-1700
Zach.Pekelis.Jones@PacificaLawGroup.com

*Attorneys for Defendants*

Agreed as to form; notice of presentation waived:

ARNOLD & JACOBOWITZ PLLC

/s/
NATHAN J. ARNOLD, WSBA No. 45356
Lesley Alvarado, Licensed Legal Intern, WSBA No. 9889467
2701 First Ave., Ste. 200
Seattle, WA 98121
(206) 799-4221
Nathan@CAJLawyers.com
Lesley@CAJLawyers.com

*Counsel for Plaintiffs*

ORDER DENYING PLAINTIFFS'
MOTION FOR INJUNCTION OR
WRIT OF PROHIBITION [PROPOSED]
NO. 21-2-01674-34

3

# EXHIBIT G

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF THURSTON
_____

WILLIAM CLEARY, et al.,           )
                                  )
              Plaintiffs,          ) THURSTON COUNTY
                                  ) NO. 21-2-1674-34
vs.                               )
                                  )
JAY INSLEE, et al.,               )
                                  )
              Defendants.          )
                                  )
                                  )
                                  )
_____

VERBATIM REPORT OF PROCEEDINGS
_____

        BE IT REMEMBERED that on October 18, 2021,

the above-entitled matter came on for hearing before the

HONORABLE CAROL MURPHY, Judge of Thurston County Superior

Court.

_____

Reported by:    Aurora Shackell, RMR CRR
                Official Court Reporter, CCR# 2439
                2000 Lakeridge Drive SW, Bldg No. 2
                Olympia, WA 98502
                (360) 786-5570
                shackea@co.thurston.wa.us

APPEARANCES


For the Plaintiff:          NATHAN J. ARNOLD
                            Arnold & Jacobowitz PLLC
                            2701 1st Ave, Ste 200
                            Seattle, WA 98121-1127


For the Defendant:          ZACHARY PEKELIS JONES
                            Pacifica Law Group
                            1191 2nd Ave, Ste 2000
                            Seattle, WA 98101-3404

1     October 18, 2021, in Olympia, Washington

2     Before the Honorable CAROL MURPHY, Presiding

3     --oo0oo--

4

5     THE COURT:  Good morning.  We are on the

6     record in the case of Cleary versus Inslee, cause

7     21-2-1674-34.  And as we get started this morning, I

8     note that I expected a request to videotape this

9     hearing or to live stream this hearing.  I would like

10    to address first that request.  And when hearing the

11    request, I would like the requester to please

12    identify yourself by name.  Also, anyone objecting to

13    that request, please identify yourself by name.

14       So I'd like to hear first from any requester.

15          MR. BAY:  Hello, Judge Murphy.  This is Mike

16    Bay with TVW, and we're the state version of C-SPAN

17    here in Olympia.  We would like to live stream the

18    hearing.  We would live stream it unedited, start to

19    finish, no commentary, no editing.

20          THE COURT:  And do you go by Mr. Bay?

21          MR. BAY:  Yes.

22          THE COURT:  Mr. Bay, I am, of course, in the

23    courtroom.  I'm hopeful that those folks that are on

24    Zoom can see that in the courtroom, there are not

25    very many people.  I am in the courtroom with a court

1     clerk, but most of the participants in this hearing

2     are on Zoom.  I'm interested, Mr. Bay, in exactly

3     what it is that you would be recording.  Would it be

4     the picture of the screen with those with their

5     video, or would it be the screen that has all of the

6     names of those that might be observing?

7          MR. BAY:  It would be whatever feed you're

8     sending out, I believe.  So although, generally, when

9     we cover things, we put things on speaker view so

10    that that's the view that we are sending out.  If I

11    can -- I have a Roxy Baggio (phonetic ) on, who is

12    actually -- Roxie, if you could slack me real quickly

13    and confirm that for me, that we would just be

14    sending out the speaker view, that I can let Judge

15    Murphy know that.  And Roxy just said it's the

16    attorneys and the judge on the gallery view.  So

17    Roxy, just let me know for sure that that means we're

18    not going to be covering all of the names and the

19    pictures that are listed; it's just going to be those

20    people?

21       Just those, she says.  So it will be the attorneys

22    and the judges on the gallery view, so we'll see the

23    people who are actually pictured and speaking, but

24    not the rest of the people.

25          THE COURT:  Thank you very much.

1    Before I hear any objections, are there any other

2    requests to videotape, record or live stream this

3    hearing?  I don't hear any requests.

4    So I'm going to hear now if there are any

5    objections to that request.  I am hearing no

6    objections.  So because I hear no objections, the

7    court is granting that request.

8    And I would like folks who are present via Zoom to

9    know that, just like in a courtroom, please be

10   respectful of the court process.  That means not to

11   be disruptive of the court process at all.  Please

12   leave your sound off, unless you're speaking, and I

13   only expect attorneys representing parties to be

14   speaking at this hearing.  So the court is granting

15   that request, and we will begin the hearing, Mr. Bay,

16   when you indicate that you are ready.

17            MR. BAY:  We will cue off you.  Whenever you

18   start, actually gavel it in for us, Roxie will

19   actually start streaming it.

20            THE COURT:  Well, I do apologize we got

21   started a little bit late today.  I had a hearing

22   that began at 8:30.  It appears that all of the

23   attorneys are ready to go, so we will begin this

24   hearing.

25   The matter before the court today is the case of

1  Cleary versus Inslee, Cause Number 21-2-1674-34.  The

2  court this morning is hearing the plaintiff's motion

3  for injunction or writ of prohibition.  And I'd like

4  to begin with appearances on the record.  If the

5  attorneys could please indicate their full names on

6  the record, please spell those names and indicate the

7  parties whom you represent.  Thank you.

8      MR. ARNOLD:  Thank you, Your Honor.  Nathan J.

9  Arnold from Arnold and Jacobowitz.  Last name is

10  spelled A-R-N-O-L-D.  I represent the plaintiffs.

11      MR. JONES:  Good morning, Your Honor.  Zach

12  Pekelis Jones on behalf of the governor and

13  defendants.  Middle name is P-E-K-E-L-I-S, and it

14  rhymes with Chehalis.

15      THE COURT:  Thank you.  Are there any

16  preliminary matters before I hear argument on the

17  motion?

18      MR. ARNOLD:  Yes, Your Honor.  We did also

19  renote a motion for contempt before Your Honor.  I

20  believe that is relevant to one of the prongs of the

21  TRO or preliminary injunction standard, Your Honor.

22      MR. JONES:  Your Honor, may I be heard?

23      THE COURT:  Mr. Jones, I appreciate that you

24  wish to be heard on this issue.  Before I hear from

25  you, if it is necessary, I want to address

1    Mr. Arnold's request.

2      In looking at the court file, there is no motion

3    for contempt that is scheduled for today.  Because

4    today's hearing is a specially scheduled hearing set

5    by the court, it is a hearing set that a party cannot

6    simply add a motion to.  The parties may note matters

7    for hearing on the court's civil motion calendar on

8    any Friday that has an available slot.  In looking at

9    the court file, it appears that there was an attempt

10    to note a motion for contempt, but the court did not

11    sign an order that set that hearing for today.

12      As the parties are probably aware, the court set

13    this hearing today as quickly as I could possibly

14    hear it after the case was assigned to me, I believe,

15    on Wednesday when I was in trial last week.  So no

16    request was made to the court to add the contempt

17    motion for today, and the court did not order it.

18      Mr. Arnold, do you require any further

19    clarification?

20        MR. ARNOLD:  No, Your Honor.  We greatly

21    appreciate your setting this on a special setting.

22    Just for our record, I do believe we made that

23    request to have it heard here.  It does go -- we

24    probably did it the wrong way, Your Honor, and I

25    appreciate your ruling on this.

1        To make my record, the contempt issue does go to

2    the public -- or the public interest prong that it

3    is.  We have been denied the ability to cross-examine

4    evidence, despite an order by Judge Wolfram that a

5    witness sit at a specific date and time for a

6    deposition.  That witness did not appear.  Our

7    position is that the government's evidence on that

8    point should be struck.  But we understand that the

9    court will take that up at a later time, Your Honor.

10        THE COURT:  Thank you, Mr. Arnold.  And I will

11    take that up at a later time, as long as it is noted

12    for hearing in compliance with the court's rules,

13    including Thurston County local rules.  If the

14    parties need any clarification of those rules, please

15    refer to the court's website in order to be clear on

16    the procedures used in this case.  I intend from here

17    forward to require the parties to abide by all of

18    those rules, and that requires that all of the

19    procedures be filed -- excuse me -- be followed so

20    that matters are timely set for hearing and the court

21    can be prepared.

22        Mr. Jones, I don't know if you wish to address the

23    court any further.  Is that necessary now?

24        MR. JONES:  Your Honor, you covered the

25    procedural dimension of it, and we're very grateful

1  that some order and compliance with the local rules

2  will finally be brought to bear in this case.  I do

3  have to correct Mr. Arnold's characterization of the

4  Walla Walla court's order to allow leave to depose a

5  witness.  The order does not order any witness to

6  actually appear.  It is simply leave to take a

7  deposition, which is why contempt is totally the

8  wrong lens through which to view any relief that

9  plaintiffs are seeking, as we explained thoroughly in

10  our response to the motion for contempt.

11         THE COURT:  Once again, the court is not

12  addressing this matter today.  The court today is

13  only addressing the plaintiff's motion for injunction

14  or writ of prohibition.

15      Are there any other preliminary matters that the

16  court needs to address?

17         MR. ARNOLD:  Yes, Your Honor.  If we may

18  inquire of how much time will be allowed for argument

19  this morning.

20         THE COURT:  Each side will be allowed

21  20 minutes for argument.  You may split that time up

22  if you wish.  Both sides may split time up and go

23  back and forth.  I will keep time, and I will hold

24  you to it, unless you're answering a question of

25  mine.

1        Any other preliminary matters?

2        So I actually expected Mr. Jones to bring up a

3   preliminary matter with regard to documents that were

4   filed and multiple affidavits that were filed with

5   regard to this motion.  I will tell the parties that

6   I have reviewed all of those declarations.  And, as

7   was noted, they were lengthy, some of them

8   repetitive, and I have reviewed all of those

9   declarations.  I am not striking them, because I did

10  consider them, but the court is fully considering the

11  objections made by counsel for the defendants in my

12  consideration of that evidence.

13       We will proceed with argument.  Mr. Arnold, you

14  may proceed first.  You have 20 minutes.

15            MR. ARNOLD:  Thank you, Your Honor.  Your

16  Honor, here, one of the first things the court must

17  look at is the proper lens through which to analyze

18  the proclamation.  The plaintiffs put forth that

19  under Washington law, as contrasted to federal law,

20  the proper analysis is one of strict scrutiny.  Your

21  Honor, our Washington State Supreme Court has held

22  that Article 1 Section 11 has broader protections

23  than the United States Constitution.  And, Your

24  Honor, while the temporary loss of unemployment may

25  not be irreparable harm in some contexts, the loss of

1      religious freedoms, free exercise in an employment

2      context, even temporarily, does constitute

3      irreparable harm.  Similarly, losing one's job as a

4      result of a medical disability is also irreparable

5      harm.

6         So, Your Honor, while the proclamation appears

7      neutral in a general application on its face, the

8      analysis by the court under Article 1 Section 11 does

9      not end there.  It is a strict scrutiny analysis.

10     Your Honor, the United States Supreme Court in *Smith*

11     had used strict scrutiny in two categories.  One of

12     those is individualized assessment.  Strict scrutiny

13     applies under circumstances in which individual

14     exemptions from a general requirement are available.

15     We see that from the *Lummi* case.

16        Here, the governor's proclamation expressly gives

17     individual agencies the authority to make individual

18     assessments, and that is exactly what has happened,

19     and strict scrutiny applies.

20        Your Honor, the evidence we've put before the

21     court is that it works as a religious gerrymander

22     targeting religious individuals for individual

23     assessment, and as a result, it should be viewed with

24     strict scrutiny.  Your Honor, in *Smith*, a law is not

25     generally applicable if it invites the government to

1        consider the particular reasons for a person's

2        conduct by creating a mechanism for individual

3        assessment.  Your Honor, where such a system of

4        individual exemption exists, the government may not

5        refuse to extend that system to cases of religious

6        hardships without a compelling interest.  That's from

7        the *Fulton* case this year in the Supreme Court.

8            Your Honor, the least restrictive means standard

9        is exceptionally demanding.  And Your Honor, this

10       analysis is well done by Judge Mendoza in the case of

11       *Blais v. Hunter*, 49 F.Supp. 3d 984.  That was

12       assessing a Washington State regulation which was, on

13       its face, neutral and generally applicable.  The AG

14       is aware of that case.  They defended Hunter in that

15       case.  That regulation was struck down as a religious

16       gerrymander, and the AG's office did not appeal.

17       Your Honor, our state courts go even further.  Quote,

18       "The most important duty of our courts to ever guard,

19       religious liberty" --

20               THE COURT:  Mr. Arnold.

21               MR. ARNOLD:  Yes, Your Honor?

22               THE COURT:  You'll need to speak much slower

23       in order for the court to make an accurate record.

24               MR. ARNOLD:  Thank you, Your Honor.

25               MR. JONES:  Can I also, Your Honor, I'm sorry

1       to interrupt.  I'm hearing some noise.  I don't know

2       if it's on the telephone or someone on the line, but

3       I'm hearing noise coming from someone other than

4       Mr. Arnold.

5            THE COURT:  I do not see that there's anyone

6       else who has their sound on, but I would ask folks to

7       turn their sound off.  I'm not hearing that noise

8       that you're hearing, Mr. Jones.

9          But, Mr. Arnold, if you could please take the

10      direction of the court reporter and begin again more

11      slowly.

12           MR. ARNOLD:  Certainly, Your Honor.  And I

13      apologize for moving fast.  It's quite a dense bit of

14      topics this morning.  But for the court reporter and

15      the court:  Quote, "The most important duty of our

16      court to ever guard religious liberty is to see to it

17      that these guarantees are not narrowed or restricted

18      because of some emergent situation." *First Covenant*

19      *Church of Seattle*, 120 Wn.2d 203.

20         That court also held that Article 1 Section 11

21      protects free exercise more broadly than the U.S.

22      Constitution.  And as this court is well aware,

23      Section 11 of our State Constitution protects freedom

24      of conscience in all matters of religious sentiment

25      and belief.  It protects it absolutely by the plain

1    language of our constitution.  It guarantees that no

2    one be molested or disturbed in their person or

3    property on account of religion.  It expressly

4    forbids religious test for employment.

5        Your Honor, our state court has held that a

6    facially neutral even-handedly enforced statute that

7    does not directly burden free exercise may

8    nonetheless violate Article 1 Section 11 if it

9    indirectly burdens free exercise of religion.

10       Your Honor, here we have evidence before the court

11   of some more similar emails indicating that the

12   Washington State Patrol would grant all exemptions

13   but deny all religious accommodation.  The data bears

14   that out as well.  That is favoring the secular over

15   the religious, and strict scrutiny applies there.

16       We also have emails from the governor's office

17   saying that they will have religious exemptions

18   included, quote, "only if they have to."  And they

19   will be, quote, "as narrow as possible."  In that

20   same email, the governor's office indicates, quote,

21   "Of course," quote, "we will have medical

22   exemptions."  That, too, is favoring one over the

23   other.  Strict scrutiny applies.

24       Now, Your Honor, the AG's office will point to

25   several cases for the proposition that the

1      proclamation need not have an exemption at all.  That

2      might be true in Massachusetts.  That might be true

3      in Maine.  It is not true under Washington State law.

4      And indeed, Your Honor, even under Massachusetts law,

5      in the recent case of *Harris v. UMass*, UMass was

6      under no obligation to offer a religious exemption.

7      But that court said, and I quote, "Once the

8      university offers religious exemptions, it must not

9      administer them in an unconstitutional way."  So even

10     under Massachusetts, which is much different than

11     Washington law, that is the rule.  That's also why

12     *Jacobson* is distinguishable.  That was under

13     Massachusetts law, not Washington law.  That was

14     legislative action, not executive fiat.  This is a

15     very important issue, and it deserves legislative

16     treatment.

17         Similarly in the recent case of *Klaassen*, the

18     Indiana legislature forbade vaccination mandates but

19     explicitly carved out the university.  So there, the

20     university did mandate, because the legislature

21     authorized it, at least implicitly, and they had

22     actual accommodations, masking and testing.  If that

23     was the case here, we wouldn't be before Your Honor

24     this morning.

25         Now, Your Honor, if you're even considering

1    nonbinding authority, I would point the court to the

2    *Dahl* case out of the sixth circuit.  There, like

3    here, exemptions were granted across the board, but

4    no accommodations were given.  There, the trial court

5    restrained, and the sixth circuit affirmed.

6         Your Honor, this case is under our State's

7    constitution, though, our State's law, and that's

8    what binds this court, including our state court's

9    precedent.  Now, the government has not even

10   suggested that they're using the least restrictive

11   means, nor can they, because we see examples on both

12   sides of the mountains where less restrictive means

13   than termination are being used.  The entire Spokane

14   School District is allowing masking.  Pierce County

15   Fire and Rescue is allowing masking only, not even

16   testing.  Spokane Fire, by contrast, is terminating

17   all their firefighters, but every single fire

18   department surrounding the City of Spokane, all of

19   whom have mutual aid agreements with the city, are

20   not requiring termination.  They are just allowing

21   masking and testing.  That is going to result in more

22   unvaccinated firefighters going into the City of

23   Spokane.  That does not forward the purpose; it

24   actually hurts it.

25        This also raises significant legal protections

1    issues, and as the court is aware, our Supreme Court

2    has said that the Washington Law Against

3    Discrimination -- actually, I'll quote, "Prohibition

4    against discrimination stems from the constitutional

5    requirements of equal protection."  That's from 128

6    Wn.2d 618.  So, Your Honor, if our teachers and our

7    firefighters, who interact with the public on a

8    regular daily basis, can accomplish the State's goals

9    with masking alone, so can the rest of the state.

10        Now, Your Honor, the entire State of Oregon, with

11   a near identical mandate in the context of their

12   state troopers is accommodating people with masking

13   and testing, not termination.  And if the State of

14   Oregon can do it, so can the State of Washington.

15   Indeed, the onus is on the government to show that

16   it, quote, "seriously undertook to address the

17   problem with less intrusive tools readily available

18   to it and considered different methods that other

19   jurisdictions have found effective."  That's from the

20   United States Supreme Court, 134 S.Ct. 2518.  Your

21   Honor, again, if Oregon can do it, Washington can do

22   it.  If the surrounding fire departments around

23   Spokane can do it, then the City of Spokane can do

24   it.

25        Your Honor, as for the public interest itself, Dr.

1    Murray, the State's own witness, has a model put

2    together where 93 percent is the conservative target

3    for vaccination.  The State's data four days ago said

4    that we're at 91.8 percent.  That is a difference of

5    1.2 percent.  That's almost exactly one-tenth of

6    one percent of the State's population.  So that's

7    what we're balancing this morning, Your Honor, an

8    increased theoretical vaccination rate of one-tenth

9    of one percent.  And on the same -- at the same time,

10    we will lose 10 percent of our state's nurses,

11    10 percent of our firefighters, 10 percent of our

12    troopers.  In the middle of a pandemic, we need those

13    people more than ever.

14      And, Your Honor, I say that it's a theoretical

15    one-tenth of one percent because it is only that.  My

16    clients have been threatened with their employment.

17    They are now losing their employment.  They are past

18    the deadline for receiving the vaccination, in any

19    event.  Nothing will change at midnight.  These same

20    people are going to still be in our communities.

21    They're going to still be -- they're going to still

22    exist.  They're not just going to disappear, Your

23    Honor.  And they (inaudible)...

24        THE COURT:  My apologies.  If I could

25    interrupt.  There's a Todd Dillman who needs to mute

1     himself so we can hear clearly in the courtroom.

2     Thank you.

3          MR. ARNOLD:  Thank you.  My apologies, madam

4     court reporter.

5          THE COURT:  I'm sorry, we'll need some

6     direction from the court reporter of where to begin

7     again.

8            (Record read.)

9          MR. ARNOLD:  Thank you.  So my clients at

10    midnight tonight are not going to just go away.  The

11    same people are still going to exist in our

12    communities, and if they're such a threat as the

13    governor says they are, they will just be out in

14    public, doing jobs without the benefit of (inaudible)

15    and without performing their essential lifesaving

16    functions that they have been able to do for 18

17    months.  We will have the same number of unvaccinated

18    people at midnight.  We will just have less nurses

19    and less firefighters.  That does not help the public

20    interest.

21       And indeed at this eleventh hour, Your Honor, if

22    the public interest has not been accomplished now,

23    it's never going to.  These people have sincere

24    beliefs, they've been accepted by their agency, and

25    the deadlines have already passed.  What we're going

1          to lose is a significant percentage of people we

2          cannot afford to lose.

3              Your Honor, also, the court is in a position today

4          sitting in equity where it can craft a more narrow

5          injunction or TRO than has been requested.  For

6          example, if the court finds that those who have been

7          teleworking for a year and a half can simply continue

8          to telework, which will accomplish the same

9          objective, then the court could enjoin the

10         termination of those who telework.

11             Or as another example, if the court finds that RCW

12         43.43, which is the statute that protects the

13         employment of state troopers, has not been complied

14         with, and it has not, then the court can enjoin just

15         those terminations, if that's all the court finds.

16             Your Honor, the same is true for those with

17         natural immunity.  We've put forth evidence to the

18         court that has not been rebutted.  This is new

19         science that was not available to the governor two

20         months ago.  He didn't have the benefit of it.  We

21         recognize that.  This would be a much different

22         hearing if we were having it two months ago instead

23         of the day of the enforcement.  Your Honor, if you

24         find those people should be allowed to continue

25         working, they can do so.

1       The same for those that already have ADA and FMLA
2   accommodations, there can be no undue hardship on a
3   company or an agency where people are already being
4   accommodated under the ADA or FMLA.  Those people
5   should be able to continue doing their job.

6       Your Honor, on the larger issue of the
7   proclamation, the State has our system of government
8   exactly backwards.  All officers have power only
9   because it's delegated to them, -this includes the
10  governor -- by the constitution or by the
11  legislature.  The State is advocating for Magna
12  Carta, not constitution.  They're advocating for King
13  George, not George Washington.  This is the opposite
14  system of what we have in this state.

15      They chiefly rely on four cases:  First,
16  *Slidewaters*.  *Slidewaters* is not binding on this
17  court, but we agree anyway.  The legislature has
18  granted the governor the ability to proclaim an
19  emergency, that's uncontested.

20      Also, under *Colvin*, which is one of the other
21  chief cases they rely on, the Supreme Court has ruled
22  the governor has the pardon power.  Of course, he has
23  the pardon power.  It's at Article 3 Section 9 of our
24  constitution.  We don't disagree with that.  It has
25  no bearing on this case, though.

1          In *Cougar Business*, that governor was able to

2     temporarily prohibit people from the blast radius of

3     a volcano.  Again, obviously, I would not be

4     representing these clients if they wanted to stand on

5     the side of a volcano.

6          And then lastly, in *Holcomb vs. The Regents of the

7     University*, the regents were able to order chest

8     x-rays -- which, I will also point out is temporary

9     as opposed to an injection -- but the only reason

10    they were able to do that was because they were

11    empowered by the legislature with a statute that

12    said, quote, "full control of the university," end

13    quote.  There, the legislature acted.  That makes

14    sense.  That's not applicable here.  We have no

15    legislative action.

16         So, Your Honor, no combination of those cases or

17    any other authorizes the governor to insert a new

18    material term into every single public employment

19    contract, that is vaccination, particularly over his

20    objection and the objection of people's actual

21    medical doctors.  Indeed, Your Honor, under the *Kumar*

22    case, which the State has cited extensively, the

23    economic duress that results in the free exercise of

24    religion is a violation of the WLAD.

25         Your Honor, subsection five of the emergency power

1    to have a single enforcement mechanism that is

2    charging with a misdemeanor, there is nothing even in

3    the emergency statute that allows for termination, or

4    worse, the loss of benefits.

5        Your Honor, at some point, the governor oversteps

6    into the province of the legislature.  One power the

7    governor does have is to call a special session.

8    That is what should happen here.  Even then, strict

9    scrutiny applies in the law.  This is a very

10   important issue.  It's a positive thing if there's

11   actual accommodation.  That's what will help the

12   public interest, and the legislature should take this

13   up, and it should go through this process.

14       And with that, Your Honor, I will reserve my time.

15           THE COURT:  Thank you.  Mr. Arnold, I do have

16   a couple of questions.  I will tell you that your

17   sound was a little bit going in and out toward the

18   end of your argument, so please try to speak loudly

19   and clearly into your microphone.

20       Mr. Arnold, are you in agreement that this case,

21   the amended complaint, presents a facial challenge to

22   the proclamations?

23           MR. ARNOLD:  Your Honor, this case presents

24   both a facial challenge and an as-applied challenge.

25   It facially challenges the proclamation where there

1    is, as we see from the State Supreme Court cases I

2    cited, where even with something this neutral or

3    generally applicable on its face, it can still be an

4    unlawful burden on free exercise under Article 1

5    Section 11 of our state constitution.  There is also

6    a facial challenge as to the extent of the authority

7    of the governor as well.

8        So I will also point out, Your Honor, there is a

9    facial challenge here to the racial impact of this

10   under the Washington Law Against Discrimination.

11   Under the State's own data, it shows that people of

12   color were vaccinating pre-mandate at a higher

13   rate -- a disproportionate rate.  By having an

14   inflexible mandate in place, the necessary result,

15   based on the data that the governor had, is that a

16   disproportionate group of people of color will be

17   removed from public service and health care.  That is

18   a disparate impact.  That is disallowed under the

19   Washington LAD.

20       And, Your Honor, if there were a real

21   accommodation, again, this would not be a lawsuit at

22   all, but there has not been.  Your Honor, it's also

23   an as-applied challenge.  There are those people --

24   there is -- there are various examples, and they're

25   increasing daily, of agencies that are able to

1      accommodate people.  I would draw the court's

2      attention again to the Pierce County Fire and Rescue.

3      That fire chief has accommodated 60 firefighters,

4      20 percent of its firefighting force.  If they can do

5      it, then my clients, who are similarly situated,

6      should be accommodated as well.  And it is in that

7      way an as-applied challenge, Your Honor.

8          I mentioned, Your Honor, you are in an equitable

9      position this morning, and if you find that, for

10     example, only teleworking individuals should be

11     allowed to continue to telework, then that would be

12     an appropriate ruling by Your Honor.  So it is both a

13     facial and an as-applied challenge.

14            THE COURT:  Thank you.  Mr. Arnold, you would

15     technically have one minute left based upon your

16     response to my question.  I will give you two minutes

17     after I hear from Mr. Jones.

18         Mr. Jones, you may proceed.

19            MR. JONES:  Thank you, Your Honor.  And did I

20     understand the court's direction that I can reserve

21     time for rebuttal as well?

22            THE COURT:  You may.

23            MR. JONES:  Okay.  My goal is to reserve five

24     minutes.

25         It is nothing new in this country to require

1    vaccination as a condition of employment or school

2    attendance or other participation in government

3    programs.  Far from it.  For more than a century,

4    such policies have routinely been adopted by states,

5    school districts, hospitals and others.  And for just

6    as long and just as routinely, courts have approved

7    them as constitutionally valid exercises of state

8    authority to protect public health, including the US

9    Supreme Court and the Washington Supreme Court.

10        So it should be unsurprising or at least legally

11   uncontroversial that, faced with the latest and worst

12   surge in the COVID-19 pandemic, Governor Inslee

13   joined the federal government, other states and many

14   universities and private employers and issued a

15   targeted COVID-19 vaccination policy in Washington.

16        Proclamation 21-14 is limited to just three

17   sectors of workers that deal directly with the

18   public, with vulnerable populations or in congregate

19   settings or all three:  State employees, health care

20   providers, and educators.  Starting today,

21   October 18th, the proclamation prohibits employees in

22   those sectors from working unless they are either

23   vaccinated or have received an exemption for a

24   religious -- for religious reasons or a disability.

25   The governor did not take this step lightly, and he

1    did not take it prematurely.

2        In August, months after vaccines were available to

3    all in Washington who wanted them and after

4    implementing vaccine lotteries, public education

5    campaigns, mobile vaccine clinics and incentive

6    programs like "Joints for Jabs," Washington's

7    vaccination rate hovered at just 70 percent of those

8    eligible.  At the same time, the Delta variant had

9    brought daily case rates to an all-time high.

10   Hospitalizations had skyrocketed, ICU's were filling

11   up, and deaths were climbing again.  Today, more than

12   8,200 Washingtonians have died from COVID-19.

13       The governor adopted the proclamation to prevent

14   more such needless deaths of State Patrol troopers,

15   of other state employees, of teachers and health care

16   workers and other first responders and all the

17   members of the public with whom they come into

18   contact.

19       As the Washington Supreme Court stated in issuing

20   an identical vaccination rule for its own court

21   employees, "COVID-19 vaccines are effective in

22   reducing infection and serious disease, and

23   widespread vaccination is the primary means we have

24   as a state to protect our health system, to avoid the

25   return of stringent public health measures, and to

1    put the pandemic behind us," end quote.

2        University of Washington's Institute for Health

3    Metrics and Evaluation estimates that the

4    proclamation will prevent up to 113,000 more COVID

5    cases, 5,880 more hospitalizations, and 765 more

6    deaths in Washington State alone.  As a matter of

7    public health, the proclamation is a critical

8    necessary step to ending this pandemic.

9        As a matter of law, too, Your Honor, it's an easy

10   call.  The proclamation is well within the governor's

11   emergency powers and respects workers' constitutional

12   rights. For those reasons, the court should deny

13   plaintiffs' request for the extraordinary remedy of a

14   preliminary injunction.

15       So, as the court knows, in evaluating their

16   requests for a preliminary injunction, the court

17   considers three factors:  Whether they've established

18   clear legal or equitable right, whether they have a

19   well-grounded fear of immediate invasion of that

20   right, and whether the acts complained of are either

21   resulting in or will result in actual and substantial

22   injury.  And each element is required.

23       To evaluate the first prong, whether plaintiffs

24   have established a clear legal or equitable right,

25   the court, as in federal law, considers plaintiffs'

1    likelihood of success on the merits of their claims.

2    The entitlement to an injunction must be clear, and

3    the court shall not issue an injunction in a doubtful

4    case.

5         So going to the court's question of Mr. Arnold as

6    to whether there is a classic facial challenge or an

7    as-applied challenge as well, it's clear, as we

8    explained in our opposition, that this is only a

9    facial challenge that is presented in the motion.

10   And the court can tell that simply by looking at the

11   relief that plaintiffs are requesting.  Their

12   argument is that the governor lacks the power under

13   the Washington constitution to enact and enforce the

14   proclamation period and claims that it violates

15   fundamental rights on its face, asking the court to

16   declare it void for a lack of authority and enjoin it

17   as invalid.  That is classic facial-challenge-type

18   language.  The goal -- the relief plaintiffs have

19   asked for in their motion is for a complete

20   invalidation of the proclamation, not any form of

21   lesser relief that I can see.

22        Now, Mr. Arnold says today, well, the court could

23   issue a narrower injunction against, you know,

24   protecting those who telework or who, you know, have

25   natural immunity, as Mr. Arnold refers to it, but

1    that record isn't at all developed before this court.

2    There are 600 plaintiffs, all from vastly different

3    circumstances, different counties, different

4    agencies, private employers, health care workers.

5    Some have asked for medical exemptions.  Some have

6    asked for religious exemptions.  Some had approved

7    medical exemptions.  They're in totally different

8    circumstances.  And Mr. Arnold hasn't presented any

9    clear, cogent basis for a limited injunction as

10   applied to only some narrow subset of these

11   plaintiffs.  So this is based on the briefing before

12   the court.  Clearly, a facial challenge and a facial

13   challenge only.

14       And in a facial challenge, plaintiffs face a very

15   heavy burden to establish that they are likely to

16   prevail on their claims.  They must show that there

17   are no circumstances under which the proclamation can

18   constitutionally be applied.  And the court's

19   analysis is limited to the proclamation on its face,

20   not as to how it might be manifested by individual

21   agencies or other employers.

22       So let's turn to this facial challenge.  There are

23   really two key questions here, and there are separate

24   questions, even though plaintiffs conflate them in

25   their briefing.  The first question is does the

1     governor have the authority, the statutory authority

2     under the -- under his Emergency Powers Act to issue

3     the proclamation.  That's the first question, and

4     that's a separate question from the second one.  If

5     he does have that authority, does it violate any of

6     plaintiffs' constitutional rights?

7        So to take -- to start with the first question,

8     under RCW 43.06 -- Chapter 43.06, the governor can

9     proclaim a state of emergency in response to a

10    disaster threatening life, health, property or the

11    public peace.  And plaintiffs do not challenge that

12    COVID-19 clearly presents such a disaster, and the

13    governor's proclamation declaring a state of

14    emergency, 20-05, which was issued in February of

15    2020, is valid.  And that declaration -- that

16    concession means that all the governor's emergency

17    powers during a state of emergency are unlocked, as

18    the *Colvin* case explains.

19       Now, one of those broad powers -- and by the way,

20    Your Honor, the Supreme Court has repeatedly

21    emphasized that the governor's emergency powers under

22    the statute delegated by the legislature are broad

23    and subject to his sole discretion.  That's in the

24    *Colvin* case as well.

25       So what the residual clause of 43.06.220 -- that's

1    subsection (1)(h) -- it provides that the governor

2    may issue an order prohibiting such activities as he

3    reasonably believes should be prohibited to help

4    preserve and maintain life, health, property or the

5    public peace.  So the proclamation is exactly that

6    sort of prohibitory proclamation that's valid under

7    the residual clause.  It prohibits covered workers in

8    those three sectors from engaging in work after

9    today, unless they're vaccinated against COVID-19 or

10   have received an exemption and an accommodation from

11   their employer.  It's a clear prohibition, and the

12   plain text of the statute clearly permits it.

13       So the governor has issued many proclamations

14   during the state of emergency, restricting which

15   businesses can be open, ordering people to stay home,

16   the stay-home order, requiring masks out in public,

17   prohibiting members of the public from going without

18   masks -- excuse me, let me try to say that again --

19   the proclamation prohibiting members of the public

20   from going outside the home without face coverings,

21   and then, of course, a proclamation prohibiting

22   tenants from being evicted -- most tenants from being

23   evicted during the emergency.

24       Now, all of those proclamations have been upheld

25   by this court and others.  So, you know, it's

1        difficult to understand how just very facially simple

2        prohibition on workers engaging in their work might

3        not be permitted under the clear text of the statute.

4            So, as I understand plaintiffs' arguments, they

5        have basically three for why they think that this

6        proclamation exceeds the governor's authority,

7        whereas others did not.  So I think the primary

8        argument they rely on is that, well, this

9        proclamation isn't really prohibitory, it's actually

10       mandatory, because it's requiring people to be

11       vaccinated.  So if that's their argument, I think

12       it's clearly wrong.  There's no requirement to be

13       vaccinated.  It's conditional.  Right?  The choice

14       belongs to each individual worker that he or she is

15       prohibited from engaging in work unless he is

16       vaccinated.  So the choice is theirs, either be

17       vaccinated to continue with their job or receive an

18       exemption or find another job during the course of

19       the pandemic.

20           So the fact that the proclamation, sure, could

21       have been written in mandatory terms, but that's

22       irrelevant.  Any of these proclamations that I just

23       discussed could have been written in mandatory rather

24       than prohibitory terms.  The stay-home proclamation

25       could have been written -- instead of you're

1    prohibited from going out, could have been written as
2    you must stay home.  The mask requirement could have
3    said, instead of saying you're prohibited from going
4    out without a mask, could have been written as you
5    must wear a mask.  Instead of -- you know, the
6    eviction moratorium could have been phrased landlords
7    must let tenants remain in their homes instead of
8    you're prohibited from evicting them.  Right?  So,
9    practically any prohibitory proclamation could be
10   phrased as a mandatory one.  That doesn't mean that
11   the governor is somehow prohibited from issuing a
12   prohibitory proclamation.  So that argument just
13   can't work.
14       The second argument plaintiffs make, although they
15   haven't made it today, is that the proclamation
16   somehow conflicts with other statutes, and they
17   read -- if you read the residual clause to actually
18   authorize the proclamation.  But, you know, they
19   haven't really developed that argument.  I think the
20   best -- or at least the most wholesome argument they
21   make is under the Pandemic Influenza Preparedness
22   Act, which would be Chapter 70.26 RCW.  Courts have
23   repeatedly rejected that principle.
24       I mean, if you read the statute, it's very simple.
25   The statute does three things.  It requires a local

1    health district to develop pandemic flu plans; it

2    requires the Secretary of Health to either approve or

3    reject those plans; and it unlocks state and federal

4    funds to local health districts to prepare -- to

5    implement those plans.  That's it.  It doesn't say

6    anything about what the governor's powers are during

7    a state of emergency, and that's why the *Slidewaters*

8    court, the federal district court, Eastern District

9    of Washington, the *Cuevas* court rejected that in

10   Chelan County, and the *Didier 2* court in this court

11   rejected that argument as well.

12       So I think the third argument is kind of a

13   separation of powers argument they're making, where,

14   you know, if a proclamation is somehow authorized

15   under the statute, then the statute is

16   unconstitutional.  The motion doesn't develop that

17   nondelegation claim at all.  There's a brief mention

18   of it in the reply, and Mr. Arnold hasn't mentioned

19   it today.  You know, this court has repeatedly

20   rejected nondelegation arguments directed at the

21   governor's proclamations.  The standard is very

22   simple.  It's under *Barry & Barry*.  It's a lawful

23   delegation so long as the legislature has provided

24   standards or guidelines which define in general terms

25   what is to be done and the official to accomplish it,

1      and the procedural safeguards must exist to control

2      arbitrary administrative action.

3          So, clearly, the legislature has provided

4      standards that is a prohibitory standard, and it's

5      identified the governor as the official to do it, and

6      then procedural safeguards are in place, and we're

7      actually doing -- we're engaging in those procedural

8      safeguards right now through the process of judicial

9      review.  The Washington Supreme Court has repeatedly

10     said that judicial review is a satisfactory

11     procedural safeguard to preclude any nondelegation

12     claim under *Barry*.

13         So, for all those reasons, Your Honor, the

14     proclamation to go to this first question is

15     authorized under the governor's emergency powers.

16     And two courts now have reached that same conclusion.

17     Pierce County Superior Court in the *Fish and Wildlife*

18     *Officers Guild vs. State*, Judge Sorensen held that

19     the proclamation was a valid exercise of the

20     governor's powers.  And then most recently, Federal

21     District Judge Barbara Rothstein on Friday denied the

22     plaintiff's request for a TRO in *Pilz vs. Inslee*

23     where some of the same plaintiffs and represented by

24     Mr. Arnold as well made very similar constitutional

25     claims that they're making in this case.  And Judge

1    Rothstein, who, of course, was a state judge before

2    she became a federal judge, concluded the

3    proclamation was a valid exercise of the governor's

4    authority.  And we included the transcript for that

5    hearing as well, filed it yesterday, Your Honor.

6        So that leads only the second question.  Right?

7    And so the --

8            THE COURT:  My apologies for the interruption,

9    Mr. Jones.  You have used all of the time you

10   anticipated.  You do have five minutes remaining.  I

11   do have a couple of questions.

12       And before we go any further, I just have a

13   question about something you just said, that you

14   filed something in this court yesterday?

15           MR. JONES:  Yes.  We filed -- well, Friday, we

16   issued a notice -- we filed a notice that we were

17   going to file the transcript in the *Pilz* case as soon

18   as we got it, and we got it on Sunday and filed it.

19           THE COURT:  So, I'm sorry.  I just was

20   wondering if heard accurate, you say you filed

21   something yesterday.  So I just want to indicate,

22   nothing that was filed yesterday has been reviewed.

23   I've only reviewed everything that was in the court

24   file as of Friday.  And I did check the file this

25   morning, and nothing was added this morning by the

1    clerk's office.  So whatever you're speaking of, I

2    have not looked at and will not consider for this

3    hearing.

4         MR. JONES:  Very well, Your Honor.  I mean,

5    it's a pretty -- it's a fairly simple point.  Judge

6    Rothstein held the proclamation was a valid exercise

7    of the governor's power.  It's not evidence.  It's

8    simply a citation of additional authority.

9         So, you know, for those reasons, it is a valid

10   exercise of the governor's authority.  I could go

11   through plaintiffs' claims that it violates their

12   constitutional rights.  They have a smattering of

13   different theories, none particularly well developed.

14   But the court really doesn't even need to evaluate

15   that, because it has binding authority from the

16   Washington Supreme Court on this very question, and

17   that is the Supreme Court's own vaccination order

18   which was issued just the week after Governor Inslee

19   issued his proclamation.  It expressly references

20   Governor Inslee's proclamation, and it imposes the

21   exact same vaccination condition on its own court

22   employees.  It would be extremely surprising if the

23   Washington Supreme Court were to believe that its own

24   proclamation, its own requirement for its employees

25   violated their constitutional rights, considering

1      it's coextensive with the governor's proclamation.

2          So, with that, I will yield the balance of my time

3      and hold it for rebuttal, Your Honor.

4          THE COURT:  Thank you.  And I do have a couple

5      of questions, Mr. Jones.  The first question I have

6      is, your materials submitted to this court indicate

7      that the governor's authority, of course, extends as

8      long as the emergency does, which is temporary.  And

9      I would like you to respond to the assertion that

10     there are permanent consequences to some individuals

11     based upon the temporary emergency.

12         MR. JONES:  Well, it's not true, Your Honor,

13     that the face of the proclamation imposes those

14     consequences.  The proclamation only prohibits

15     workers from engaging in work while the proclamation

16     is in effect.  That's all it does.  And it leaves it

17     to individual agencies, individual employers to

18     determine how best to implement that requirement.  So

19     nothing in the proclamation would preclude a

20     hospital, for example, from saying, well, you know,

21     we are going to allow all our -- we're going to have

22     paid leave for all our employees who don't want to

23     get vaccinated during this time.  So the proclamation

24     doesn't impose those consequences.  It's the

25     individual decisions of agencies and other

1    implementing authorities.

2        You know, the whole question of accommodations and

3    what's necessary for any individual employer, any

4    individual agency, that's an individualized

5    as-applied question.  And Judge Rothstein made the

6    same point that in deciding on an emergency

7    injunctive relief, it's not about each of these 600

8    individual employees' potential claims.  Those need

9    to be adjudicated on a case-by-case basis going

10   through the administrative process.  The question

11   before the court is whether the proclamation facially

12   is invalid.

13        THE COURT:  Thank you.

14       Mr. Arnold.

15        MR. ARNOLD:  Thank you, Your Honor.  First,

16   I'm unaware of any authority that says the Supreme

17   Court's own rules are binding law on this court.  I

18   don't believe the Supreme Court makes law.  A similar

19   separation of powers issue, but I'm simply not aware

20   of any authority to that effect.

21       Similarly, Judge Rothstein was not analyzing state

22   law, and as Mr. Jones just pointed out, this is an

23   individualized analysis.  That raises strict scrutiny

24   under our state constitution.

25       Now, Your Honor, this might not be novel in Maine

1    or Massachusetts, but it is novel in Washington State

2    for the governor to require this.  The legislature

3    can do it.  We have great (inaudible) vaccination.

4    The legislature should do this, not the governor.

5    And as Your Honor points out, there is no end in

6    sight.  The court can take judicial notice that over

7    the weekend, there's a job posting for a vaccine

8    administrator that is funded through 2024.  There is

9    no end in sight whatsoever.  This is not temporary,

10   nor is an injection temporary.  And we don't want

11   anyone to get (inaudible) uninjected.  It's great

12   that people that have been vaccinated who want to

13   have been.  But those with sincere religious beliefs

14   and their own doctors orders not to should not lose

15   their job as a result of it, Your Honor.

16       This court is not restricted to just reading the

17   plain text of the proclamation.  That is not the law

18   in this context.  You can look at how it is applied.

19   That is even in a facial challenge, which we, again,

20   contend it's not.  But even in a facial challenge,

21   the court can look beyond the plain text when we're

22   talking about Article 1 Section 11, which we are.

23       And Your Honor, if this was two months ago at the

24   beginning of the mandate, it's a much different

25   argument.  But we are here at the eleventh hour

1      asking those remaining with sincere religious

2      beliefs, the sincerity which has not been challenged

3      by the governor, it's been accepted, and those whose

4      own doctors say don't do this be allowed to continue

5      working, especially people who can social distance,

6      especially people who can telework.  Where some

7      agencies are allowing this and others are not, that

8      raises, even on a facial challenge, significant

9      issues under the Washington Law Against

10     Discrimination.

11         Also, Your Honor, the government's own model, even

12     if we're in a non-strict scrutiny standing, the

13     governor's own model fails to take into account the

14     loss of these essential workers.  There is nowhere in

15     their model that nets out the death as a result of

16     vaccination.  Which, again, I'll say has already been

17     accomplished because the governor is already at the

18     numbers that his model asks for, so it's been

19     accomplished.  There is no netting out of the loss of

20     life for less nurses and less firefighters, which our

21     state desperately, desperately needs to still have

22     working, who have proven track records of using PPEs.

23     Otherwise, they would all be in the hospital.  They

24     know how to use PPEs.  That's out there.  We put

25     forth significant expert testimony that's been

1     unrebutted.  The governor's -- the net loss of life

2     and even the net spread of COVID will be reduced if

3     those with religious objections and those with

4     medical objections are allowed to simply continue

5     doing their job.

6              THE COURT:  Thank you, Mr. Arnold.  Your time

7     is expired.

8          Mr. Jones, you have one minute.

9              MR. JONES:  Thank you, Your Honor.  So, to go

10    to Mr. Arnold's point, his claim that there will be

11    devastating losses to the State due to nurses and

12    firefighters resigning, that is just -- there's no

13    evidence in the record for that.  That is based on

14    pure speculation and anecdotal claims of individual

15    workers scattered around the State.

16         Mr. Arnold repeatedly says that the governor has

17    already accomplished his goal.  Again, this is

18    just -- it's not what the record shows.  The record

19    shows significant numbers of State employees have

20    been vaccinated, 92 percent as of October 4th.  We

21    don't yet have a record on health care workers or

22    educational workers and what their vaccination rates,

23    and those represent the vast majority of those

24    covered by the proclamation.

25         I think it's important to note that some people

1      will undoubtedly choose not to be vaccinated because

2      of this proclamation, and they will perhaps lose

3      their jobs as a result of it, and that is tragic and

4      deeply unfortunate.  But the far greater tragedy

5      would be allowing health care workers or teachers and

6      others, who work very closely with sensitive groups,

7      in prisons, in jails, and all sorts of congregate

8      settings, to allow them to interact with the public

9      and endanger the public whom they're supposed to

10     serve.  And it's that avoidance that -- it's avoiding

11     that tragedy that compelled the governor to issue the

12     proclamation.  And balancing those risks is a classic

13     policy role for the political branches, not for the

14     courts.  Plaintiffs have failed to establish --

15              THE COURT:  Thank you, Mr. Jones.

16              MR. JONES:  Thank you, Your Honor.

17              THE COURT:  Thank you.  Your time is expired.

18              MR. ARNOLD:  Your Honor, may I correct one

19     thing in the record?

20              THE COURT:  Your time is expired as well.

21              MR. ARNOLD:  Of course.

22              THE COURT:  The court will issue an oral

23     ruling today.  I am going to take a brief recess

24     before issuing an oral ruling on the record.  I

25     anticipate going back on the record in approximately

1    15 minutes.  We'll go back on the record at 10:15

2    this morning, at which time the court will put its

3    oral ruling on the record.  Court is in recess.

4              MR. ARNOLD:  Thank you, Your Honor.

5              (Recess.)

6              THE COURT:  We are back on the record in the

7    case of Cleary versus Inslee, case number

8    21-2-1674-34.  The court, having heard oral argument

9    and reviewed the pleadings, is prepared at this time

10   to issue an oral ruling on the plaintiff's motion for

11   injunctive -- excuse me -- for injunction and the

12   court -- excuse me -- and the writ of prohibition.

13     First of all, I want to ask before we proceed any

14   further, it appears that counsel is back on the

15   screen.  Can everyone hear the court?

16             MR. ARNOLD:  Yes, Your Honor.

17             MR. JONES:  Yes.

18             THE COURT:  Excellent.  The court will now

19   issue its oral ruling.

20     The legal standard for injunctive relief is that

21   the requesting party establish a clear legal or

22   equitable right that there is a well-grounded fear of

23   immediate invasion of that right and that the act

24   complained of will result in actual and substantial

25   injury.  So, first, the plaintiffs will need to show

1    that they are likely to prevail on the merits.  This
2    requires the court to, on this very limited record,
3    look into whether the plaintiffs will ultimately be
4    successful.

5        Today is not a hearing on the merits, but one
6    element that the court must consider is whether the
7    plaintiffs are likely to be successful.  When the
8    court addresses the merits of this case, which again
9    is not today, the question will not be whether the
10   proclamations issued by the governor were the right
11   response or the best response, but whether the
12   response chosen and implemented by the governor is
13   within the governor's authority and whether it
14   violates applicable constitutional or statutory
15   provisions.

16       To the court, it appears that this is a facial
17   challenge, first, to the governors's authority, as
18   plaintiffs indicate in their briefing, that the
19   governor could have gone about this a different way.
20   Once again, the question is not whether the governor
21   could have addressed the issue differently or issued
22   a different proclamation on different authority.  The
23   court is only addressing the governor's proclamations
24   at issue and whether they violate the constitutional
25   and statutory authorities cited.

1    The court concludes, once again, that this is a

2    facial challenge.  Therefore, under the legal

3    authority, there would need to be no circumstance

4    under which the provisions of the proclamations at

5    issue would be constitutional in order to address the

6    constitutional challenges.

7    The court concludes on this record that strict

8    scrutiny does not apply.  However, even if it did,

9    the court finds that the plaintiffs would not likely

10   prevail on this facial challenge.  The court

11   concludes that the proclamations at issue will likely

12   be found to be a valid exercise of the governor's

13   police and emergency powers.

14   To the extent that the plaintiffs have presented

15   an as-applied challenge as to specific individuals,

16   this record has not been fully developed.  The

17   declarations contained individual circumstances, some

18   of which are quite concerning, but not fully

19   developed.  The record is quite mixed.  There is

20   evidence indicating that exemptions and

21   accommodations have been provided in many

22   circumstances, but not in others.  The proclamations

23   themselves indicate that these are individual

24   analyses, and, therefore, the court cannot address

25   some of those individual circumstances because they

1    have not been fully developed in this record.

2       The second prong of the injunction standard

3    requires a well-grounded fear of immediate invasion

4    of that right established.  Again, the words of the

5    proclamation itself make the case individual, and

6    because the clear legal or equitable right has not

7    been established, the plaintiffs cannot show a

8    well-grounded fear of immediate invasion of that

9    right.

10       Finally, the court must address whether the act

11    complained of will result in actual or substantial

12    injury.  The record in this case shows that multiple

13    individuals will have significant changes in their

14    life potentially by these proclamations that are at

15    issue.  The question before the court, though, is

16    whether there will be irreparable harm.  It appears

17    to this court, based again on this record, the record

18    before the court, based upon the declarations, that

19    the harm is financial only.  Once again, these are

20    many individual instances that may be litigated

21    individually.

22       In balancing the interests and considering the

23    legal standard, the court has balanced the competing

24    important interests on both sides of this case.  It

25    is not surprising at all that people in Washington do

1       not agree with the governor's policy actions.  It is

2       also not surprising that other legislators and policy

3       makers and other Washington residents think that no

4       response or a different response is appropriate.

5       Those questions are not before the court.  The

6       appropriate response to the COVID pandemic is

7       complex, and there is no unanimity, even among the

8       medical community, as the declarations submitted in

9       this case show, but the court today does not weigh

10      the evidence and does not answer the ultimate

11      questions.  Rather, on limited questions before the

12      court, I must determine whether the plaintiffs have

13      established a likelihood of prevailing on the merits

14      and the other elements in order to determine whether

15      to enjoin the proclamations.  The court concludes

16      that the plaintiffs have not met their burden.

17          Because this is a facial challenge to the

18      proclamations, and the legal standard for a facial

19      challenge requires that the mandate and other

20      elements of the proclamations be unconstitutional in

21      all applications, and because the governor had the

22      legal authority under the powers granted to the

23      governor to issue the proclamations, and because even

24      if the individual plaintiffs show that individual

25      instances in which the proclamation and the resulting

1     actions may be unjust, the plaintiffs have not met

2     their burden to show that it is unjust in all

3     applications, the court, therefore, finds that the

4     plaintiffs have failed to show a likelihood of

5     success on the merits.  The motion for injunction is

6     denied.  Similarly and for similar reasons, the court

7     denies the writ of prohibition.

8         I encourage the parties to confer regarding the

9     form of an order that reflects the court's ruling

10     today.  I am hopeful that I can sign such an order

11     today as soon as possible, but I want to provide the

12     parties the opportunity to confer regarding the form

13     of that order.  Do the parties anticipate being

14     prepared to address the form of an order within the

15     hour?

16             MR. JONES:  Yes, Your Honor, I believe we do.

17             MR. ARNOLD:  Yes, Your Honor.

18             THE COURT:  Would the parties be prepared to

19     address the form of an order at 11:00 o'clock?

20             MR. JONES:  Yes, I'm available to confer with

21     Mr. Arnold in the interim and meet back up at eleven.

22             MR. ARNOLD:  Yes, Your Honor.  I'm available

23     as well.  And we will -- in trying to do this as

24     timely as possible, we'll do it as quickly as we can.

25             THE COURT:  Thank you.  If the parties agree

1    as to the form of an order, I would appreciate if you

2    would indicate that to my judicial assistant,

3    Kristine Maine by email.  And if we need to address

4    any contested issues as to the form of the order, I

5    will address that on the record at 11:00 o'clock.

6              MR. JONES:  Thank you, Your Honor.

7              THE COURT:  And we are completed at this time.

8              MR. ARNOLD:  Thank you, Your Honor.

9         (Recess.)

10             THE COURT:  We are back on the record in the

11   case of Cleary versus Inslee, 21-1-1674-34.  And I

12   would like to inquire whether counsel has reached

13   agreement regarding the form of an order.

14      Mr. Arnold, Mr. Jones, have you reached an

15   agreement?

16             MR. ARNOLD:  Your Honor, I think we're quite

17   close.  We have been exchanging a draft, and I think

18   we will have something to Your Honor shortly.

19             THE COURT:  Mr. Jones?  I don't see Mr. Jones

20   on the Zoom screen.

21             MR. ARNOLD:  And Your Honor, I did email him a

22   red line and indicated we'd be hopping back on the

23   Zoom.  I do think we will have an agreed order as to

24   form here to Your Honor shortly.

25             THE COURT:  Very well.  Based on your

1 representation of Mr. Arnold, the court will be

2 taking a recess for about 15 minutes. I'm hopeful

3 that, in the meantime, the parties will come to

4 agreement regarding the form of the order. So if the

5 parties have not reached agreement as to the form of

6 the order or if you're close once again, feel free to

7 communicate that to my judicial assistant, Kristine

8 Maine. Otherwise, I anticipate going back on the

9 record in about 15 minutes.

10      Court will be in recess.

11          MR. JONES: Thank you, Your Honor.

12          MR. ARNOLD: Thank you, Your Honor.

13          (Recess.)

14          THE COURT: Counsel, we are back on the record

15 regarding the form of the order in the case of Cleary

16 versus Inslee, Cause Number 21-2-1674-34. So I have

17 in front of me, I believe, a couple of orders. And I

18 will hear from the parties. I'm just looking at

19 these for the first time. I know counsel has been

20 talking about them, so I will hear from either one of

21 you regarding the contested issues.

22          MR. JONES: I think, Your Honor -- Zach

23 Pekelis Jones for defendants. I believe there are

24 only two contested issues in the red lines and the

25 versions circulated by plaintiff's counsel. The

1    first is line 7 to 8 on the second page.  The court

2    found that strict scrutiny didn't apply, but even if

3    it did apply, plaintiffs would still be unlikely to

4    prevail.  Plaintiffs ask for the phrase "to this

5    facial challenge" to be put after "apply."  We do not

6    agree with that edit because it's my understanding

7    that the court concluded this wasn't a facial

8    challenge, but that doesn't have anything to do with

9    why strict scrutiny didn't apply.  The court's

10   conclusion that strict scrutiny did not apply is

11   based upon its analysis of the law.  And that would

12   be the case in an as-applied challenge as well under

13   the various constitutional theories that plaintiffs

14   have posited.  That's why I didn't think that "to

15   this facial challenge" was an appropriate assertion

16   on line 8.

17      The second point of disagreement is with respect

18   to irreparable harm.  So this is line 11, the court

19   also concludes that plaintiffs have failed to

20   establish that the proclamation is either resulting

21   in or will result in actual substantial and

22   irreparable injury, as the financial harm they allege

23   are not irreparable.  And plaintiffs prefer, instead

24   of that last part, that the court consider because

25   the court finds that the harm is financial only.

1    It's my understanding that plaintiffs alleged more

2    than just financial harm.  They also alleged

3    violation of their constitutional rights, which, of

4    course, they have not established under the first

5    prong.  So that's why I thought it was better to have

6    a more narrow phrasing.  We don't have a strong

7    objection in that regard to plaintiff's preferred

8    language.  We do think that the insertion of "facial

9    challenge" that I discussed previously would not be

10   appropriate or accurately reflect the court's ruling.

11          THE COURT:  Thank you.  Mr. Arnold.

12          MR. ARNOLD:  Thank you, Your Honor.  The

13   language that we used in the -- taking this in

14   reverse order, as far as the irreparable harm, that

15   was, I believe, verbatim from Your Honor, that is

16   that the court finds the harm is financial only.  So

17   we were trying to track your oral ruling, which we

18   also greatly appreciate Your Honor did today.  This

19   is an extraordinary circumstance, and we're all

20   moving fast.

21      As to the first issue, my understanding from the

22   court was that they were -- that Your Honor was

23   deciding this purely as a facial challenge.  So

24   wanted to make sure that our order reflected that,

25   that this was not an as-applied challenge, but I

1    easily could have misunderstood Your Honor.

2              THE COURT:  Thank you.  So do the parties have

3    any other input regarding the form of the order?

4              MR. JONES:  Not from defendants, Your Honor.

5              MR. ARNOLD:  No, Your Honor.  I think we

6    quickly dealt with the other issues and have

7    agreement otherwise.

8              THE COURT:  Thank you.  So I am going to

9    consider your arguments and look at my notes, and I

10   will get an order signed within a few minutes.  And

11   the court's judicial assistant will email that signed

12   order to counsel, and it will be filed in the court

13   file.

14      Anything else for today?

15             MR. ARNOLD:  No, Your Honor.  And thank you

16   again for scheduling this hearing.

17             MR. JONES:  No, Your Honor.  Thank you.

18             THE COURT:  Thank you.  We are completed for

19   today.

20

21                        --oOo--

22

23

24

25

CERTIFICATE OF REPORTER

STATE OF WASHINGTON           )
                              ) ss.
COUNTY OF THURSTON            )

       I, AURORA J. SHACKELL, CCR, Official
Reporter of the Superior Court of the State of Washington
in and for the County of Thurston do hereby certify:

1.  I reported the proceedings stenographically;

2. This transcript is a true and correct record of the
proceedings to the best of my ability, except for any
changes made by the trial judge reviewing the transcript;

3. I am in no way related to or employed by any party in
this matter, nor any counsel in the matter; and

4. I have no financial interest in the litigation.


       Dated this 21st day of October, 2021.



                _____
                AURORA J. SHACKELL, RMR CRR
                Official Court Reporter
                CCR No. 2439

# EXHIBIT H

4

FILED
SUPERIOR COURT
THURSTON COUNTY, WA

2021 DEC 10  AM 9: 56

LINDA MYHRE ENLOW
THURSTON COUNTY CLERK

1  | Hearing date: December 10, 2021
2  | Hearing time: 9:00 a.m.
   | Judge/Calendar: Hon. Carol Murphy

3

4        21-2-01674-34
         ORGMT     135
         Order Granting Motion Petition
5        11515954

6

7                    **STATE OF WASHINGTON**
                **THURSTON COUNTY SUPERIOR COURT**

8

9    WILLIAM CLEARY, et al.,              NO. 21-2-01674-34

                 Plaintiffs,             [~~PROPOSED~~] ORDER GRANTING IN
10                                        PART DENYING IN PART
                                          DEFENDANTS' MOTION FOR
11        v.                              JUDGMENT ON THE PLEADINGS

     JAY INSLEE, et al.,
12
                 Defendants.
13

14        This Court has considered Defendants' Motion for Judgment on the Pleadings (Motion);

15   Plaintiffs' response; Defendants' reply; the applicable law; the parties' pleadings, including

16   embedded documents and documents incorporated by reference in the pleadings; judicially

17   noticeable facts and documents; and the parties' oral arguments made at the November 19, 2021

18   hearing. The factual allegations in Plaintiffs' Amended Complaint filed on September 21, 2021

19   have been construed as true and in the light most favorable to Plaintiffs for purposes of this

20   Motion.  The Court did not convert the CR 12(c) motion to a CR 56 motion and did not address

21   materials outside the Amended Complaint and the documents embedded therein.

22        The Court, finding itself fully informed, hereby GRANTS IN PART and DENIES IN

23   PART Defendants' Motion. The Court GRANTS the Motion as to the following claims brought

---

[PROPOSED] ORDER GRANTING IN                    1         ATTORNEY GENERAL OF WASHINGTON
PART DENYING IN PART                                             Complex Litigation Division
DEFENDANTS' MOTION FOR                                          800 Fifth Avenue, Suite 2000
JUDGMENT ON THE PLEADINGS                                        Seattle, WA 98104-3188
                                                                    (206) 464-7744

1   in Plaintiffs' Amended Complaint: Violation of Separation of Powers (first cause of action);

2   Deprivation of Religious Freedom, WA Const. Art. I, Sec. 11 (fourth cause of action); Violation

3   of Freedom of Speech and Assembly (fifth cause of action); Violation of Washington Law

4   Against Discrimination (sixth cause of action); and Excessive and Unconscionable Penalties,

5   Lesser Available Means and Balancing (seventh cause of action). The first, fourth, fifth, sixth,

6   and seventh causes of action are dismissed with prejudice. The Court DENIES the Motion as to

7   the following claims brought in Plaintiffs' Amended Complaint: Deprivation of Life, Liberty, or

8   Property, WA Const. Art. I, Sec. 3 (second cause of action); Deprivation of Privacy, WA Const.

9   Art. I, Sec. 7 (third cause of action); and Violation of the Contracts Clause and Breach of

10   Contract as to State Employees (eighth cause of action). The second, third, and eighth causes of

11   action remain in the case only as to the named Defendants: Governor Jay Inslee, Superintendent

12   Donald Holbrook, and the State of Washington.

13       IT IS SO ORDERED.

14       DATED this _10th_ day of _December_ 2021.

15

16                     _Carol murphy_
                    THE HONORABLE CAROL MURPHY
                    Thurston County Superior Court

17

18   Presented by:

19   ROBERT W. FERGUSON
    Attorney General

20   _/s/ Cristina Sepe_
    KRISTIN BENESKI, WSBA #45478

21   First Assistant Attorney General
    LAURYN K. FRAAS, WSBA #53238

22   CRISTINA SEPE, WSBA #53609
    Assistant Attorneys General

23   KARL D. SMITH, WSBA #41988

[PROPOSED] ORDER GRANTING IN         2         ATTORNEY GENERAL OF WASHINGTON
PART DENYING IN PART                         Complex Litigation Division
DEFENDANTS' MOTION FOR                     800 Fifth Avenue, Suite 2000
JUDGMENT ON THE PLEADINGS                  Seattle, WA 98104-3188
                                        (206) 464-7744

1    Deputy Solicitor General
     800 Fifth Avenue, Suite 2000
2    Seattle, WA 98104
     Kristin.Beneski@atg.wa.gov
3    Lauryn.Fraas@atg.wa.gov
     Cristina.Sepe@atg.wa.gov
4    Karl.Smith@atg.wa.gov

5    ZACHARY PEKELIS JONES, WSBA #44557
     Special Assistant Attorney General
6    PACIFICA LAW GROUP LLP
     1191 2nd Ave. Suite 2000
7    Seattle, WA 98101
     Zach.Pekelis.Jones@PacificaLawGroup.com
8
     *Attorneys for Defendants*
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

[PROPOSED] ORDER GRANTING IN                    3
PART DENYING IN PART
DEFENDANTS' MOTION FOR
JUDGMENT ON THE PLEADINGS

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1

**DECLARATION OF SERVICE**

2       I hereby declare that on this day I caused the foregoing document to be served,

3 via electronic mail, per agreement, on the following:

4       Nathan J. Arnold
      Lesley Alvarado
5       ARNOLD & JACOBOWITZ PLLC
      2701 First Avenue, Suite 200
6       Seattle, WA 98121
      (206)799-4221
7       Nathan@CAJLawyers.com
      Lesley@CAJLawyers.com
8

      *Counsel for Plaintiffs*
9

10       DATED this 2nd day of December 2021, at Tacoma, Washington.

11                                */s/ Cristina Sepe*
                               CRISTINA SEPE, WSBA #53609
12                                Assistant Attorney General

13

14

15

16

17

18

19

20

21

22

23

[PROPOSED] ORDER GRANTING IN         4       ATTORNEY GENERAL OF WASHINGTON
PART DENYING IN PART                               Complex Litigation Division
DEFENDANTS' MOTION FOR                          800 Fifth Avenue, Suite 2000
JUDGMENT ON THE PLEADINGS                       Seattle, WA  98104-3188
                                        (206) 464-7744

# EXHIBIT I

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

| | |
|---|---|
| BRENT MATTILA, an individual; STEVEN ERICSON, an individual; and DARRIN QUASCHNIK, an individual, | No. 22-2-14316-9 SEA |
| Plaintiffs, | ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |
| v. | |
| CITY OF SEATTLE; and HAROLD SCOGGINS, Chief of the Seattle Fire Department, | |
| Defendants. | |

THIS MATTER came before the Court on Plaintiffs' Motion for Preliminary Injunction ("Motion"). The Court has heard argument of counsel, and has read and considered the files and records here in, including but not limited to:

1.    Plaintiffs' Motion for Temporary Restraining Order or Preliminary Injunction and supporting documentation, (Sub 5, 6, 7, 8, 9, and 10);

2.    Defendants' Response to Plaintiffs' Motion ("Response"), and supporting documentation (Sub 18, 19, 20, 21, 22, 23, & 24);

3.    Plaintiffs' Reply and supporting documentation (Sub 26, 27, & 28).

4.    Defendant's Sur-Response Declaration (Sub 29)

ORDER DENYING PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION - 1

To obtain a preliminary injunction, the movant must establish (a) a clear legal or equitable right, (b) a well-grounded fear of immediate invasion of that right, and (c) that the act complained of will result in actual, substantial, and irreparable injury. Failure to establish any one of these requirements results in a denial of the injunction. The criteria also must be examined in light of equity including balancing the relative interests of the parties, and, if appropriate, the interests of the public.

Plaintiffs have not met the required elements to obtain a preliminary injunction. The Court concludes that Plaintiffs have not established that they are likely to prevail on the merits of their claims. Plaintiffs have also failed to establish that, in the absence of preliminary injunctive relief, they will experience an actual, substantial, and irreparable injury. Finally, the balance of the equities and the public interest weigh against the issuance of an injunction.

Based upon the foregoing, the Court hereby DENIES Plaintiffs' Motion for Preliminary Injunction.

IT IS SO ORDERED this _____ day of October, 2022.

_____
Judge Matthew Williams

ORDER DENYING PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION - 2

King County Superior Court
Judicial Electronic Signature Page

Case Number:      22-2-14316-9

Case Title:       MATTILA ET AL VS CITY OF SEATTLE ET ANO

Document Title:   ORDER  RE DENYING PRELIMINARY INJUNCTION

Signed By:        Matt Williams

Date:             October 12, 2022

Judge:  Matt Williams

This document is signed in accordance with the provisions in GR 30.

Certificate Hash:            EB84B7853CB038BA5F09ED31155B8D18BB90ECE2

Certificate effective date:  1/3/2022 3:22:29 PM

Certificate expiry date:     1/3/2027 3:22:29 PM

Certificate Issued by:       C=US, E=kcscefiling@kingcounty.gov, OU=KCDJA,
                             O=KCDJA, CN="Matt Williams:
                             dD/50zst7BGdnINZt8fBPA=="

# EXHIBIT J

```
 1                IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

 2                     IN AND FOR THE COUNTY OF KING

 3    _____

 4    BRENT MATTILA, an individual;          )

 5    STEVEN ERICSON, an individual;         )  No. 22-2-14316-9 SEA

 6    and DARRIN QUASCHNIK, an individual,   )

 7                    Plaintiffs,            )

 8    v.                                     )

 9    CITY OF SEATTLE; and HAROLD SCOGGINS,  )

10    Chief of the Seattle Fire Department,  )

11                    Defendants.            )

12    _____

13                    HEARING - CONDUCTED VIA ZOOM

14             The Honorable Matthew W. Williams Presiding

15                         October 12, 2022

16    _____

17

18

19

20

21

22    TRANSCRIBED BY:  Reed Jackson Watkins
                       Court-Certified Legal Transcription
23                     206.624.3005

24

25
```

```
 1                    A P P E A R A N C E S

 2

 3    On Behalf of Plaintiffs:

 4    NATHAN J. ARNOLD

 5    Arnold & Jacobowitz PLLC

 6    2701 First Ave, Suite 200

 7    Seattle, Washington 98121

 8

 9

10    On Behalf of Defendants:

11    ZACHARY J. PEKELIS

12    Pacifica Law Group LLP

13    1191 Second Avenue, Suite 2000

14    Seattle, Washington 98101

15

16

17

18

19

20

21

22

23

24

25
```

                    I N D E X   O F   P R O C E E D I N G S

                                                                Page

October 12, 2022 Hearing.................................... 4

Argument by Mr. Arnold..................................... 4

Argument by Mr. Pekelis................................... 14

Rebuttal Argument by Mr. Arnold........................... 28

Ruling.................................................... 35

```
 1                          -o0o-

 2                     October 12, 2022

 3

 4       THE COURT:  Good morning, Counsel.  We are on the record

 5    in open court on Mattila vs. City of Seattle and Harold

 6    Scoggins, Cause No. 22-2-14316-9 SEA.

 7       As I said, we're on the record in open court.  The

 8    courtroom doors are open and unlocked; however, the parties

 9    and counsel are appearing remotely by videoconference.

10       So, Counsel, will each of you enter your appearance,

11    beginning with Mr. Arnold?

12       MR. ARNOLD:  Thank you, Your Honor, and good morning.

13    Nathan J. Arnold on behalf of the plaintiffs.

14       MR. PEKELIS:  Good morning, Your Honor.  Zach Pekelis on

15    behalf of defendants.

16       THE COURT:  Good morning.  Counsel, Mr. Arnold, this is

17    your motion for preliminary injunction or TRO.  You have 20

18    minutes.

19       MR. ARNOLD:  Thank you, Your Honor, and good morning.

20    Thank you to the lower bench as well.  Thank you for your

21    tech support, for allowing us to continue to operate

22    remotely.  And thank you to opposing counsel, who has been a

23    gentleman throughout this process.

24       Your Honor, we are always looking for ways to simplify

25    things.  And this case comes off your docket if the City of
```

1       Seattle's fire department merely starts following the latest

2       and current CDC guidance instead of, inexplicable, clinging

3       to outdated guidance.

4         Now, Your Honor, no one can set foot outside, at least the

5       downtown courthouse, maybe not in Kent.  But no one can step

6       outside the Seattle courthouse and to think to themselves,

7       we have too many first responders in the city of Seattle.

8         Your Honor, at the same time, it's undisputed that the

9       fire department is paying historic overtime while having

10      historic lack of coverage.  This, of course, itself impacts

11      public safety.

12        So, Your Honor, what my clients are asking the Court for

13      is that during the pendency of this action, they be allowed

14      to serve their city while not contradicting their religious

15      beliefs.  And those are religious beliefs that the City

16      has -- that the department and the City have accepted as

17      sincere.  We're not here today asking the Court to strike

18      down the mayoral directive, we are just asking that while

19      this emergency elsewhere ended sometime ago -- and even our

20      governor has said that it ends soon -- that these three

21      people, in compliance with current CDC guidance, be allowed

22      to keep serving their city.

23        Your Honor, what we're not here this morning talk about is

24      the governor's proclamation.  As I just mentioned, any

25      impact that has goes away in a couple of weeks.  And it's

1        not the governor who elected to terminate or threatened to

2        terminate, rather, these three firefighters.  There's

3        nothing in the record that indicates the governor forced the

4        fire chief to pick and choose who would be accommodated and

5        who would not be, and indeed, the governor's mandate on its

6        face requires the fire chief to follow the Washington law

7        against discrimination.

8          We are here today -- and this is, of course, a court of

9        law, but it's also a court of equity.  We're here today to

10       discuss and address the facts today.  We're not here to

11       discuss what the City believed months ago.  We're not here

12       to discuss what anyone believed years ago.  Two years ago,

13       Your Honor, I was likely Lysol-wiping Amazon boxes on my

14       front porch.  No one here is denying that Covid exists, that

15       it has been an issue, but things have changed.  This science

16       has changed.

17         Twelve months ago, we were told by the most powerful

18       people in the world that this vaccine was a silver bullet

19       and that it would end Covid by preventing transmission.  But

20       that didn't happen.  And while the rest of the country has

21       chosen to adapt, indeed, most of the rest of the state has

22       chosen to adapt, the City of Seattle inexplicably chooses

23       not to.

24         I don't know the why, Your Honor.  I don't know if that's

25       institutional ego on the part of the City, but the reality

1        is they have no rational basis to not simply follow the

2        latest and best science as promulgated by the CDC.

3          And, Your Honor, as I mentioned, this is a court of

4        equity, and what is -- what may or may not have been one way

5        or the other equitable a year ago is irrelevant to what

6        we're discussing today as it regards these three specific

7        firefighters.  It's what is equitable today that should

8        drive the Court's decision.  And in making that analysis,

9        Your Honor, I would submit to the Court that it is not

10       rational for the City to ignore the latest CDC guidance.

11       And that is wholly independent from the fact, as I would

12       again submit to Your Honor, that the City is inappropriately

13       infringing upon religious beliefs that are absolutely

14       guaranteed, not just by our federal constitution, but are

15       more liberally and broadly protected under Section 1,

16       Article 11 of our state constitution.

17         There is also, independently, violations of the Washington

18       law against discrimination that I would submit to the Court

19       my clients have a likelihood of success of prevailing on.

20       There is no undue burden today on the City to accommodate

21       these people and have three more able-bodied firemen when we

22       have a huge staffing crisis within the Seattle Fire

23       Department.

24         Now, Your Honor, going to the constitutional issues.  When

25       there is more than an incidental burden on religious

1       practice, religious belief, under our state jurisprudence,

2       the government must show first that it's necessary and,

3       second, that it utilizes the least restrictive means.  Now,

4       the City's actions as of today are neither.  The City's

5       policy does not achieve the goal that it purports to

6       accomplish.  The mandates have been in place for some time

7       now.  Covid has not disappeared from the city, and public

8       safety has declined, not improved, since this policy was

9       enacted.  I don't think anyone can argue against that.

10          And, Your Honor, we also know that it's not necessary

11      because the City's own experts in this case, Dr. Sayre,

12      coauthored a study showing low risk of transmission between

13      and amongst first responders and patients.  So his own

14      studies -- not disclosed to this Court, mind you, but his

15      own studies contradict the position that he has put before

16      Your Honor.

17          Now, when we look at the least restrictive means, one of

18      the things that the Court looks to under the War Solider

19      case, among others, is:  What are other jurisdictions doing.

20      Now, other cities have had no problem accommodating all

21      their firefighters.  Other states have had no problem

22      accommodating all their firefighters.  The virus is not

23      different.  There's no evidence, at least in the record and

24      the City has not suggested that the virus is somehow

25      different in the City of Seattle than elsewhere.  And I

```
 1            don't think that would be supported by the science anyway,

 2            Your Honor, but there simply isn't anything in the record.

 3             Now, we also have an issue where the City has a policy

 4            that has been evidenced by email sent to department heads by

 5            the deputy mayor that says they must prioritize medical

 6            accommodations first and then move to religious

 7            accommodations.  We also have an email from one of those

 8            department heads, Mr. Lombard, that's in the record,

 9            memorializing that religious accommodations simply would not

10            be granted.  As applied to these three firefighters this

11            morning, Your Honor, that is discriminatory, it violates the

12            Washington law against discrimination and it is violative of

13            Article 1, Section 11.

14             Your Honor, again, the vaccines are not what was

15            advertised to any of us.  We now know, based on the latest

16            and greatest science, including the CDC itself, that these

17            vaccines do not stop transmission.  Therefore, a government

18            policy even -- if we weren't dealing with religious liberty

19            and constitutionally-guaranteed rights -- would be arbitrary

20            and capricious.

21             Your Honor, I saw that the City submitted a surreply

22            declaration yesterday.  I'm not objecting to that as such.

23            I don't know that it's allowed under the rules, but I don't

24            have an objection to it because, as the Court frequently

25            sees, it's not always what's included in the papers that are
```

1     most important, sometimes it's what's not there that is most

2     important.  There was nothing in that surreply disputing

3     that the deputy mayor was emailing department heads stating

4     that medical accommodations take precedence.  Yes, Your

5     Honor.

6          THE COURT:  I apologize.  From who was the certified --

7     who -- who authored the declaration?

8          MR. ARNOLD:  Your Honor, there was a declaration from

9     Ms. -- her name is -- her name is escaping me.  Excuse me, I

10    think it's Sarah Lee.  She's an attorney with the City of

11    Seattle.

12         MR. PEKELIS:  Your Honor, may I interject?

13         THE COURT:  I have a declaration that was filed on the

14    11th from Ms. Lee.  Is that what we're talking about?

15         MR. ARNOLD:  Yes, it is, Your Honor.

16         THE COURT:  Okay, it's four pages long.  I have not had a

17    chance to review that.  I've reviewed everything else, but I

18    haven't reviewed that.  And I apologize, I'm going to take

19    just a moment.

20         MR. ARNOLD:  Certainly, Your Honor.

21         THE COURT:  Okay.  Thank you, Counsel.  I've reviewed it.

22    Go ahead.

23         MR. ARNOLD:  Now, since the Court has just reviewed this,

24    you will note there is nothing in there that challenges --

25    the express words that are in the email that's in the

1   record:  The deputy mayor is emailing department heads

2   saying you must accommodate medical exemptors before

3   religious.  That is treating a secular activity superior to

4   a religious activity, that is violative of our constitution.

5     Similarly, there is nothing in that surreply to explain,

6   Mr. Lumbar, who is the head of the -- he's a director.  He's

7   the head of the civilian 911, as it was rebranded by the

8   City -- memorializing meetings where it was clear that

9   religious accommodations would simply not be granted.

10    They also do not clarify or even acknowledge in this

11   surreply that their own expert coauthored a study

12   contradictory to the position that he puts before Your

13   Honor.  Nor do they address the reality -- and nor can they

14   because they would be being dishonest with the Court -- that

15   there is a full-blown staffing crisis occurring at the City

16   of Seattle Fire Department.

17    Your Honor, there can be no undue hardship here where the

18   vaccine does not stop transmission.  And more importantly,

19   Your Honor -- well, perhaps it's not more importantly.

20   Independently, Your Honor, the system that has been put in

21   place is picking and choosing between medical and religious

22   exemplars.  There is no scientific basis or rational basis

23   or otherwise to say that the same individual with a medical

24   accommodation, unvaccinated, poses different risk than a

25   person who is unvaccinated for a religious reason.  That is

 1        the same person, same lack of vaccination, same job duties.

 2        The City cannot pick and choose between the religious and

 3        the secular and treat the religious as a second class.

 4           Your Honor, the mayor of Seattle also announced yesterday

 5        that the Covid emergency for the City of Seattle ends in a

 6        couple weeks, and this Court sitting in equity should not

 7        allow all these individuals to be terminated over their

 8        religious objection where the City has declared the

 9        emergency is over in a matter of weeks.

10           Now, there is -- the mayor also said that he's doing this

11        to comport with the governor's recent decision to end his

12        emergency.  Of course, it does not fully comport because the

13        governor's mandate on vaccines, as it applies to these three

14        individuals this morning, will go away in three weeks

15        because they are under that mandate, due to their department

16        of health licensure as EMTs.

17           So there will be no compliance with the governor's orders

18        for the City to worry about, to the extent that is even

19        something they rely upon in a mere matter of weeks.

20           Your Honor, what the City knows today is that terminating

21        these three firefighters does not ameliorate any public

22        safety issues nor the fire department staffing issues.  It

23        only deepens the crisis while at the same time independently

24        violating my clients' rights under both the state

25        constitution and under WLAD.

1          And, Your Honor, it would be arbitrary and capricious for

2     the City to continue on this path and ignore the latest CDC

3     guidance.  And that's even if there were not fundamental

4     religious liberties involved in this, which require -- I

5     would submit to the Court, requires the Court to hold it to

6     a higher standard, which I would also submit to the Court,

7     it cannot pass that test of strict scrutiny.

8        Your Honor, fundamentally, this is a request for equitable

9     relief.  We submit to the Court that it would not be

10    equitable to allow for the termination of these three public

11    servants, burdening their religious beliefs, whether through

12    its failure to accommodate when we know the accommodations

13    are available, particularly now that we know that the

14    vaccine does not stop transmission or independently if it's

15    because of a manufactured, desperate impact; or third,

16    because it is a de facto religious test for public

17    employment, which if you read the fullness of Article 11, is

18    not allowed under our state's constitution.

19       Your Honor, that failure to accommodate under WLAD is an

20    additional basis, independent from the constitutional basis,

21    upon which my clients are likely to succeed on the merits.

22    And with today's knowledge, there simply is no rational

23    basis, and it's, therefore, arbitrary to deny my clients

24    their livelihood over their religious objection, and for

25    that matter, to deny the City of Seattle of their public

1      service at a time when the city needs it more than ever.

2          Your Honor, with that I would reserve the balance of my

3      time for rebuttal.

4          THE COURT:  Thank you.

5          Mr. Pekelis.

6          MR. PEKELIS:  Thank you, Your Honor.

7          Your Honor, vaccination requirements are nothing new in

8      this country.  For more than a century, such policies have

9      routinely been adopted by states, cities, school districts,

10     hospitals, and others.  And for just as long and just as

11     routinely, courts have upheld them.  Faced with the delta

12     surge and the Covid-19 pandemic, the deadliest pandemic in

13     U.S. history, Washington's governor and Seattle's mayor

14     issued orders requiring vaccination of certain workforces.

15     Both orders covered Seattle firefighters, and both orders

16     reflected the consensus among scientists and public health

17     experts that vaccination against Covid-19 was and remains

18     the single best strategy to combat the virus.

19         That is the opinion of Dr. Jeffrey Duchin, King County

20     health officer, and the leader of this county's pandemic

21     response.  And it is the view of all reputable public health

22     experts and officials and our state and nationally using the

23     CDC.

24         As Dr. Duchin testifies in his declaration:  Vaccination

25     continues to reduce the risk of transmission of the Omicron

1    subvariants that have predominated Covid-19 cases in 2022.

2       Dr. Duchin reports that currently an unvaccinated person

3    is 2.7 times -- nearly three times -- more likely to test

4    positive for Covid-19 than a person vaccinated with at least

5    the primary series.  That is why the CDC's position today is

6    that Covid-19 vaccination means you are less likely to have

7    an infection and less likely to spread the disease to

8    others.

9       And Dr. Duchin, citing numerous studies, concludes that

10   the vaccines remain highly effective at preventing severe

11   illnesses caused by Omicron.

12      Mr. Arnold's suggestion that the updated CDC guidance

13   somehow undermines or is inconsistent with those conclusions

14   is entirely false.  It's a misstatement of what the CDC's

15   updated guidance does.  And Dr. Duchin explains this very

16   clearly in his declaration, paragraphs 82 and 83,

17   illustrating -- explaining that the updated guidelines

18   simply reflects that the quarantine and isolation protocol

19   for individuals with Covid-19 illness are the same

20   regardless of whether an individual has been vaccinated

21   against Covid-19.  And that's sound, because a person who's

22   been vaccinated can still contract the illness and can still

23   transmit it; they do so at lower rates and with a lower risk

24   than a person who's unvaccinated, but it can still occur.

25      The CDC's guidance reflects the public health imperative

1         to provide simple, straightforward, easily comprehensible

2         recommendations to the public as opposed to having two

3         different systems for two different groups of people.  One

4         of which, by the way, is become -- is much smaller and

5         becoming smaller by the day.  That is the percentage of the

6         population that's unvaccinated.  So it's a complete

7         distortion of the record and of the CDC guidance to suggest

8         that the CDC somehow thinks that vaccination is no longer

9         imperative.

10          Against that scientific backdrop, the Seattle Fire

11        Department has implemented the governor's proclamation and

12        the mayoral directive beginning in August of 2021.

13        Consistent with both orders, the fire department processed

14        employee requests for exemptions and accommodations, whether

15        based on medical reasons or sincerely-held religious

16        beliefs.  Once an exemption was approved, the department

17        then assessed whether a reasonable accommodation was

18        available to an employee based on his or her specific job

19        duties and individual limitations.

20          Now, in making those individualized decisions, the fire

21        department relied on the city accommodations matrix, which

22        Ms. Lee referenced in her original declaration as well as in

23        the supplemental declaration filed yesterday.  That matrix

24        was based on a similar matrix provided by the state.  And

25        under that matrix firefighters fall under the highest risk

1    category of workers, those whose essential duties require

2    frequent, unavoidable or unpredictable interaction or

3    exposure to others, including vulnerable populations, and

4    those ineligible for vaccination.

5       For employees in that highest risk category, the matrix

6    provides for two accommodations to be considered.  First,

7    transfer to another position that does not involve such

8    close contacts.  Unfortunately, the fire department had no

9    such positions available at the time it was making these

10   accommodations.

11      Second, an available accommodation could include temporary

12   leave, but only if the exemption need is temporary.  For

13   example, if an employee was Covid-19 positive and had to

14   wait to be vaccinated.

15      So despite Mr. Arnold's assertion in his reply and today

16   that accommodations were made for firefighters based on

17   medical exemptions that allowed them to remain in their

18   position unvaccinated, that's entirely false, and that's why

19   we filed Ms. Lee's supplemental declaration to address this

20   new allegation that Mr. Arnold brought forth in his reply

21   only for the first time.

22      Ms. Lee's supplemental declaration makes clear that there

23   has been no accommodations, medical or religious or

24   otherwise, for employees that would allow them to remain

25   unvaccinated in their positions long term.

 1           These three plaintiffs were all firefighters -- are all

 2      firefighters with religious objections to the three original

 3      Covid-19 vaccines based on their indirect link to fetal stem

 4      cells.  The fire department did not question the sincerity

 5      of their asserted religious beliefs and approve their

 6      exemption requests.  But consistent with the matrix, the

 7      department could not accommodate Plaintiffs in their current

 8      position as firefighters due to the frequent close contact

 9      they have with others, including patients receiving

10      emergency medical services, their coworkers, and other

11      healthcare professionals.

12           After going through the interactive process with each

13      plaintiff, the department denied their accommodation request

14      to remain activated while continuing in service.  However,

15      the department allowed Plaintiffs to go on a lengthy --

16      year-long really -- leaves of absence before formally

17      separating them from employment.

18           Rather than challenge the accommodations decisions when

19      they were made in October 2021, a year ago, Plaintiffs

20      waited ten months until their leaves were nearly up before

21      filing this lawsuit and motion for preliminary injunction.

22      That delay, Your Honor, itself, is perhaps the most obvious

23      obstacle to an injunction here, as it undercuts any finding

24      of a reparable harm.  Even had they not sat on their rights

25      for so long, though, Plaintiffs have failed to otherwise

1    make a colorable case for reparable harm, which is an

2    essential requirement of any injunction.

3      Mr. Arnold makes a point that this is an equitable relief

4    that he's seeking, but that doesn't mean that it's

5    untethered from all legal principles.  There are established

6    criteria to award a preliminary injunction, and a

7    irreparable harm is the essential one.  It is well

8    established that loss of employment alone does not

9    constitute a irreparable harm because it is fully

10   compensable in damages if the claims are meritorious and

11   they ultimately prevail.

12     The second major factor in entering a preliminary

13   injunction, of course, is a balance of the equities,

14   including the public interest, and those all weigh strongly

15   against an injunction.  Against three Plaintiffs' interests

16   in their jobs -- again, not a trivial injury, but certainly

17   not an irreparable one -- the Court must weigh the City's

18   and the public's significant interests in promoting the

19   safety of both the fire departments 1,000-person workforce

20   and the hundreds of thousands of members of the public with

21   whom firefighters will interact.  A medically vulnerable

22   Seattlite in crisis should be able to call 911, confident

23   that the firefighter, paramedic or EMT providing emergency

24   medical services has done everything reasonably possible to

25   reduce the risk of transmitting Covid-19, above all else,

1    getting vaccinated.  The same goes for fire fighters

2    themselves, whose jobs are dangerous enough as it is and who

3    should not have to spend 72-hour shifts in close quarters

4    with unvaccinated coworkers who have a higher risk of

5    transmitting the virus.

6      The plaintiffs' interest in continued employment during

7    the pendency of this litigation pales in comparison to the

8    paramount public health interest at stake here.

9      Finally, and most importantly, Plaintiffs failed to

10   establish any clear legal right to injunctive relief because

11   they're unlikely to prevail on any of their legal claims.

12   And that's where I plan to focus the balance of my time

13   today, Your Honor.

14     None of the five causes of action pleaded in this

15   complaint is well developed in Plaintiffs' motion.  The

16   reply, and frankly, counsel's presentation today, only

17   further confuses and conflates their theories, such that for

18   several of their claims, one can really only guess at what

19   Plaintiffs' actual theory of liability even is.  But this

20   much is clear, state and federal courts in this state have

21   already rejected those same claims and various challenges to

22   the proclamation, many in cases brought by Plaintiffs' same

23   counsel.  Yet Plaintiffs not only fail to distinguish or

24   grapple those with those decisions, they do not even

25   acknowledge them.  The Court should follow the decisions of

1        these other courts in Washington that have unanimously

2        rejected challenges to vaccination requirements and deny the

3        motion for preliminary injunction.

4            Your Honor, may I inquire as to my time?  I got my clock

5        started a little late.

6            THE COURT:  You have about ten minutes left.

7            MR. PEKELIS:  Thank you, Your Honor.

8            I'd like to begin where Plaintiffs focused most of their

9        energy in their reply, which is in their religious freedom,

10       constitutional claims.  Presumably based on Article 1,

11       Section 11, as that's the only claim pleaded in the

12       complaint.  As we explained in our response, Plaintiffs'

13       focus on the free exercise clause of the U.S. Constitution

14       is puzzling because no such claim appears in the complaint

15       and is well established that the Court cannot issue a

16       preliminary injunctive relief based on a claim that is not

17       plead.  Nevertheless, even if Plaintiffs had filed a free

18       exercise claim under the US Constitution, it would not be

19       likely to prevail for many reasons.

20           Before we actually delve into the jurisprudence, I think

21       it's important to what exactly are Plaintiffs challenging

22       here?  My understanding of the complaint is not that they're

23       challenging the proclamation or the directive on a facial

24       level, but they're challenging the individual accommodations

25       decisions as to these particular plaintiffs, which is to

1     say, the decision that firefighters, because of their close

2     contact with patients and their coworkers, cannot be

3     accommodated unvaccinated in their current position.  So

4     assuming that's correct, the Court applies the same rule

5     that has governed for exercise of jurisprudence for 30

6     years.  That's the rule under Smith v. Department of Human

7     Resources of Oregon.  And that principle, the Smith rule, is

8     that a neutral, generally applicable, law does not trigger

9     strict scrutiny; it is subject only to rational basis

10    review, meaning there has to be a reasonable connection

11    between a legitimate state interest and the policy adopted,

12    a rational basis.

13       So before the pandemic, numerous federal courts had held

14    that vaccine mandates, whether adopted by governments or

15    school districts, were neutral and generally applicable and

16    easily met rational basis review.  And importantly, Your

17    Honor, those were vaccine mandates that had no religious

18    exemptions at all, and we collect those cases in our

19    response.

20       So here we have a vaccine mandate that has a religious

21    exemption and accommodation process, although not one that

22    is just handed out without any scrutiny or accommodations

23    analysis.  During the pandemic, numerous courts as well,

24    including the First Circuit, the Second Circuit, Seventh

25    Circuit, the Ninth Circuit, and both district courts in our

1      state, the Western and Eastern Districts of Washington, have

2      held that the proclamation and other Covid-19 vaccination

3      mandates, similarly are neutral and generally applicable,

4      and easily survive rational basis review.

5          So rather than make an argument for why the accommodations

6      decisions or the underlying orders were not neutral or

7      generally applicable under those principles, Plaintiffs

8      seemed to pivot to the US Supreme Court's decision in Fulton

9      v. City of Philadelphia.  And that case dealt with an

10     adoption agency's -- city adoption agency's system of

11     entirely discretionary exemptions.  And the U.S. Supreme

12     Court ruled that when you have a -- basically a better

13     discretion in a decision-maker -- an official

14     decision-maker, that effectively renders the rule not

15     generally applicable.

16         Now, Judge Rothstein, in the Pilz case distinguished

17     Fulton and said that the proclamation did not create a

18     system of entirely discretionary exemptions simply because

19     it allowed for medical -- discrete medical and religious

20     accommodations.  It was still neutral and generally

21     applicable, Judge Rothstein ruled, so rational basis for

22     review applies.

23         And the same goes for the accommodations decisions here.

24     The accommodations matrix applied regardless of whether the

25     accommodation was for medical or religious reasons, it's the

1    exact same accommodations provided.  And Mr. Arnold's

2    insinuation that somehow there were different standards

3    being applied for medical exemptees and religious exemptees

4    is completely false.  In the fire department, no employees

5    were allowed to remain unvaccinated in their current

6    position as an accommodation.

7        THE COURT:  Counsel, will you address the Lombard email?

8        MR. PEKELIS:  The Lombard -- the Tiffany Washington email,

9    is that what you're referring to?

10       THE COURT:  The email that states that medical

11   accommodations -- medical exemptions would be prioritized.

12       MR. PEKELIS:  Yes, Your Honor.  So that is -- the context

13   of that is in a single department where they're saying,

14   Tiffany Washington is saying for these 19 employees -- some

15   of whom were medical exemptees and others were religious

16   exemptees -- that priority in terms of addressing the

17   accommodations had to be -- had to go to the medical.  And

18   that's -- and the reason for that is because there's a

19   different standard that applies under state statutory law,

20   under the WLAD, for what an undue hardship is for an

21   employer for a medical exemption versus for a religious

22   exemption.  It's a higher standard that needs to be met for

23   a medical standard under state statutory law than for a

24   religious standard.  So that's what prompted that direction

25   for one single department based on -- for 19 employees who

1     were receiving accommodations.

2        Now, that's easily distinguished.  There's nothing that

3     suggests the fire department engaged in the same approach

4     here.  There's nothing to -- no evidence that that was some

5     sort citywide approach where:  Let's all address all the

6     medical exemptions first and then move on to the religious

7     exemptions.  We're talking about one single email dealing

8     with 19 discrete employees.

9        Now, distinguish that from the case cited by Plaintiffs,

10    Unify SCC vs. Cody -- they cite this in their reply, and I

11    think it's a really telling case from the Northern District

12    of California where the court overall upheld the

13    accommodations process, which was quite similar to the

14    accommodations process here, where different employees were

15    categorized in different risk levels and different

16    accommodations were available based on those different risk

17    levels.

18       The court said that was fine.  Not only did it meet

19    rational basis review, but it met strict scrutiny, even if

20    strict scrutiny had applied.  But one narrow part of it was

21    problematic for the court, and that was where the court --

22    where the county, Santa Clara County, for a discrete number

23    of accommodations involving a change to a different

24    position.  So for employees in the high-risk category, some

25    could change to a different position in a lower-risk

1      category that would allow them to remain unvaccinated.  And

2      the county's policy was to address -- to provide that

3      accommodation of transfer to medical exemptees first and

4      religious exemptees later, if any such positions remain.

5      And the court said, No, that is likely to violate the free

6      exercise clause because it's not neutral and generally

7      applicable because you're prioritizing one type of exemptee

8      over another.

9         And that's not what's happening here, because in the fire

10     department, no available positions went -- there were no

11     available positions in lower risk positions, no applicants,

12     no accommodations requesters, medical or religious, received

13     consideration for transfer to lower-risk positions.  And

14     that's stated in Ms. Lee's original declaration.

15        So the Unify SCC Codi analysis simply doesn't apply.  And

16     in fact, the case helps us because the court, as I

17     mentioned, ruled that even if strict scrutiny applied, it

18     was -- it met strict scrutiny because vaccination is the

19     most effective means based on the evidence of preventing the

20     spread of Covid, and there was no other reasonable means of

21     achieving those objectives other than mandatory vaccination

22     for those high risk employees.

23        THE COURT:  Mr. Pekelis, you've only got about a minute

24     and a half left.  But there's an issue that I'd like you to

25     clarify for me.  What is the current status of the three

1     plaintiffs with respect to their employment at the City of

2     Seattle?  My understanding is they've been terminated.  Am I

3     correct in that?

4       MR. PEKELIS:  No, that's not correct, Your Honor.

5       THE COURT:  Okay.  Thank you.

6       MR. PEKELIS:  All three -- all three are in a leave status

7     right now.

8       THE COURT:  Okay.

9       MR. PEKELIS:  Your Honor, is there -- if the Court has any

10    other specific questions -- I guess I want to address the

11    declarations that have been submitted as part of the reply

12    brief, Your Honor.

13      So, you know, unfortunately this is somewhat of a pattern

14    with Mr. Arnold in past similar cases that we've dealt with,

15    where there's a barebones motion with 59 pages of supporting

16    exhibits, and then the reply contains 387 pages of new

17    declarations all supporting their original arguments, none

18    truly in rebuttal.  And, you know, that should raise a red

19    flag for any experienced legal practitioner when you see

20    such a lopsided difference between what's in the reply and

21    what's supporting the original motion.  It's called

22    sandbagging.

23      You know, I'd like to make a motion to strike the Arnold

24    declaration in its entirety.  It's not responsive.  I

25    specifically point out that there are three declarations

1    from notorious vaccine skeptics, all discredited.  And, you

2    know, we'd like an opportunity -- certainly if the Court

3    were to consider granting this injunction, we would like an

4    opportunity to reply and explain why those three supposed

5    experts, Drs. Markovits, McCullough and Malone, should not be

6    credited one iota by this court, and we'd favor a

7    continuance if the Court were to rule in favor of

8    Plaintiffs.

9        You know, in conclusion, Your Honor, I just would say that

10   a preliminary injunction is an extraordinary remedy to be

11   used sparingly and only in a clear and plain case, and this

12   is not such a case.  Plaintiffs have failed to establish any

13   of the criteria for injunctive relief, and their motion

14   should be denied.

15       THE COURT:  Thank you.

16       Mr. Arnold, five minutes.

17       MR. ARNOLD:  Well, thank you, Your Honor.  Very well.

18   Thank you, Your Honor.

19       So first, the City's accommodation matrix does not

20   supersede the State's constitution, and it does not

21   supersede WLAD.  So the fact that the City may be in

22   compliance with their own matrix that they made up is

23   completely irrelevant to whether or not they're following

24   the law.

25       Your Honor, the City cannot point to any vaccination

1      requirement over the last hundred years or otherwise for a

2      vaccine that does not stop transmission.  The consensus

3      among scientists today, discredited or not -- the consensus

4      among the CDC has changed.  They've promulgated new guidance

5      even since Dr. Duchin's declaration that goes even farther

6      to indicate, for example, that masks are not even required

7      in healthcare settings anymore.

8          THE COURT:  Mr. Arnold --

9          MR. ARNOLD:  So, Your Honor, the City --

10         THE COURT:  Mr. Arnold, I need to ask you a question

11     because --

12         MR. ARNOLD:  Yes, Your Honor.

13         THE COURT:  -- you've made a statement repeatedly that

14     someone has represented to someone that the purpose of the

15     vaccine was to provide some type of 100 percent prevention.

16     Where in any of this briefing, where in any of the

17     information that has been presented to this Court would I

18     find the assertion, the credible assertion, that the purpose

19     of the vaccine was to provide a complete prophylactic

20     against Covid-19 pandemic?

21         MR. ARNOLD:  Your Honor, I think the Court can take

22     judicial notice that that is what has been -- was originally

23     promulgated by the CDC, it was stated by the president of

24     the United States, it was stated by multiple advisors to our

25     federal government, that this would be a complete

1     prophylactic; that has since changed.  And the CDC's

2     guidance has even --

3        THE COURT:  I decline to take such judicial notice,

4     Mr. Arnold.

5        MR. ARNOLD:  Thank you, Your Honor.

6        THE COURT:  But please proceed.

7        MR. ARNOLD:  I understand.  Yes, Your Honor.  If the

8     City's policy is based upon prophylaxis, it does not

9     accomplish that anymore.  And there is no authority that

10    they can point to where a vaccine mandate was upheld on that

11    basis.

12       And indeed, in this state, Your Honor -- which is very

13    different from Massachusetts, very different from Maine --

14       THE COURT:  And, Mr. Arnold, they're not -- that's not

15    what they're saying.  At no point has Mr. Pekelis ever

16    argued nor in any of the materials that I was able to find

17    and reviewed from the City as I was reviewing them, did I

18    ever see the City suggesting that the vaccine provided a

19    complete defense.  What the City is saying is that the

20    vaccine reduces the likelihood of spread to vulnerable

21    populations, and that is the governmental interest that

22    they're asserting.

23       So when you raise the straw man of complete prophylactic

24    effect, I have to tell you, Mr. Arnold, I'm not hearing

25    that's what Mr. Pekelis is saying.

1          Can you address the issue that they are raising, which is

2          that it reduces the likelihood of transmission?

3          MR. ARNOLD:  Yes, Your Honor.  We now know and the CDC has

4          said in their change guidance, that this is not as effective

5          of a vaccine as we originally thought.

6          Now, looking to the burden on the City, if the rest of the

7          fire department is vaccinated, then all they need to do to

8          avoid the risk of apparently these three individuals to each

9          other is put them on different shifts.  Then we have fully

10         vaccinated shifts, less these three individuals.  So that

11         removes that concern, that undue burden.

12         And moving to the undue burden, Your Honor, I have been

13         accused of --

14         THE COURT:  Well, once again, Mr. Arnold, I don't think

15         that's what Mr. Pekelis was saying.  And, again, maybe I'm

16         wrong, and if I am, please correct me.

17         MR. ARNOLD:  Your Honor, that is --

18         THE COURT:  What I hear him saying is it's not these three

19         individuals as it relates to each other.  It's that these

20         three individuals, if they were to reenter the SPD --

21         reenter into the workforce there, it is the potential -- the

22         almost-three-times potential that they could become

23         infectious and spread not only to -- potentially to their

24         vaccinated coworkers, but also to vulnerable populations

25         that SPD serves.  So can you address that, sir?

1          MR. ARNOLD:  Yes, Your Honor.  Absolutely, Your Honor.

2      So one of the things that an employer cannot rely on in

3      their undue burden analysis is a hypothetical risk.  That is

4      a hypothetical risk.  We have put information into the

5      record, including from Fire Chief Walsh, that shows this is

6      a minimal risk.  Millions of contacts with SFD, excuse me,

7      and the public before there was a vaccine resulted in one

8      known transmission of Covid.

9        We have in the record as well, the report and study from

10     Dr. Sayre, the City's own expert, saying that it is a low

11     risk for EMTs to transmit the virus.

12       So the City is relying on a hypothetical and a remote

13     risk, where under our state jurisprudence, particularly the

14     most recent case interpreting WLAD -- this is the Suarez

15     case out of Division II, the employer must take affirmative

16     steps in resolving the conflict between the religious belief

17     in this case, as was the case in Suarez, and the work

18     duties.  And only after they failed to take those

19     affirmative steps -- which I don't believe the fire

20     department has taken here -- only then can they have an

21     undue burden if it requires a significant expense.  They

22     have not articulated what that is in this particular

23     instance, Your Honor.

24       THE COURT:  So, Mr. Arnold, on that issue, on the

25     accommodation issue --

1          MR. ARNOLD:  Yes, Your Honor.

2          THE COURT:  And as an example, as you're aware, one of the

3     concerns was that the vaccines that were being offered, the

4     concerns that were raised by your clients, may have involved

5     the use of fetal stem cells.  Didn't I read within the

6     materials submitted that one of the accommodations that was

7     offered to your clients was the opportunity to use a vaccine

8     that did not use fetal stem cells?

9          MR. ARNOLD:  Your Honor, I would need additional expert

10    testimony to address the science behind that vaccine.  I do

11    know that it is still under an EUA.  I also know on the

12    legal side -- trying to stay more in my lane and not from

13    the science -- that the government does not get to inquire,

14    and the test is not whether or not the religious belief

15    asserted follows with the dogma of the specific

16    denomination.

17         I saw something in the opposition indicating that the

18    largest denomination, Christian denominations support --

19         THE COURT:  And, Counsel, and I followed your argument

20    there in terms --

21         MR. ARNOLD:  Oh, thank you, Your Honor.

22         THE COURT:  -- of what you're saying in terms of one

23    religious belief versus another.

24         MR. ARNOLD:  Thank you, Your Honor.

25         THE COURT:  I was just asking, when you raise the issue of

1    accommodation, I mean, in the materials that I read, it

2    appeared that there were accommodations offered that

3    addressed the concerns for -- the religious concerns made by

4    your clients.  And so that's why I was asking is why wasn't

5    that sufficient?

6       MR. ARNOLD:  Thank you, Your Honor.  I would have to

7    submit additional evidence from my clients about why that is

8    not significant -- not sufficient, Your Honor.

9       THE COURT:  Thank you.

10      MR. ARNOLD:  I can say that even if that were the case,

11   that is still not the least restrictive means.  That an

12   injection of an EUA product is still not the least

13   restrictive means when we know that when Covid was not --

14   when Covid continued to be a problem post vaccine, the

15   things that the fire department did are the exact things

16   that my clients have asked that they could do, such as

17   masking and frequent testing, and all of the things that

18   they were doing for two years or year and a half before the

19   vaccines became available before they were faced with this

20   termination.

21      So, Your Honor, this is a policy that has not solved the

22   problem.  And it is policy that to the extent there's any

23   burden, it is hypothetical and it is remote at this point.

24      Now, Your Honor, asked about the Tiffany Watson <sic>,

25   Watson email.  There is -- counsel indicated there is no

 1    evidence in the record that there was any prioritization.

 2    But there is evidence in the record, Your Honor.

 3    Mr. Lombard, who is a director -- also, there's an email

 4    that was uncovered in a Public Records Act request that

 5    shows that this disfavoring of religious accommodations was,

 6    in fact, a city-wide policy.  So there is the irrefutable

 7    email from Tiffany Watson.  I understand that they've

 8    attempted to distinguish that.  There is Mr. Lombard's

 9    email, which I don't believe they've attempted to

10    distinguish.

11      And then there's Fire Chief Walsh's testimony where this

12    individual is risking his career and his pension to come out

13    and tell the Court the truth.  In this procedural posture,

14    Your Honor -- we're not here on summary judgment, we're here

15    on a likelihood of success, and I would submit to Your Honor

16    that where there is an insider in a management position

17    who's willing to tell a court, regardless of the

18    consequences that he might suffer, that this was gone about

19    in the wrong way, that should bear on whether or not my

20    clients will be likely to succeed on the merits of their

21    claims.

22      THE COURT:  Thank you, Counsel.

23      MR. ARNOLD:  Thank you, Your Honor.

24      THE COURT:  Initially Mr. Pekelis' motion to strike the

25    Arnold declaration and to continue to allow rebuttal to the

1   expert declarations, that motion to strike and the motion

2   for continuance is denied.

3       The issue before this Court today is whether or not a

4   preliminary injunction should issue that would require the

5   reinstatement of these three plaintiffs.  I note that

6   Mr. Pekelis' observation that as we work through this, there

7   is a -- frequently a conflation of many of the issues, and I

8   most certainly understand that one of the issues that this

9   case presents relates to the discussion about the

10  effectiveness of various -- well, and certainly the

11  evolution of knowledge relates to the treatment and the

12  prevention and the significance of the Covid pandemic.

13      There's no question that the knowledge base that has

14  developed, the science that has developed, the guidance that

15  has both developed and been transmitted through various

16  public health and governmental agencies has changed.  And I

17  recognize that Mr. Arnold asks me to take a -- well, in some

18  respects, a rear-review as it relates to what was known then

19  versus what is known now.

20      And most certainly the science that relates to this issue

21  has been the subject of a strenuous public debate by

22  practitioners in the field of epidemiology and others who

23  have injected themselves, their views, into this area.

24      The significance here in the context of the decision that

25  the Court is being asked to make relates to the balancing

1    that must take place, whether the Court applies a rational

2    basis or a strict scrutiny standard in the context of the

3    importance of the public interest.

4       As my questions indicated, when Mr. Nathan <sic>

5    repeatedly said essentially that the vaccine was viewed as

6    being this perfect panacea, not only do I decline to take

7    public -- to take judicial notice of that, I note that from

8    the very beginning -- and I do take judicial notice that

9    from the very beginning, the efficacy rate of the various

10   vaccines were the topic of much public discussion.

11      The purpose of a vaccine, as was explained by Dr. Duchin,

12   it's not to provide a complete social panacea.  It is to

13   reduce the likelihood of infection, which, in turn --

14   especially when someone such as a firefighter is working

15   with distressed and autoimmune compromised in other

16   populations -- is to reduce, in turn the likelihood of the

17   spread of a disease which at one time so thoroughly

18   overwhelmed our public agencies and healthcare facilities as

19   to create situations in which individuals -- well, our

20   healthcare systems were being overwhelmed.  And we may not

21   be in that place now.

22      And the variants, as was explained in the defense, is

23   briefing the variants have evolved, but risk still remains.

24   And so when we look at the relief that is currently

25   requested by the plaintiffs in this case, essentially the --

1 the court order their reinstatement, the Court has to first

2 determine whether or not the plaintiffs are likely to

3 prevail on the merits of their claim.  And at this point,

4 based upon the information that has been presented, I do not

5 find that the plaintiffs are likely to prevail on the merits

6 of their claim, both because of the information that was

7 presented as it relates to -- and I note that the -- one of

8 the strongest arguments presented by counsel was the

9 difference between medical accommodations versus religious

10 accommodations.  But, again, based upon the supplemental

11 information that was presented in the sur-response, which

12 explained the nature of the medical accommodations and why

13 limited medical accommodations were allowed whereas most

14 medical accommodations were not, whether it's in the context

15 of accommodations, the plaintiffs not agreeing to

16 accommodations that were offered, the importance of the

17 public safety health crisis that the City faced and may well

18 continue to face.  And, again, I make no ruling on that

19 because that's not in front of me today.

20  And so I find that the plaintiffs have not established

21 that they're likely to prevail on the merits of their claim.

22  Additionally, as Mr. Pekelis argues, the issue here is not

23 one that creates a risk of irreparable harm, rather it is

24 one which should the plaintiffs prevail, that then the

25 result -- the relief that would be granted would be granted

1        in the form of monetary damages.

2          And so for those reasons, the request for a preliminary

3        injunction is denied.  I'll issue an appropriate order.

4          Thank you, Counsel.

5          MR. ARNOLD:  Thank you, Your Honor.

6          THE COURT:  I do want to ask.  Counsel, when -- and I know

7        that every judge is different, and I realize that you may

8        well be dealing with some judges that find large quantities

9        notebooks and papers to be very helpful.  Just as a heads

10       up, not only I, but I also want to suggest to you, many of

11       my colleagues -- and as you know, we've replaced two-thirds

12       of our judges in the last five years.  Many of us actually

13       are far more comfortable, and we actually find the use of

14       either the electronic filing system, which is KCscript,

15       where you file the working copy, eworking copies.  And if

16       you have a document that's too big for that, there's

17       actually a process that we use called ShareFile.  I strongly

18       encourage you, when you're working with particular judges,

19       find out what the best way for them to obtain working

20       copies.  Because I realize the immense effort that goes into

21       the creation of large quantities of paper.  And I can tell

22       you I find the use of eworking copies to be much -- it's

23       much easier for me to both be able to access, organize, and

24       work with those.

25         I also want to, again, suggest one eworking copies,

1       KCscript, which is the electronic court file, the ShareFile

2       system.  Some judges I have heard -- although, again, you

3       might want to double-check this -- like flash drives.

4       Increasingly we are finding that some flash drives have

5       imbedded in them viruses, and so increasingly we're moving

6       away from the use of flash drives for us to receive

7       electronic working copies.

8         So, again, I just strongly encourage you and request you

9       check with your judge, it might save you some work.

10        MR. ARNOLD:  Thank you, Your Honor.

11        THE COURT:  Thank you.  Thank you, Mr. Arnold,

12      Mr. Pekelis.

13        MR. PEKELIS:  Will do, Your Honor.  Thank you.

14        THE COURT:  Have a good day.

15                    (Conclusion of hearing)

16

17

18

19

20

21

22

23

24

25

```
1                    C E R T I F I C A T E

2

3     STATE OF WASHINGTON        )

4                                )

5     COUNTY OF KING             )

6              I, the undersigned, do hereby certify under penalty

7     of perjury that the foregoing court proceedings or legal

8     recordings were transcribed under my direction as a certified

9     transcriptionist; and that the transcript is true and accurate to

10    the best of my knowledge and ability, including changes, if any,

11    made by the trial judge reviewing the transcript; that I received

12    the electronic recording in the proprietary court format; that I

13    am not a relative or employee of any attorney or counsel employed

14    by the parties hereto, nor financially interested in its outcome.

15

16             IN WITNESS WHEREOF, I have hereunto set my hand this

17    20th day of October, 2022.

18

19    ___Bonnie Reed_____

20    s/ Bonnie Reed, CET

21    Reed Jackson Watkins, LLC

22    800 Fifth Avenue, Suite 101-183

23    Seattle, Washington 98104

24    Telephone: (206) 624-3005

25    E-mail: info@rjwtranscripts.com
```